UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE №: 6:26-cv-340

CTRLPEW LLC, ALEXANDER
HOLLADAY, CENTURION PARTNERS
GROUP, LLC, JONATHAN ADAMS, and
TREY BICKLEY,

*Plaintiffs*,

v.

DAVID CHIU, in his official capacity as San
Francisco City Attorney, and ROB BONTA, in
his official capacity as Attorney General of
California,

*Defendants*.

_____/

## DECLARATION OF ALEXANDER HOLLADAY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Alexander Holladay, declare the following:

1. I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called as a witness, I could and would testify competently to them.

2. I am a Plaintiff in this action. I reside in Florida.

3. I am the founder and operator of CTRLPEW LLC.

4. CTRLPEW LLC is operated from Florida.

5. I am an author, designer, publisher, curator, and digital artist. My work includes written publications, photographs, technical explanations, commentary, curated links, and three-dimensional digital models.

1

6. I create and publish firearms-related expression from Florida. I also curate and present firearms-related works by others on CTRLPEW. My publications are directed to readers, viewers, researchers, designers, hobbyists, collectors, historians, and others interested in firearms design, and arms culture.

7. CTRLPEW is a publication platform. I make editorial decisions about what to publish, what to highlight, how to describe works, how to organize them, and how to present them to the public.

8. My publications often combine technical information with political commentary, cultural references, historical references, humor, safety discussion, photographs, renderings, and personal explanation. I intend those works to be read, viewed, studied, discussed, criticized, and built upon.

9. I do not maintain an office in California. I do not reside in California. I do not perform the publication activity at issue in California. I do not buy any California-specific advertising. I do not direct anything to the state of California as opposed to readers generally on the open internet.

10. The relevant publication decisions are made by me in Florida. The works are created, edited, curated, and withheld from publication by me in Florida.

11. The materials I publish on CTRLPEW include written guides, photographs, renderings, screenshots, PDFs, hyperlinks, and three-dimensional digital models.

12. The three-dimensional digital model files I publish are typically in STL and STEP format. These are files that can be opened in common viewing software so a person can inspect the three-dimensional model.

13. The below image is one of my STEP models opened for viewing:



14. The below image is the same model in STL format:



15. I do not publish machine-specific G-code or machine-control files that command a printer, CNC mill, or other machine.

16. A person who downloads one of my model files does not thereby cause a firearm, firearm component, or any other object to be manufactured. The file can be opened, viewed, inspected, modified, or studied without manufacturing anything.

17. Many users interact with my works exactly that way. They read the written material, look at renderings and photographs, open the models in software, rotate and inspect them, compare them to other designs, or otherwise appreciate them.

4

18. Some people may use digital models as resources in a later manufacturing process. But that requires separate software, separate human decisions, and additional user input. Those decisions are not supplied by the model file itself.

19. My works communicate ideas about private arms ownership, technical self-sufficiency, mechanical design, historical design lineage, and resistance to laws or cultural attitudes hostile to private arms ownership.

20. My works also communicate through aesthetics. I use shape, proportion, ornamentation, visual references, historical references, political references, and design choices to communicate meaning.

21. One example is the Joshie Woshie 9 project. The Joshie Woshie 9 is a three-dimensional digital work depicting a pistol-frame design that includes political, artistic, and cultural elements, including stylized artwork, and a political URL. True and correct representative images of this work are included here:





22. I intended the Joshie Woshie 9 to be viewed as a visual, technical, political, and cultural work. The model's appearance and presentation are part of the message.

23. Another example is the TacDaddy publication. The TacDaddy README is a written and visual publication. It includes cover art, a personal foreword, commentary, renderings, original photographs, humor, safety discussion, and design explanation. A true and correct copy of the TacDaddy README is attached to the amended complaint as Exhibit 7. (Doc. 34-7).

24. The TacDaddy README is intended to be read by humans. It reflects my voice, editorial judgment, and explanation of the project. It communicates not only technical information, but also the reasons for the project, the cultural context for the project, and my own commentary.

25. Another example is the Plastikov V4 reinforced fire-control housing that I have withheld from publication because of Defendants' enforcement campaign.

26. The Plastikov V4 reinforced fire-control housing is both expressive and useful. It incorporates design cues associated with Soviet-era and related firearm design, and it comments on, adapts, and recontextualizes those design cues in a modern distributed-design setting.

27. Another withheld project involves a zigzag-cylinder concept inspired by unusual historical design paths, including mechanisms associated with E.K. Root and Samuel Colt, and modern references to Emilio Ghisoni's Mateba

revolvers. I have described that project as a kind of "small museum" of unusual mechanical ideas.

28. That project is designed to preserve and present historical mechanical ideas that are otherwise obscure. It combines historical reference, design exploration, and science-fiction or retro-futurist aesthetics to communicate ideas about design lineage, technological experimentation, and the preservation of abandoned mechanical concepts.

29. I intended that project to be viewed, studied, discussed, and critiqued by other designers and readers. I also intended it to invite future designers to think about forgotten or abandoned mechanisms in new ways.

30. My curation of other authors' works is also expressive. I decide which works to include, how to describe them, how to categorize them, and how to present them to the audience. Those choices communicate my view about what is technically significant, culturally significant, historically interesting, or politically important.

31. Before Defendants' enforcement campaign, I published and intended to continue publishing firearms-related works through CTRLPEW and related online channels.

32. I became aware that Defendants Rob Bonta and David Chiu, through the California Attorney General's Office and San Francisco City Attorney's Office, filed an enforcement action in California state court concerning firearms-related digital publications.

8

33. I understand that Defendants seek penalties, injunctive relief, and other remedies under California Civil Code §§ 3273.61 and 3273.625.

34. I understand that those statutes include severe civil penalties and that Defendants' theory treats publications such as written instructions, digital models, web pages, and links as actionable if Defendants believe they promote, facilitate, or assist unlawful manufacture of firearms in California.

35. I also understand that Defendants have indicated they may seek preliminary injunctive relief and may attempt to implement relief through third parties, including internet service providers or other intermediaries that support my websites and online profiles.

36. I take that threat seriously. If Defendants succeed in pressuring or compelling third-party service providers, the result could disable or burden CTRLPEW's website, associated profiles, publication channels, hosting, domain services, distribution channels, or audience access.

37. A third-party takedown or service interruption would not be limited to California readers. It could prevent Florida readers from accessing my works. It could prevent me, in Florida, from publishing to willing Florida readers and recipients.

38. Since becoming aware of Defendants' enforcement campaign, I have stopped publishing new firearms-related works that I otherwise would have published.

39. I am withholding the works described below because I fear that Defendants will use California Civil Code §§ 3273.61 and 3273.625, or related California-

law theories, to seek penalties, injunctions, or third-party disruption based on my Florida publication activity.

40. My decision to stop publishing is not voluntary in the ordinary sense. I want to publish these works. I have not published them because Defendants' enforcement campaign creates a credible threat that doing so will expose me, CTRLPEW, or my publication infrastructure to penalties or third-party disabling.

41. But for Defendants' threatened application of California Civil Code §§ 3273.61 and 3273.625 to my Florida publications, I would immediately resume publishing firearms-related works from Florida.

42. If this Court enters an injunction preventing Defendants from applying or effectuating those California statutes against my Florida publication activity, I intend to publish the withheld works described below.

43. I also intend to continue updating, curating, and publishing written guides, photographs, renderings, commentary, links, and digital models through CTRLPEW.

44. My inability to publish causes immediate harm to me. It prevents me from speaking to my audience. It prevents me from releasing works I have created. It prevents discussion, critique, feedback, and further development of those works.

45. The harm is not limited to lost revenue, if any. The primary harm is the loss of speech, loss of audience engagement, loss of timely publication, loss of

10

community discussion, and loss of my ability to participate in public debate and technical culture.

46. Delayed publication changes the value of my speech. These works are part of an active public and technical conversation. If I cannot publish when the works are ready, I lose the ability to participate in that conversation at the relevant time.

47. The enforcement threat also harms readers and recipients in Florida. I know that readers use CTRLPEW to study, archive, discuss, and learn from firearms-related works. When I do not publish, those readers cannot receive the works I would otherwise make available.

48. I cannot reliably publish to the open internet while guaranteeing that no person in California will ever access the publication. I do not know the true physical location of every person who views or downloads material from CTRLPEW or related platforms.

49. Third-party platforms do not provide me with a reliable way to make a publication available in Florida while excluding every non-exempt California user. Even where location tools exist, they are imperfect and can misidentify users or block lawful users outside the targeted area.

50. Attempting to comply with Defendants' theory by removing or disabling material would suppress access for lawful Florida readers and recipients. It would also impair CTRLPEW's role as a publication platform.

51. I do not seek to manufacture anything in California. I do not seek to sell physical firearms in California through this case. I seek to publish and receive speech from Florida and to make my works available to willing lawful recipients in Florida.

52. The requested injunction would redress my injury. If Defendants are enjoined from applying or effectuating California Civil Code §§ 3273.61 and 3273.625 against my Florida publication activity and Florida publication infrastructure, I will resume publishing the withheld works.

53. The following are works I have been forced to withhold as a result of Defendants' activity:

    a. The PepperGrinder



        i. Project Package Contents

1. Digital Model Files consisting of seven displayable model files in ".step" and ".stl" format to help visualize it.

2. Accompanying this is an instruction document containing my personal commentary and narrative, a parts list, and illustrations and photographs related to the instructions in the document.

ii. I started this project thinking about the zigzag-cylinder revolver, a mechanism that has fascinated me since I first encountered it years ago. The idea goes back to 1855, when E.K. Root, an employee of Colt, designed a revolver whose cylinder was indexed by precise tracks machined into its exterior rather than by the hidden internal clockwork of gears, levers and pawls that we experience today. It saw limited commercial success, largely because those external tracks were difficult to machine accurately and were exposed to everything the real world could throw at them. It was, in short, a road briefly traveled. I am drawn to those roads. My goal here was to update an ancient concept into something utilitarian and sci-fi stylized, while keeping the zigzag idea alive in the current zeitgeist. I don't claim the mechanism was right. I want it preserved and in front of the next generation of designers, so they can study it, be inspired by it, and maybe develop it into something the original never could be. And

underneath all of it, stripped of the aesthetics, this is a series of simple pistons and levers. That plainness is the point, because it lets me say something I could not say any other way. Removed of all the veneer and preconceptions of the viewer, all the things taught to us over decades of education and through encouraged inexperience. These are not complicated machines. By designing this firearm and sharing my thoughts about it, I am making a statement: that the government should not be restricting these objects and that the social stigma ingrained by the institutions that support our society is undeserved. That these files in their digital forms are expressive in the same vein as a sculptor in clay or bronze. The digital format allows for the preservation of my own expression and for a collection of other parties to build upon it, making it their own, which is an act encompassed and expressly intended in my choices of release venue. This is a living art, designed, released, and intended for many hands to observe it, study it, experience it, evolve it, and build upon it.

    iii.  In short: I want people to look at it and think "woah, that's weird!"

b. The Suoza – The Suoza, a future-facing design, and a tribute to the friends who made me a better designer and engineer along the way, from late nights playing video games, to service with the United States Military, and beyond.

14



    i. Project Package Contents

        1. Digital Model Files in ".step" and ".stl" format.

        2. Instruction document containing my thoughts and commentary on this design, as well as a parts list, and embedded illustrations or images related to the instructions in the document.

    ii. As a CAD designer and firearms enthusiast, I recognized that the Kel-Tec SU16 shares much of its form and function with the AK: a similar operating logic and layout, close enough that it could stand in as the mechanical heart of the rifle I had in mind. That kinship is what made it practical. It was also American, designed and built here, and I wanted an American core under this rifle for reasons that have less to do with the mechanism than with the shape I chose to wrap around it.

    iii. As a Veteran of the United States Armed Forces, I am proud of being an American, and proud of what America stands for. My

15

time in the service taught me a great deal about the significance and history of firearms.

iv. The shape of the Suoza is an homage, though not to the weapon a historian would recognize. Its silhouette and bullpup character echo the OTs-14 Groza, "Thunderstorm," a compact Russian bullpup built on the bones of the AKS-74U and introduced in 1994. Thus, the Suoza is a satire which tells us that even the most advanced firearms made in Russia, long a hostile power to the United States, are inferior to American hardware dressed up like those Russian weapons.

v. I did not meet the OTs-14 as a piece of Soviet hardware. I met it in the early 2000s in the Tom Clancy Ghost Recon games, a low-fidelity shape on a screen. I wanted one long before I understood what it was. That want followed me. I was inspired in part to serve because of the bravery displayed by America's finest virtual warriors.

vi. As my knowledge of firearms grew, through my own service and the years after, the Groza matured in my mind from a pixelated object of fascination into a real rifle I wished to hold and to understand. This longing for the passions of youth and the long nights of video games with old friends is the exact feeling I feel

16

when looking at the models for this firearm, and I wish for others who are interested to join me in this nostalgia.

vii. In short: I want people to look at it and think about video games, America, service, bravery, and the way these things shape our lives and influence our desires.

c. Improved, Soviet-inspired Plastikov V4 fire control housing



i. This package consists of a single displayable model file in ".step" and/or ".stl" format.

ii. Current State

1. This project is complete, pending release. This will be published immediately should the defendants be enjoined.

iii. As I explained in my declaration attached to the first amended complaint (Doc. 34-8), I intended for this design to suggest a sort of political dissonance, in addition to echoing the recursion which is necessarily found in design. I wish for others who are interested to be able to inspect the models of this design and to hear the echoes of a design from a place without property, a place that no longer exists.

iv. In short: I want people to look at it and think about the Soviet Union, and the lessons that it taught us.

d. Space Cowboy Grips



i. This package consists of two displayable model files in ".step" and/or ".stl" format.

ii. The "Space Cowboy" Grips are about finding identity in a strange land. I grew up half-Japanese in the rural Midwest in a place where there were not many others like me. Frankly, there were not many others like me for a long way in any direction. I always understood, in the abstract, that the Japanese side of my heritage came from a culture built differently than the one around me: polite and measured in a way my small town would have recognized, but far more formal, more structured, more particular about the public-facing shape of things.

iii. One part of my ancestral cultural identity that I identified with in my formative years was the Anime TV show "Cowboy Bebop."

iv. The figurehead firearm of the series, carried by its main character, is a Jericho 941R. As the firearms-and-Bebop community has long catalogued, the production team rendered it with extraordinary fidelity, down to the K.B.I. import rollmarks that appeared on the specific early-1990s American-imported, rail-less models. Because of Japan's strict firearm laws, animators of that era worked from what they could get: Western gun magazines, imported model guns, and whatever real reference was available. They copied that reference line for line, including the import marks that came with it, and carried them faithfully into the show. What was completely unique, though,

19

were the handgrips attached to that pistol. They were a product of the same creativity that makes Cowboy Bebop one of the greatest shows of all time.

v. These grips are my way of reimagining that unique feature. As an animated show, Cowboy Bebop only ever displayed these grips in three dimensions. My design takes them into the 21st Century, and into a whole new dimension, allowing fans of the show to view the details of these grips on their computers like never before. I wish to take the object that sat at the crossing point of my heritage, my isolation, my first reach into the wider world, and share the feeling of love that a show gave a kid who did not have many other places to find it.

vi. In short: I want people to look at it and think about my favorite Anime TV show, which inspired me to embrace my heritage and culture.

vii. However, I understand Californa's law to be so overbearing that it prohibits even sharing the digital model files for grips for common handguns (§ 3273.50 (c)).

e. Article: Colonial Gun Building in America

i. American gun building evolved between 1607 and 1776 from a scarce, import-dependent repair trade into a regional craft network capable of arming a revolution, driven by militia laws

20

that created steady demand, immigrant artisans who introduced rifling and the boring mill, and Revolutionary-era contracts that imposed early production standards. The conclusion contrasts this trajectory of growing accessibility with modern proposals to embed firearm-blocking software in 3D printers, using the Stamp Act and the 1990s Clipper Chip to suggest that restrictions on the tools of a distributed craft tend to be evaded rather than obeyed.

    ii. I began researching and drafting this work in mid-2024 but stopped because the State's enforcement conduct would certainly consider it "encouraging" home manufacture. If defendants are enjoined, I will resume the work and publish it.

f. Article: The History of the Improvised Firearm

    i. "The History of the Improvised Firearm" is a long-form work of historical scholarship tracing the craft, clandestine, and hobbyist production of firearms from roughly 950 CE to the present, classifying a weapon by the origin of its production rather than its eventual fate. Spanning the bamboo fire-lances of Song China to the FGC-9 in Myanmar.

    ii. I began researching and drafting this work in mid-2024 but stopped because the State's enforcement conduct would certainly consider it "encouraging" home manufacture. If defendants are enjoined, I will resume the work and publish it.

21

54. Lost Revenue, Opportunity, and Reputational Harm.

a. CTRLPew is a media company that covers the 3D-printed firearm community without itself manufacturing, selling, or dealing in firearms. Although it operates outside the firearms industry, it faces the same heavy regulation and scrutiny imposed on that industry by governments, financial institutions, social media platforms, commerce platforms, and nearly every facet of technology infrastructure.

b. As such, CTRLPew is unable to monetize its content in the traditional forms available to media companies. It is categorized and restricted by proximity to and association with the firearms industry rather than by anything it actually does.

c. Because conventional monetization is foreclosed to it, CTRLPew is unusually dependent on the direct support of its audience, deriving its primary income from merchandise such as stickers, patches, and shirts, along with donations and a limited number of affiliate marketing agreements. Each of these depends on a single underlying asset: CTRLPew's ability to consistently reach and communicate with its audience.

d. That audience relies on a consistent schedule of content across social media platforms. Together this content drives visitors to CTRLPew.com, where they may then purchase these trinkets and baubles in support.

22

e. CTRLPew's revenue depends on a direct chain: consistent content across social media and the website drives audience engagement, that engagement drives visitors to CTRLPew.com, and those visitors sustain the merchandise sales that constitute the company's primary income. By forcing CTRLPew silent, the action severs that chain at its source.

f. As a direct result of ceasing publication, I have lost substantial income and have seen my audience dwindle.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of May, 2026 in Orlando, Florida.

ALEXANDER ゆき HOLLADAY