UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE №: 6:26-cv-340

CTRLPEW LLC, ALEXANDER
HOLLADAY, CENTURION PARTNERS
GROUP, LLC, JONATHAN ADAMS, and
TREY BICKLEY,

*Plaintiffs*,

v.

DAVID CHIU, in his official capacity as San
Francisco City Attorney, and ROB BONTA, in
his official capacity as Attorney General of
California,

*Defendants*.

_____/

## DECLARATION OF JOHN LETTMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1. I am John Lettman, a resident of the Commonwealth of Pennsylvania.

2. I am over the age of eighteen and competent to make this declaration, and if called as a witness, I could and would testify competently to them.

3. I am an Embedded Software Engineer and Site Reliability Engineer with 13 years of experience in related fields, particularly in the design, management, programming, deployment, and maintenance of computer software systems.

4. I make this declaration based on my personal knowledge, technical experience, and understanding of digital design files, computer-aided design, computer-aided manufacturing, and Internet distribution systems.

1

## <u>Digital Model Files vs. Manufacturing Instructions</u>

**Digital Model Files**

5.  "Digital Model Files" such as STEP (a/k/a STP), STL, OBJ, and similar formats are not self-executing manufacturing instructions. They do not, (and cannot) by themselves, cause a machine to manufacture an object.

6.  STEP (a/k/a STP), commonly exchanged as ".step" or ".stp" files, stands for "Standard Exchange of Product Model Data."

7.  It was developed as an ISO standard, ISO 10303, to allow different computer-aided design (CAD) systems to exchange CAD geometry without proprietary formats.

8.  STEP files are used to convey characteristics of a three-dimensional object.

9.  The following is an image of the "Joshie Washie" artistic Digital Model File rendered with glass material properties and raytracing within a three-dimensional viewer computer program.





10. STL, commonly exchanged as ".stl" files, is a shorthand for "stereolithography," originally documented by 3D Systems, Inc. in the late 1980s.

11. ISO/ASTM 52915:2013 also describes STL as the longstanding industry-standard transfer format between design programs, while noting that an STL file contains only surface-mesh information and lacks provisions for color, texture, material, substructure, and similar object properties.

12. STL files are used to represent the surface geometry of a three-dimensional design as a mesh of triangles.

13. The following images are the "Joshie Washie" rendered with a wireframe showing the triangle composition within a 3D viewer computer program.



14. STEP and STL files are representations of geometry. They may describe the shape, scale, contour, or visual structure of a three-dimensional object, but they are not machine-control programs.

15. These files may reflect artistic choices, aesthetic design, engineering judgment, dimensional relationships, proportions, and other expressive or analytical decisions.

16. They are capable of being viewed, rotated, rendered, measured, inspected, studied, or modified entirely on a computer without manufacturing anything.

**Manufacturing Instructions: G-code and CAM**

17. By contrast, G-code and Computer-aided manufacture (CAM) output are machine-control instructions generated for a particular manufacturing process, machine, tool, material, setup, and set(s) of operating parameters.

18. G-code was developed in the 1950s by MIT, and is capable of being written and interpreted by humans.

19. G-code contains commands directing a machine how and where to move, at what speed, with what tool, at what feed rate, and other process-specific settings such as temperature.

20. Below is a sample G-code program written to illustrate the cutting of a rectangular pocket.

```
O1001 (Sam...gram.gcode*   ✏ ✕
        O1001 (Sample 3-axis mill program: shallow rectangular pocket)

        G20 (Use inch units)
        G17 (Select XY plane for circular/linear interpolation)

        T1 M06 (Load Tool 1 and perform tool change)
        S3000 M03 (Set spindle speed to 3000 RPM and turn spindle clockwise)

        G54 (Use work coordinate offset G54)
        G00 X0.000 Y0.000 (Rapid move to program origin in X and Y)

        M08 (Turn coolant on)

        G00 X0.250 Y0.250 Z0.1 (Rapid to starting corner of pocket)

        G01 Z-0.050 F10.0 (Feed down into material to Z -0.050 at 10 inches/minute)

        G01 X1.750 Y0.250 F20.0 (Cut along the first side of the rectangle)
        G01 X1.750 Y1.250 (Cut along the second side of the rectangle)
        G01 X0.250 Y1.250 (Cut along the third side of the rectangle)
        G01 X0.250 Y0.250 (Cut along the fourth side, returning to start)

        G00 Z0.100 (Rapid retract to 0.100 above the part)

        G00 Z1.000 (Rapid retract to safe height above the part)
        M09 (Turn coolant off)

        M05 (Stop spindle)

        M30 (End program)
```

21. G-code is best understood as describing the planned movement(s) of manufacturing equipment in a human-intelligible manner.

22. The overwhelming majority of desktop 3D-printers contain G-code interpreters and accept G-code instructions.

23. G-code is an interpreted control language associated with ISO 6983 programming formats for numerical control machines, and in practice it is read

7

by a machine controller or controller software rather than executed directly as native binary code.

24. The RS274NGC interpreter, for example, is described by the National Institute of Standards and Technology (NIST) as software that "reads numerical control code and produces calls to a set of canonical machining functions."[1]

25. G-code is readable shorthand language, for example:

a. G20 – this sets the units to inches.

b. G21 – this sets the units to millimeters.

c. G00 X10 Y20 Z5 – this moves the tool to (10, 20, 5) in the (X, Y, Z) coordinate space as rapidly as possible (usually without touching the workpiece).

d. G01 X10 Y20 Z5   this moves the tool to (10, 20, 5) in the (X, Y, Z) coordinate space subject to whatever feedrates are active in memory (usually while working with the material). For example, G01 X10 Y20 Z5 F1 would move the tool to the same location at 1 unit per minute (or 1 unit per revolution in feed-per-revolution mode).

e. M08 – this turns on coolant flow.

f. M09   this turns off coolant flow.

26. G-code may be written or evaluated without the intervention of computer software programs (i.e., by hand).

---

[1] https://www.nist.gov/publications/nist-rs274ngc-interpreter-version-3

27. When a G-code file is loaded into a machine, the interpreter reads the program block by block.[2] It parses commands such as motion or movement commands, coordinates, feed rates, spindle or material extrusion commands, tool selections, offsets, units, and settings. The interpreter maintains the machine state, including whether coordinates are absolute or incremental, whether the program is using inches or millimeters, what coordinate system is active, what feed mode applies, and what prior commands remain in effect.

28. A single line of G-code may therefore have different meanings depending on the machine, machine configuration, and preceding state.

29. In a high-level sense, G-code is closer to a "scripting" or "command" language than to a self-contained executable program code.

30. Unlike a Digital Model File, G-code is intended to be executed by a machine interpreter rather than viewing the characteristics of a three-dimensional object.

31. As a result, viewing the G-code as a three-dimensional object requires the simulation of the instructions in the G-code to estimate what it will create.

**Machine G-Code Interpreter and Motion Controller**

32. On the lowest level, the interpreter does not merely "make" a part.

33. The translation performed by the interpreter parses the G-code program into controller-level operations such as linear moves, arc moves, dwell commands,

---

[2] In the sample program above, each "block" is represented by the number on the left side of the program.

tool chances, spindle or header commands, coolant or fan commands, and other machine functions. This is the "canonical machining functions" described *supra.*

34. Those "canonical machining functions" are performed by the motion controller firmware as part of their real-time control work.

35. The commands are converted into trajectories subject to the machine's limits.

36. The motion controller then outputs still lower-level electrical commands, such as step-and-direction pulses for stepper drives, position or velocity setpoints for servo drives, header or fan pulse width modulation (PWM) signals, spindle control signals, or other actuator commands.

37. Accordingly, G-code may be viewed as the written shorthand list of instructions provided by humans or other software to the firmware performing the actual electrical signaling to the components of the machine.

**Differences**

38. The existence of a STEP or STL Digital Model File does not determine whether an object can be manufactured safely, reliably, or accurately. This is because Digital Model Files lack the requisite manufacturing instructions necessary for a machine to manufacture something.

39. Digital Model Files are used for many purposes, including artistic expression, political commentary, assets for rendering video games, movies, or other animated mediums, scans of physical objects or places, medical diagnostics, simulations, and more.

40. Digital Model Files may be used as resources for a manufacturer who wishes to manufacture something that a Digital Model Files depicts.

41. This process requires separate software and human input, including selection of CAM software, machine firmware, machine type, material, tooling, orientation, supports, infill, layer height, speeds, feeds, temperatures, tolerances, post-processing, fixturing, calibration, and inspection.

42. As such, a Digital Model File cannot itself cause a manufacturing machine to begin the process of creating something physical with only the information contained in the Digital Model File.

43. A person may open the Digital Model File in CAD software or a three-dimensional viewer to rotate it, zoom in and out, examine its geometry, render images of it, compare it to other designs, study its engineering features, or critique its artistic or technical aspects.

44. None of these uses require the sort of additional human input required to use a Digital Model File as a resource for operating a manufacturing machine.

45. The parameters of their manufacture must be defined before software may generate machine instructions referencing the geometry information present in the Digital Model Files.

46. In my opinion, treating STEP or STL files as equivalent to manufacturing code is incorrect.

47. A Digital Model File is more analogous to digital artwork, photographs, or sculptures: it depicts the way something *looks*, but it does not bear instructions on how to *make* it.

**Code Distinction**

48. To reiterate, Digital Model Files are usually stored in computer-readable formats, but that does not make them "code."[3]

49. Many ordinary digital files are computer-readable without being code.

50. For example, a JPEG image contains visual, pictural, or photographic information that software can display, but the JPEG file itself does not instruct a machine to start manufacturing whatever is shown in the JPEG.

51. Thus, a JPEG is data representing an image, and software can display that data for humans to view as an image.

52. A Digital Model File is similar in that respect: it is data representing a three-dimensional object.

53. The fact that software can open, parse, interpret, display, measure, or transform a digital file for a human to view does not mean that a Digital Model File is code.

54. Digital Model files are merely digital content: occasionally technical, occasionally artistic, sometimes banal, other times engaging, other times documentary – and even mixes between these categories as well.

---

[3] "Code" meaning executable computer software, instructions, mundane lists of unexpressive declarative actions.

55. A salient example is the process of printing a JPEG. In this example, we start with the assumption that an individual (the "user") takes a photograph of the Mona Lisa with their camera:

   a. The user opens the JPEG file on their computer and an application, typically the "photo viewer" installed with their Operating System (e.g., Microsoft Windows, Apple macOS, GNU/Linux).

   b. The photo viewer decodes the JPEG compression, decompresses the image data, and renders the image data into a device-independent bitmap (DIB) or similar in-memory representation.

   c. When the user issues the print command for the photograph, the Operating System receives the request and forwards the image data to the "print spooler" service.

   d. The print spooler is a service on an Operating System for managing print jobs to printers associated with the user's computer.

   e. The print spooler queues the print job.

   f. Prior to sending the photograph data to the printer, the print spooler converts the data into the format understood by the printer, called the Page Description Language (PDL).

   g. Here, the PDL is similar to G-code. It is an intermediate representation for the machine, in this case a printer, to understand.

   h. Several PDLs exist, but the most common are:

      i. PostScript (".ps"): a vector-oriented, Turing-complete language originally developed by Adobe.

      ii. Printer Command Language (PCL): commonly used by Hewlett-Packard printers.

      iii. Direct Raster: commonly used by inkjet and budget printers lacking full PostScript support.

  i. The converted PDL data is transmitted to the printer for the onboard processor or Raster Image Processor (RIP) to interpret.

  j. Here, the processor or RIP is similar to the motion controller of a manufacturing machine. It is the interpreter of intermediate instructions used to command the components of the printer.

56. Thus, the printer is unable to directly print the JPEG:

  a. It must be first opened in specific software.

  b. The user must instruct the software on how to print it, including parameters such as width, height, color, and quality.

  c. The software must then interpret the JPEG and create instructions for the specific printer in an intermediate language.

  d. The user, software, or Operating System must then convey the instructions to the printer.

  e. The printer must interpret the instructions and execute specific commands to internal components to produce the page.

57. Similarly, a 3D printer or a CNC machine is unable to directly operate from a Digital Model File:

    a. It must be first opened in specific software.

    b. The user must instruct the software on the machine's parameters, materials, limits, and more.

    c. The software must then interpret the geometry within the Digital Model File and create instructions for the specific manufacturing machine in G-code (or a similar intermediate language).

    d. The user or software must then convey the instructions to the manufacturing machine.

    e. The manufacturing machine must interpret the instructions and execute specific commands to internal components to shape the material.

58. In many cases, "one-shot" manufacturing is not feasible for a particular design due to the limitations of the manufacturing machine or the complexity of the resulting object.

59. Users may need to perform several operations, rotating or relocating the material between each operation.

60. In those cases, the user may produce several G-code files for one or more related Digital Model Files to manufacture the design, each performing an operation on different parts of the material.

**Limiting Online Access**

61. I also understand that some parties have proposed limiting access to certain online materials only for users in California, while leaving access available elsewhere.

62. In my opinion, reliable California-only exclusion is not technically feasible with ordinary internet distribution tools.

## User Localization

63. Websites and platforms generally do not know a user's true physical location with certainty.

64. They may rely on Internet Protocol (IP) address geolocation, account information, billing information, shipping information, device signals, or self-reported location.

65. Each of these methods is incomplete and can be inaccurate.

66. Users may access the internet through VPNs, proxies, corporate networks, cloud services, mobile carrier networks, public Wi-Fi, Tor, or other routing systems that obscure or misidentify location.

67. Mobile networks and internet service providers may route traffic through infrastructure located outside the user's actual state.

68. Conversely, a user outside California may appear to be in California because of routing, carrier gateways, database errors, or platform-level location assumptions.

16

69. IP geolocation[4] databases are probabilistic and can be wrong, especially at state-level precision.

70. Many third-party hosting platforms, social media services, marketplaces, code repositories, cloud storage providers, and file-distribution services do not provide a reliable mechanism for a publisher to exclude only California users while preserving access for all non-California users.

71. Even where crude geoblocking[5] tools exist, they are not uniformly available, not always State-specific, and not reliable enough to determine a user's legal status.

**User Citizenship Evaluation**

72. A publisher also generally lacks user-by-user knowledge of whether a particular person is subject to, exempt from, or otherwise outside the scope of a particular State restriction.

73. The publisher typically cannot determine whether a user is a California resident, physically present in California, temporarily traveling, acting on behalf of an exempt entity, licensed, authorized, or otherwise legally permitted to access the material.

74. There is no reliable public database that allows an ordinary online publisher to make those determinations for each user in real time.

---

[4] "Geolocation" is the use of technology that identifies (or, almost always, *estimates*) the location of a user based on available data.

[5] "Geoblocking" is the use of technology that restricts access to Internet content based on the geographic origin of the user requests.

75. The collection of the necessary personally identifiable information (PII) to perform precise geolocation and/or citizenship tests would subject those attempting any semblance of good faith compliance to liability on breaches or expensive safeguards.

76. For example, using a drivers license for geolocation and/or citizenship tests would require the handling of a document that could otherwise be exploited for identity theft if the computer system experiences an intrusion by a malicious actor.

77. On the other side of this example, the collection of this information chills user interaction with otherwise benign expression. A gatekeeper requiring sensitive PII necessarily creates pause for the average user.

78. Extended further to the societal level, the normalization of PII collection necessary to establish, with certainty, the users' geographic location and State citizenship could expose potentially millions of Americans to further intrusions to their identity, privacy, and individual expression.

79. The collection of the PII alone does not solve the problem as one must validate it against a known authority, such as each individual State.

80. Public systems for the purpose of PII validation generally do not exist as they could easily become a vector for violating the privacy rights of constituents in each State.

81. Because of these technical and practical limitations, a demand that material be made unavailable to California users may not be achievable by California-only exclusion.

82. In practice, a takedown request sent to a third-party platform often results in removal or disabling the material globally or nationwide, not merely within California.

83. Such a removal prevents access by users outside California as well, including users in jurisdictions where access may be lawful.

84. Accordingly, in my opinion, there is a meaningful technical distinction between Digital Model Files and machine-executable manufacturing instructions, and there are substantial practical barriers to implementing reliable California-only exclusion without also burdening or disabling access by non-California users.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of May, 2026, in Bradford, Pennsylvania.

JOHN LETTMAN