UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

|  |  |
|---|---|
| CTRLPEW LLC *et al.*,<br><br>                              Plaintiffs,<br><br>v.<br><br>DAVID CHIU, in his official capacity as San Francisco City Attorney, and ROB BONTA, in his official capacity as Attorney General of California,<br><br>                              Defendants. | Case No.: 6:26-cv-340-PGB-RMN |

**DECLARATION OF KARUN TILAK IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Karun Tilak, declare as follows:

1.      I am over the age of eighteen. I have personal knowledge of the facts stated in this declaration, and, if called as a witness, I could and would testify competently to them.

2.      I am counsel for Defendant San Francisco City Attorney David Chiu in this action.

3.      I am also counsel for plaintiff the People of the State of California (the "People") in *People of the State of California v. Gatalog Foundation, Inc.*

1

*et al.*, S.F. Super. Ct. Case No. CGC-2-633508 (the "California enforcement action").

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the complaint filed in the California enforcement action. Plaintiffs CtrlPew LLC ("CtrlPew") and Alexander Holladay are named as defendants in the California enforcement action.

5.      On March 30, 2026, CtrlPew and Holladay filed a motion to quash service of summons for lack of personal jurisdiction in the California enforcement action. A true and correct copy of that filing is attached hereto as **Exhibit 2**.

6.      On April 1, 2026, the People filed a motion for a preliminary injunction in the California enforcement action. Attached hereto as **Exhibit 3** is a true and correct copy of the memorandum of points and authorities in support of the People's motion for preliminary injunction. Attached hereto as **Exhibit 4** is the proposed order submitted by the People in relation to their preliminary injunction motion.

7.      On May 20, 2026, CtrlPew and Holladay filed their reply brief in support of their motion to quash service of summons for lack of personal jurisdiction. Attached hereto as **Exhibit 5** is a true and correct copy of that filing.

2

8.    A hearing on CtrlPew and Holladay's motion to quash was set for June 5, 2026.

9.    On June 5, 2026, the California court issued an order continuing a hearing on the motion to quash to allow the parties to conduct jurisdictional discovery.  The court set a further status conference on August 14, 2026 to discuss supplemental briefing on the motion to quash and a continued hearing date on the motion to quash.

10.    The California court has also vacated the briefing schedule and hearing date for the People's preliminary injunction motion, and has indicated that those will only be reset after the to-be-scheduled continued hearing on the motion to quash.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of June 2026, in San Francisco, California.

/s/Karun A. Tilak
Karun A. Tilak

# EXHIBIT 1

ROB BONTA (SBN 202668)
Attorney General of California
NICKLAS A. AKERS (SBN 211222)
Senior Assistant Attorney General
MICHAEL E. ELISOFON (SBN 240707)
Supervising Deputy Attorney General
VESNA CUK (SBN 309157)
ANDREW J. WIENER (SBN 282414)
DANIEL DUBOIS (SBN 345123)
BRENDAN RUDDY (SBN 297896)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3782
  Fax:  (415) 703-5480
  E-mail:  vesna.cuk@doj.ca.gov

DAVID CHIU (SBN 189542)
San Francisco City Attorney
YVONNE R. MERÉ (SBN 175394)
Chief Deputy City Attorney
SARA J. EISENBERG (SBN 269303)
Chief of Complex and Affirmative Litigation
RONALD H. LEE (SBN 238720)
Asst. of Complex and Affirmative Litigation
KARUN A. TILAK (SBN 323939)
Deputy City Attorney
  Fox Plaza
  1390 Market Street, 6th Floor
  San Francisco, CA  94102-5408
  Telephone:  (415) 355-3308
  Fax:  (415) 437-4644
  E-mail:  karun.tilak@sfcityatty.org

*Attorneys for Plaintiff*
*The People of the State of California*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**02/06/2026**
**Clerk of the Court**
**BY: GERMAN PEREZ**
**Deputy Clerk**

[EXEMPT FROM FILING FEES
PURSUANT TO GOVERNMENT CODE
SECTION 6103]

**CGC-26-633508**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

UNLIMITED JURISDICTION

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                        Plaintiff,<br><br>     v.<br><br>**GATALOG FOUNDATION INC.**, a Florida corporation; **CTRLPEW LLC**, a Florida limited liability company; **ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive,**<br><br>                        Defendants. | Case No.<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, AND OTHER EQUITABLE RELIEF**<br><br>(Civ. Code §§ 3273.61, 3273.625; Bus. & Prof. Code § 17200 et seq.)<br><br>[VERIFIED ANSWER REQUIRED PURSUANT TO CODE OF CIVIL PROCEDURE SECTION 446.] |

1

The People of the State of California ("the People" or "Plaintiff"), by and through Rob Bonta, Attorney General of the State of California, and David Chiu, the City Attorney of San Francisco, allege the following on information and belief:

**<u>INTRODUCTION</u>**

1.     The People bring this action against Gatalog Foundation Inc., CTRLPew LLC, Alexander Holladay, Matthew Larosiere, and John Elik (a/k/a "Ivan The Troll") for unlawfully distributing computer code for 3D printing firearms and prohibited firearm accessories and for promoting and facilitating the unlawful manufacture of 3D printed firearms and firearm accessories in violation of Civil Code sections 3273.61 and 3273.625 and the Unfair Competition Law (Bus. and Prof. Code § 17200 et seq.).

2.     California faces a public safety crisis from the proliferation of unserialized, untraceable, and unsafe firearms—commonly called ghost guns—sweeping across the state and the rise of dangerous firearm accessories such as auto-sears, which are used to convert semi-automatic firearms into machineguns.  In 2015, California law enforcement agencies recovered just 26 ghost guns from suspected criminal activity.  From 2021 through 2025, they recovered an average of over 11,000 ghost guns and auto-sears per year.[1]

3.     3D printed guns are a growing subset of ghost guns in California. They are easy to produce with 3D printing equipment and materials readily available for purchase online or at common retailers, such as a 3D printer and plastic filament, and firearm parts widely available for purchase from firearm dealers or parts suppliers. And they can be fully assembled in less than a day.

4.     California has responded with laws that specifically prohibit 3D printing firearms and prohibited firearm accessories without a license to manufacture firearms, and since 2023, has also prohibited the distribution of computer code for printing them to those without a license. As of January 1, 2026, it is also unlawful to knowingly, willfully, or recklessly aid, abet, promote, or

---

[1] These figures represent ghost guns and auto-sears reported directly to the California Department of Justice, Division of Law Enforcement, Bureau of Firearms. For 2021-2023, they include reports of seized ghost guns, and for 2024-2025, they include reports of seized ghost guns as well as auto-sears.

2

facilitate the "unlawful manufacture of firearms," which includes the manufacture of a firearm using a 3D printer by an unlicensed person.

5.    Defendants ignore these prohibitions by making computer code and instructions for producing over 150 different designs of lethal firearms and prohibited firearm accessories available to anyone with access to the Internet, including in California.  Defendants conduct their illegal activities through two websites that they own, control, or manage: thegatalog.com and ctrlpew.com. Each website links to profiles that Defendants maintain on Odysee.com, an online video and filesharing platform[2] through which Defendants make the code available.  To subsidize their operations, Defendants also sell merchandise related to 3D printed firearms and solicit donations.

6.    The threat posed by Defendants' conduct is very real.  As part of their investigation, the People used Defendants' code to build a fully functioning Glock-style handgun.  The People downloaded the code and instructions necessary for building this deadly weapon from Defendants' website with a few simple keystrokes.  The download was performed from a computer in San Francisco with a California-based IP address.

7.    The People bring this action to stop Defendants from continuing the spread of unlawfully 3D printed firearms and prohibited firearm accessories in California.

<b><u>PARTIES</u></b>

8.    Plaintiff is the People of the State of California.  The People bring this action by and through Rob Bonta, Attorney General of the State of California, and David Chiu, the City Attorney of the City and County of San Francisco.  The Attorney General and City Attorney are authorized to bring an action enforcing Civil Code sections 3273.61 and 3273.625 under subdivisions (c) and (c)(2) of those sections, respectively.  They are also authorized to bring an action to enforce the Unfair Competition Law under Business and Professions Code sections 17203, 17204, and 17206.

---

[2] Odysee is similar to video-sharing platform YouTube but also allows users to share non-video files. Odysee is not a defendant in this action.

3

9.     Defendant Gatalog Foundation Inc. is a Florida corporation with its principal place of business in Orlando, Florida.  Gatalog Foundation Inc. was formed in 2021.  From 2019-2021, the company was known as Deterrence Dispensed, an unincorporated association.

10.     Defendant CTRLPew LLC is a Florida limited liability company with its principal place of business in Orlando, Florida.  It was formed in Iowa in 2020 and has been registered in Florida since 2023.

11.     Defendant Alexander Holladay, an individual, is a principal of Gatalog Foundation Inc. and of CTRLPew LLC.  He the Treasurer of Gatalog Foundation Inc. and Manager and Registered Agent of CTRLPew LLC.

12.     Defendant Matthew Larosiere, an individual, is the President and Registered Agent of Gatalog Foundation Inc.

13.     Defendant John Elik, an individual, is the Director of Gatalog Foundation Inc.  He operates on the internet under the alias "IvanTheTroll."

14.     Plaintiff is not aware of the true names and capacities of defendants sued herein as DOES 1 through 100, inclusive, and, therefore, sues these defendants by such fictitious names.  Each fictitiously named defendant is responsible in some manner for the violations of law alleged.  Plaintiff will amend this Complaint to add the true names of the fictitiously named defendants once they are discovered.  Whenever reference is made in this Complaint to "Defendants," such reference shall include DOES 1 through 100 as well as the named defendants.

15.     The defendants identified in Paragraphs 9 through 14 above are hereafter referred to collectively in this Complaint as "Defendants" or "Gatalog."

16.     At all relevant times, each Defendant acted individually and jointly with every other named Defendant in committing all acts alleged in this Complaint.

17.     At all relevant times, each Defendant acted: (a) as a principal; (b) under express or implied agency; and/or (c) with actual or ostensible authority to perform the acts alleged in this Complaint on behalf of every other named Defendant.

18.     At all relevant times, some or all Defendants acted as the agent of the others, and all Defendants acted within the scope of their agency if acting as an agent of another.

4

19.    At all relevant times, each Defendant knew or realized, or should have known or realized, that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint.  Knowing or realizing that the other Defendants were engaging in such unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts.  Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants and other third parties in the unlawful conduct.

20.    Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint.  The conspiracy, common enterprise, and common course of conduct continue to the present.

21.    Defendants are alter egos of each other.  There is a unity of interest and ownership between and among Defendants, such that in reality they have no separate personalities.  Defendants have used the corporate form to perpetrate fraud and accomplish other wrongful and inequitable acts, including those alleged in this Complaint.  Failure to hold Defendants liable for the wrongful acts of their alter egos would lead to an inequitable and unjust result.

22.    At all relevant times, Defendants distributed or caused to be distributed digital firearm manufacturing code into California to unauthorized individuals.  At all relevant times, Defendants aided, abetted, promoted, or facilitated the unlawful manufacture of firearms in California, including by distributing digital code and associated instructions that are intended to and do enable the manufacture or production of firearms using a 3D printer into California.

## JURISDICTION AND VENUE

23.    This Court has original jurisdiction over this action pursuant to California Constitution article VI, section 10.

24.    This Court has jurisdiction over Defendants because Defendants intentionally availed themselves of the benefits and protections of California including by: distributing digital firearm manufacturing code and associated instructions into California, including digital firearm manufacturing code and instructions specifically aimed at California users; selling associated

5

merchandise directed to a California audience; directing website users to avail themselves of protections provided by California law; and soliciting and accepting donations from California to support the distribution of digital firearms code. The exercise of jurisdiction over Defendants by California courts is therefore consistent with traditional notions of fair play and substantial justice.

25. The violations of law alleged in this Complaint occurred in the City and County of San Francisco and elsewhere throughout California.

26. Venue is proper in this Court pursuant to Code of Civil Procedure section 395.5 because Defendants' solicitation, marketing, sales, and distribution activities included San Francisco and therefore Defendants' liability arises in the City and County of San Francisco.

27. Venue is also proper in this Court pursuant to Code of Civil Procedure section 393, subdivision (a) because violations of law that occurred in the City and County of San Francisco are a "part of the cause" upon which the Plaintiff seeks the recovery of penalties imposed by statute.

## FACTUAL BACKGROUND

### I. 3D Printed Ghost Guns and Prohibited Firearm Accessories Are a Grave Threat to Public Safety

#### A. Ghost Guns Evade Federal and State Gun Laws

28. Under state and federal law, firearms must be sold with an identifying serial number and are subject to various point-of-sale requirements, including a background check. The serialization requirement ensures that firearms used in crimes are traceable by law enforcement, which is essential to solving gun-related crimes. And the background check requirement helps prevent dangerous weapons like firearms from ending up in the hands of prohibited persons, such as persons convicted of dangerous felonies, persons subject to domestic violence or gun violence restraining orders, persons involuntarily hospitalized for dangerousness due to mental health disorders, and underage individuals.

29. Ghost guns bypass this process. Ghost guns are firearms that lack a serial number and are made by private, unlicensed individuals from firearm products sold or produced without a

COMPLAINT—PEOPLE V. THE GATALOG FOUNDATION, INC., ET AL.

background check.[3]  Because they are not serialized, ghost guns are effectively untraceable by law enforcement.  And because they are manufactured privately, often in one's home, they bypass critical safeguards like background checks.  In this way, ghost guns unlawfully circumvent traditional gun control measures.

30.    The key component of a gun—and the component that is privately manufactured without a serial number to produce a ghost gun—is typically what is referred to as a frame (for handguns) or a receiver (for rifles and shotguns).  For most models of firearms, the frame or receiver serves as the central housing for the operational mechanism of the firearm.  These frames and receivers are regulated as firearms by federal and state firearms laws, and as such must be serialized and sold pursuant to a background check.  (For some firearm models, the critical component may be another part of the gun, and in such case, it is that component that is regulated by firearms laws.)

31.    Historically, ghost guns were typically assembled from unserialized, *incomplete* frames or receivers, or kits containing these products, that were sold without a background check.  The incomplete frames or receivers could readily be converted into finished frames or receivers using a drill and common hand tools and then, combined with store-bought firearm parts (also generally not serialized or subject to a background check) or parts sold within the kits, readily assembled into fully functioning unserialized firearms.

32.    As discussed further below, federal and state regulation of the above incomplete frame and receiver products has become more stringent, and ghost guns are increasingly being manufactured by using widely available consumer-grade 3D printers or computer-numerical-control ("CNC") milling machines. Typically, 3D printers or CNC milling machines are being used to produce the frame or receiver of the weapon, and like with the above products, combined with store-bought firearm parts to produce a fully functioning unserialized firearm. 3D printers

---

[3] California law does not prohibit unlicensed individuals from manufacturing firearms from *serialized* firearm products, such as serialized frames or receivers or serialized incomplete frames or receivers, that were purchased pursuant to a background check; unlicensed individuals may lawfully manufacture up to three such firearms per year for personal use. See Pen. Code § 29010.

7

and CNC milling machines may also be used to produce nearly all of the components of a functioning firearm.

33.    These illicit, unserialized, and untraceable weapons pose a grave and urgent danger to the People of California.  California's ghost-gun crisis has escalated dramatically over the past decade.  In 2015, state and local law enforcement agencies reported the recovery of just 26 ghost guns to the California Department of Justice, Division of Law Enforcement, Bureau of Firearms. By 2021-2025, the law enforcement agencies reported an average of over 11,000 ghost guns and auto-sears (i.e., machinegun conversion devices) recovered per year.[4]

34.    National data reflect a similarly alarming increase. Between 2017 and 2023, U.S. law enforcement agencies recovered 92,702 suspected ghost guns.[5] Annual recoveries exploded from 1,629 in 2017 to 27,490 in 2023—a 1,688% rise in just six years.[6]

35.    California bears a disproportionate share of this national crisis. From 2017 to 2021, it was responsible for 55% of the nearly 38,000 ghost gun traces reported to the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").[7]

36.    Ghost guns also pose a serious threat to public safety in San Francisco.  In 2022, San Francisco had the third highest instances of ghost guns involved in crimes for cities in California. In 2020, ghost guns made up 44% of firearms recovered in homicides in San Francisco. And between 2022 and 2025, the San Francisco Police Department ("SFPD") recovered hundreds of ghost guns in connection with crimes.

**B.    Digital Firearm Code Files Fuel the Proliferation of Ghost Guns and Lethal Firearm Accessories**

37.    3D printed firearms represent a rapidly expanding subset of the ghost gun threat. They are cheap and increasingly easy to produce as 3D printing technology continues to advance.

---

[4] For 2021-2023, these figures include reports of seized ghost guns, and for 2024-2025, they include reports of seized ghost guns as well as auto-sears.

[5] U.S. Department of Justice, *National Firearms Commerce & Trafficking Assessment – Volume IV, Part V: Privately Made Firearms Updates and New Analysis* 5 (January 2025), <https://www.atf.gov/media/18631/download> (as of Feb. 5, 2026).

[6] *Id.*

[7] *Id.* at 6.

Moreover, following the U.S. Supreme Court's decision upholding an ATF rule regulating ghost gun "kits" as firearms subject to serialization and background check requirements, 3D printed guns have become more appealing as an alternative way to circumvent gun control laws.

38. Widely available consumer-grade 3D printers capable of printing firearm parts, frames, receivers, and accessories now start at about $200 and are compact enough to fit on a small table. A single spool of PLA+ polymer filament, for example—the only other material required—costs approximately $20-30 and may be sufficient to print multiple firearm components. By way of comparison, a typical Glock model handgun retails for around $500 or more.

39. The software needed to operate most 3D printers—called a "slicer" software—is available for free online.

40. The only other item necessary to produce a 3D printed gun or firearm accessory is the digital code file for the printer. As discussed below, through the Gatalog repositories, the Defendants in this case made the code files for over 150 3D-printed firearms and prohibited firearm accessories available for anyone to download from the Internet. Defendants' codes are also accompanied by instructions on how to print the components and assemble them into functional weapons.

41. The process for printing a 3D printed firearm is straightforward. A user downloads the digital code and opens it up in a slicer software. After setting the necessary parameters and settings—many of which Defendants specify in the instructions accompanying their digital code—the slicer software takes the code file and settings and transmits programming instructions (called "gcode") to the 3D printer. The 3D printer then deploys layer upon layer of the molten polymer filament onto the print bed in the patterns specified by the code. As the plastic cools, it hardens, creating the final 3D-printed firearm or accessory.

42. Through this process, users can quickly, relatively inexpensively, and easily produce a frame or receiver for a firearm without a serial number. 3D printed frames and receivers can then be combined with other parts—which may be bought in stores or in many cases produced using a 3D printer—to make a complete, untraceable, and unserialized gun. The assembly

9

process is easy, even for novices. Defendants' code files often contain instructions on how to combine the components contained in the files with other parts to complete the "build" and produce an operational weapon. And Defendants sell parts kits that can be used to complete the 3D printed firearms for which they distribute digital firearms codes. As described below, the People were able to print and assemble a handgun using Defendants' code in approximately 8.5 hours.

43.  Real-world shootings underscore how the digital files distributed online become functional weapons. The release of a viral 3D-printed pistol design first released by Deterrence Dispensed, the predecessor entity to Defendant the Gatalog Foundation, Inc., resulted in one of the highest-profile ghost gun shootings to date[8]: in November 2024, UnitedHealthcare CEO Brian Thompson was assassinated with a homemade firearm based on that design.[9]

44.  Digital firearms code files also enable users to easily produce dangerous firearm accessories that can be inserted into or used in conjunction with a 3D printed firearm. These include, for example, machinegun conversion devices such as auto-sears (small devices that modify a gun to fire automatically), large capacity magazines (ammunition feeding devices that hold more than 10 rounds), silencers (devices or attachments that silence or dampen the sound of a gunshot), and multi-burst trigger activators (devices that allow a firearm to discharge two or more shorts in a burst). Indeed, these accessories are generally simple devices that are even more straightforward to print and assemble than firearms.

45.  These prohibited accessories pose a serious threat to public safety as they make firearms even more dangerous and lethal by increasing the rate of fire, increasing the capacity to inflict harm, and concealing the shooter. For example, the 3D printed firearm used to assassinate UnitedHealthcare CEO Brian Thompson was outfitted with a 3D printed silencer. Prohibited accessories have also often been used in mass shootings to cause a high number of casualties. For

---

[8] Corey Kilgannon, *Pistol Taken From Suspect Was a Fully Homemade Weapon, Officials Say* (December 10, 2024) New York Times <https://www.nytimes.com/2024/12/10/nyregion/uhc-killing-ghost-gun-3d-printing.html> (as of Feb. 5, 2026).

[9] Andy Greenberg, *The 'Ghost Gun' Linked to Luigi Mangione Shows Just How Far 3D-Printed Weapons Have Come*(December 10, 2024) WIRED <https://www.wired.com/story/luigi-mangione-united-healthcare-3d-printed-gun-fmda-chairmanwon-v1/> (as of Feb. 5, 2026).

example, the "bump stock" (a type of multi-burst trigger activator), which replaces a rifle's standard stock and allows a semi-automatic firearm to fire continuously like a machinegun, gained infamy when it was used by a gunman who killed 60 people and injured hundreds more in the 2017 Las Vegas music festival, the deadliest mass shooting in modern United States history.[10] For these reasons, many dangerous accessories are illegal to manufacture or possess in California, but users can now manufacture these lethal devices at home to evade detection.

46.    The threat posed by 3D printed firearms and prohibited firearm accessories is particularly acute in California. In July 2023, federal agents seized two 3D printers—one adorned with swastikas—from the home of a San Fernando Valley man who was prohibited from owning firearms due to a prior felony.[11] He had been using the printers to assemble fully automatic weapons and had publicly called for the mass murder of Jewish people.[12]

47.    In December 2023, a San Francisco resident pleaded guilty and was sentenced to six years in prison for selling ghost guns out of his home to drug dealers and other criminals.  Upon arrest, he was found with several untraceable ghost guns, including fully automatic AR-15 machine guns, AK-47 parts, ammunition, two 3D printers, and a milling machine to drill metal gun parts.[13]  Between 2022 and 2025, the SFPD recovered approximately 40 guns with 3D printed components, including in connection with crimes involving drugs, assaults, thefts, and criminal threats.

---

[10] Kalhan Rosenblat, *Las Vegas shooting is deadliest in modern U.S. history* (October 2, 2017) NBC News <https://www.nbcnews.com/storyline/las-vegas-shooting/las-vegas-shooting-deadliest-modern-u-s-history-n806486> (as of Feb. 5, 2026).

[11] U.S. Department of Justice, *Reseda Man Affiliated with Violent White Supremacist Group Charged in Federal Criminal Complaint with Drug and Ammunition Offenses* (July 28, 2023), <https://www.justice.gov/usao-cdca/pr/reseda-man-affiliated-violent-white-supremacist-group-charged-federal-criminal> (as of Feb. 5, 2026).

[12] *Id.*

[13] Jonah Owen Lamb, *He beat addiction and homelessness to become an IT tech. Then he started making ghost guns*, The San Francisco Standard (January 2, 2024) <https://sfstandard.com/2024/01/02/san-francisco-catalytic-coverter-theft-ghost-gun/> (as of Feb. 5, 2026).

11

COMPLAINT—PEOPLE V. THE GATALOG FOUNDATION, INC., ET AL.

48.    In February 2024, Santa Rosa Police arrested a 14-year-old boy—who would have been too young to purchase a gun legally—for manufacturing firearms using a 3D printer.[14] That same month, San Jose Police investigating a triple shooting discovered a loaded, 3D printed handgun in the home of the juvenile suspect.[15]

49.    The exponential growth in the production of 3D printed guns and their use in crimes across California point to an escalating public-safety threat and underscore the urgent need for injunctive and declaratory relief sought herein.

**II.    Defendants' Operations**

**A.    Defendants' Online Presence**

50.    Through several related websites and online profiles, Defendants maintain an internet presence through which they distribute computer code and instructions for 3D printing over 130 different firearm models.  Defendants make their code and instructions available for easy download by anyone in California.

51.    Defendants also distribute files for 3D printing prohibited firearm accessories. These include, for example: auto-sears; large capacity magazines; silencers; and various accessories, attachments, or devices that may be used to render a firearm an illegal assault weapon.[16]

52.    Defendants sell merchandise, take donations, maintain affiliate links, and sell firearm parts kits designed to complete 3D printed firearms.

---

[14] Tim Fang, *14-year-old Santa Rosa student accused of manufacturing firearms with 3D printer,* CBS NEWS (Feruary. 14, 2024) <https://www.cbsnews.com/sanfrancisco/news/santa-rosa-14-year-old-montgomery-high-student-accused-manufacturing-firearms-3d-printer/> (as of Feb. 5, 2026).

[15] Aja Seldon, *2 alleged San Jose gang members arrested in triple shooting*, FOX KTVU (February 29, 2024) < https://www.ktvu.com/news/2-alleged-san-jose-gang-members-arrested-in-triple-shooting> (as of Feb. 5, 2026).

[16] Assault weapons are firearms that are semi-automatic and have specific features or characteristics that make them more dangerous, including by increasing the rate of fire and capacity for firepower.  For example, California law restricts the use of a flash suppressor, which muzzles the flash of a firearm and thus helps to conceal the shooter, as well as the use of a pistol grip, handgrip, or forward grip, which increase the ability of the shooter to fire at a high rate. (Pen. Code § 30515, subd. (a).)

12

### 1.    The Gatalog Website

53.    Defendants maintain a website, https://thegatalog.com, called "The Gatalog."

54.    The Gatalog website is simple.  The homepage contains a website header and ten different links.  Each link correlates to a category of files for 3D printing firearm-related items.  For example, "Printable Frames and Receivers," relates to files for printing firearm frames and receivers, and "3D Printable Magazines," relates to files for 3D printing magazines.

55.    Below is a snapshot of the Gatalog homepage.

### 2.    The Gatalog's Odysee Profiles

56.    Each of the links on the Gatalog homepage takes the user to a related profile on Odysee.  And, through these profiles, Defendants disseminate files for 3D printing firearms and firearms accessories.  Each of the links on the Gatalog homepage takes the user to a corresponding profile on Odysee.  The names of the profiles are nearly the same as the links, except with "The Gatalog's" in front of the title.  For example, "Printable Frames and Receivers" becomes "The Gatalog's Printable Frames and Receivers," and "3D Printable Magazines" becomes "The Gatalog's 3D Printable Magazines."

13

57.    The titles on the Gatalog website and the corresponding Odysee Profile and URL on Odysee are as follows:

| Link on Gatalog's website: | Odysee profile: |
| --- | --- |
| Hybrid Designs | The Gatalog's Hybrid Designs |
| Printable Frames and Receivers | The Gatalog's Printable Frames and Receivers |
| Primarily Printed Designs | The Gatalog's Primarily Printed Designs |
| DIY Suppressors | The Gatalog's DIY Suppressors |
| 3D Printable Magazines | The Gatalog's 3D Printable Magazines |
| Accessories | The Gatalog's Accessories |
| Guides and Tutorials | The Gatalog's Guides and Tutorials |
| Technical Data Packages | The Gatalog's Technical Data Packages |
| Reference Models | The Gatalog's Reference Models |
| Comical Creations | The Gatalog's Comical Creations |

58.    The Odysee profiles contain code files and instructions for 3D printing over 150 designs of firearms and prohibited accessories.[17]

59.    In addition to the shared profile name, each Odysee profile contains the Gatalog logo. And on each webpage where files are made available for download, the name of the design is introduced with the logo and "The Gatalog presents" and Defendants invite users to "Join the community at thegatalog.com."  Snapshots of these aspects of the pages are shown below in paragraphs 65 and 67 with respect to The Gatalog's Printable Frames and Receivers profile and the FMDA DD19.2 3D Printable Glock Frame.

60.    The files posted on the Odysee profiles are available for free and can be downloaded by simply clicking a "download" button.  Nothing on the file pages of the Odysee profiles prevents downloads of the files from California.  Nor is there anything on the file pages requiring

_____

[17] The Odysee profiles also include files that contain only guides and tutorials or additional technical information, including, for example, in The Gatalog's Guides and Tutorials profile.

14

a user to demonstrate that he possesses valid state and federal manufacturers licenses. As set forth more fully below, an analyst from the California Attorney General's Office was able to download the files on the Odysee profiles from California without issue.

61.    The files available for download on Odysee generally consist of individual zip folders. For each firearm or accessory design, the zip folder contains computer-aided design ("CAD") digital code for the design. Most zip folders also include instructions for using the CAD files to print the design. These instructions often provide recommended materials and specific print settings for a 3D printer to successfully print the design. Many of the zip folders also contain detailed instructions for how to combine the 3D printed component with other parts (whether store-bought or self-manufactured) to produce operational firearms or firearm accessories.

62.    Defendants strictly control the files disseminated through the Gatalog website and the associated Odysee profiles. While Defendants make available a "Beta Program" for users to share and test their code files, they make clear that they will only distribute the final "single released and proven package" of files "containing third-party verified models and documentation containing thorough build details and instructions."[18] Files must be approved by "Gatalog leadership" before they are made available on the Gatalog Odysee profiles.[19] Defendants make clear that their goal is to ensure that only the final, verified files "live forever . . . [s]o when some random completely disconnected . . . person finds the files they are able to construct them successfully."[20]

---

[18] *The Beta Program*, The Gatalog <https://thegatalog.com/the-beta-program/> (as of Feb. 5, 2026).

[19] *Product Development LIfecycle*, Deterrence Dispensed <https://gitlab.deterrencedispensed.com/deterrence-dispensed/information-and-tutorials/-/wikis/For-Developers/Process-Management/Product-Development-Lifecycle> (as of Feb. 5, 2026).

[20] *Supra* n. 16.

15

**B.  3D Printed Firearm Files**

63.  Through the Odysee profiles, Defendants disseminate files for manufacturing or producing over 130 different models of 3D printed firearms.  These include designs for various semi-automatic handguns and rifles.

64.  The vast majority of Defendants' 3D printed firearm models (over 115) are made available through the Gatalog's Printable Frames and Receivers profile.  The files distributed through the Gatalog's Printable Frames and Receivers profile contain the digital code for frames or receivers of firearms, and in many cases contain detailed instructions on how the 3D printed components can be combined with other purchased parts (including those sold by Defendants) to produce a functional weapon.

65.  Below is a snapshot of The Gatalog's Printable Frames and Receivers page on Odysee.



66.  One of the printable frame designs distributed by Defendants is "The FMDA DD19.2 3D Printable Glock Frame."  The FMDA DD 19.2 is a design based on a Glock 19 model handgun.  A version of the FMDA DD 19.2 was used in the killing of the United Healthcare CEO in December 2024.

16

67.    Below is a snapshot of the FMDA DD 19.2 posting on Gatalog's Odysee profile.



68.    The FMDA DD 19.2 design includes detailed instructions to make it easy for a user to print and assemble the gun.  The digital code is accompanied by a "README" file that recommends the 3D printer settings that users should use, notes that the provided files "are oriented and scaled properly," and warns users that they "MUST follow these print settings in order to get the best possible results."  The zip folder also comes with a detailed tutorial with a

COMPLAINT—PEOPLE V. THE GATALOG FOUNDATION, INC., ET AL.

"shopping list" of other components and step-by-step instructions to combine the 3D printed frame with other components in order to produce a functional Glock style handgun.

69. Another one of the printable frame or receiver designs is "The CAG19," described as a "California Compliant Glock 19-based Carbine kit." As suggested by the name, this design is specifically directed to California residents. The instructions state the design is legal in California and that "[t]his project is aimed to provide Californians with the entire legal process to print and assemble a California compliant Glock 19 carbine." However, 3D printing such a firearm without a manufacturer's license is illegal under California law.

70. Several of Defendants' Odysee profiles contain files for so-called "fully printed projects," which are firearms that are designed to have most of their parts produced through 3D printing. These designs can be found in The Gatalog's Hybrid Designs and The Gatalog's Primarily Printed Designs profiles, which together contain over 15 different designs. As with printable frames and receivers, Defendants make available both the digital code for 3D printing the firearm parts and provide instructions for assembling the firearm.

71. One of the Gatalog's Hybrid Designs is the FGC-9. FGC stands for "F*** Gun Control" and the FGC-9 has been linked to violent criminals and extremists. As Defendants claim on their CTRLPew website (discussed further below), "By owning an untraceable firearm like the FGC9, individuals can have a veto power on par with their government" and "[b]ecome [u]ngovernable." The file includes not just the digital code to print the FGC-9 but also a detailed 110-page guide that provides recommended settings for slicer software, a timetable for how much time each build is expected to take and how much material it will use, and step-by-step instructions to combine the various printed components into the final product: a semi-automatic firearm that is described as "the most effective and easiest to build homemade semi-automatic firearm design for people with limited access to gunsmithing knowledge and tools."

C.   **3D Printed Firearm Accessories**

72. Through several profiles, Defendants also make available firearms code files for over a dozen different designs intended to produce prohibited firearm accessories, including auto-sears, large capacity magazines, and silencers. These accessories can render a firearm more

18

dangerous and lethal by increasing the rate of fire, increasing the capacity to inflict harm, and concealing the shooter, among other things.

73.    Through The Gatalog's Accessories profile, Defendants' code files include several designs for an auto-sear, which can be used to easily convert a handgun or rifle to fire automatically as a machinegun.  For example, the "'Make Glocks Full Auto' Glock autosear" can be used to print an auto-sear using the files provided by Defendants that can then be inserted into certain Glock model handguns to convert them into a machinegun.  As another example, the "Yankee Boogle 3D Printable AR15 Full-Auto Mod (Swift Link)" can be used to convert virtually any AR model semi-automatic rifle into a machinegun.  The auto-sear files include the digital code for printing the items as well as instructions for purchasing any additional parts and installing the auto-sear into the firearm.

74.    Below is a snapshot of a photograph on the "Make Glocks Full Auto Glock auto-sear" Odysee page; the auto-sear is reflected in orange.



75.    Through the Gatalog's 3D Printable Magazines profile, Defendants' code files also include designs for large-capacity magazines that can be used for various model handguns and rifles.  For example, the "Menendez Magazine v2.0 Pack" disseminated by Defendants provides files for various 3D printable 9mm Glock magazines, including a 17 round, 25 round, and 30 round magazine, which the instructions indicate can be used in Glock 17, 19, and 26 style handguns.  These magazine designs are attributed to IvanTheTroll, the alias of Defendant John

19

Elik. The large-capacity magazine files distributed by Defendants contain both files for 3D printing the items and instructions for parts to purchase and how to assemble the magazine.

76. And through the Gatalog's DIY Suppressors profile, Defendants' code files include designs for silencers. For example, the "K-CAD 3D Printed Suppressor Pack V1.0" contains files for silencers designed to fit numerous models of handguns or rifles. The silencer files posted by Defendants contain both files for 3D printing the items and instructions for any additional parts to purchase and how to assemble the silencer.

77. Below is a snapshot of a photograph on the "K-CAD 3D Printed Suppressor Pack V1.0" Odysee page; the silencers are in the red boxes.



### D.  Defendants' Files Can Be Used to Produce Functional Firearms

78. The files distributed by Defendants may be used to print and assemble a fully functional firearm.

79. On June 17, 2024, an analyst of the California Attorney General's Office went online with a California-based IP address and visited each of the linked Gatalog profiles on Odysee available from the homepage. The analyst was able to download all files available from each of the Odysee profiles, which included over 200 different files. On March 6, 2025, the analyst returned to the Gatalog website and Odysee profiles and downloaded files for new designs that had been posted since the previous download. On January 7, 2026, the analyst returned to the Gatalog website and Odysee profiles and again downloaded all of the files available from each of

20

the Odysee profiles, which included over 240 files, including files for over 150 firearm and prohibited firearm accessory designs.

80. Using one of the files—the "FMDA DD 19.2"—the People 3D printed and assembled a functional firearm. By utilizing the digital code and following the step-by-step instructions accompanying the code and other recommendations in the Gatalog files—including using the recommended filament, 3D printer model, and print parameters—the People printed three frames. Each print took approximately 7.5 hours.

81. As printed, each frame constitutes a firearm precursor part regulated under California law, including Civil Code sections 3273.61 and 3273.625.

82. A special agent supervisor at the California Department of Justice, Bureau of Firearms, then assembled one of the 3D printed frames with other commonly available firearm parts to produce an operational firearm. To do so, he followed the assembly instructions that accompanied the digital code, which detailed which parts to purchase and what tools to use. The assembly process took one hour.

83. Thus, in 8.5 hours—about a business day—Defendants' digital code and accompanying instructions may be used to produce an unserialized ghost gun.

**E.    The CTRLPew Website**

84. Defendants maintain another website, ctrlpew.com, that complements and expands upon the Gatalog's illegal distribution of firearm manufacturing code. The corporate entity CTRLPew LLC ("CTRLPew") was formed in 2020 by Defendant Holladay. The name CTRLPew stands for 3D printing weapons: "ctrl" refers to the keyboard key and "Pew" stands for "Print Every Weapon." The Gatalog website links to the CTRLPew website.

85. The CTRLPew website in turn links to the 3D printing files for firearms and accessories available for download on the Gatalog Odysee profiles. The home page invites users to "Browse All The Gatalog Releases" and includes a search function to "Search The Gatalog." Users can also access the files through a section called "File Drops." The files are divided into seven "post categories" that correspond to names of the Odysee profiles: Accessories, Comical Creations, Guides, Hybrid, Magazine, Primarily Printed, Printable Frames, and Suppressor. The

21

files may also be tagged based on various features, including, for example, the type of firearm (e.g., 9 mm, AR15) and the gun developer.  Each of the 3D printing file pages attributes the firearm or accessory design to its developer.

86.    A snapshot of the CTRLPew homepage appears below.



87.    Once on a "file drop" page, a user simply needs to click a green button that says "Download Here" or "Download from the Gatalog" and they are taken to the corresponding download page on Odysee (discussed above).

88.    Through the CTRLPew website, Defendants disseminate guides and tutorials for 3D printing firearms and firearm accessories and various blog posts and articles about the same. "Getting Started Guide 0 – How to Start 3D Printing Quickly" walks the user through setting up the capability to 3D print and provides recommendations for 3D printers, filaments, slicer software, slicer settings, the files themselves, and firearm parts kits.  In particular, the guide directs users to The Gatalog for the 3D printing files, linking to the "File Drops" section of the CTRLPew site and to The Gatalog website.  Defendants also state that Gatalog files "are the only releases" that will be covered on the CTRLPew site "in any detail."

89.    Through the CTRLPew website, Defendants sell merchandise, solicit donations for gun developers, and earn commissions through affiliate links to various 3D printing equipment,

22

material, and other items.  Defendants Holladay, Larosiere, and Elik each have their own pages for receiving donations through the CTRLPew website.

90.    Defendants also profit from the distribution of digital firearms code in other ways. In particular, Defendants Larosiere and Holladay operate another company—MAF Corp.—that sells parts kits specifically designed to complete the firearms printed using the Gatalog's digital firearms code. The CTRLPew website directs users to MAF Corp. and often provides a discount code to purchase firearms kits.  MAF Corp. is also featured in the Getting Started Guide, as well as on individual design pages, as a "preferred part vendor[]."[21]  The instruction manuals that accompany many of Defendants' digital code files also recommend purchasing parts from MAF Corp. in order to complete the firearm build.

91.    CTRLPew directs its services to California residents, and Defendants are aware of firearms laws, including California law, that regulate 3D printing of firearms.  CTRLPew sells merchandise directed to California residents, including a "warning" sticker in the form of a yellow hazard triangle sign that states, "Not for Making Guns."  The product posting mocks California law concerning the sale of 3D printers for manufacturing firearms: "This sticker is especially timely given the introduced California legislation (AB-1089) that prohibits the sale, offer for sale, or transfer of a CNC milling machine or 3D printer with the sole or primary function of manufacturing firearms to anyone in the state.  So not only will you be making a statement about safety and responsibility, but you'll also be 'showing your support' for sensible firearm regulations."  CTRLPew also sells a sticker "10 rounds only" that mocks California's restriction on large capacity magazines.  In addition, The CTRLPew terms of service instruct "California Users and Residents" to resolve complaints by contacting the California Department of Consumer Affairs.

92.    The stated purpose of Defendants' operations is to circumvent firearms regulations.  CTRLPew sells merchandise stating, "Go and make it.  Print one of everything.  Laugh on the grave of gun control" and "F*** Gun Control."  One of the firearm models developed by an

[21] See, e.g., *File Drop: The MacDaddy V2.0*, CTRLPew <https://ctrlpew.com/file-drop-the-macdaddy-v2-0/> (as of Feb. 5, 2026).

23

affiliate of Gatalog (and currently distributed through the Gatalog Odysee profiles) is called the FGC-9, which stands for "F*** Gun Control."

**F.      The Individual Defendants' Activities**

93.      The individual defendants are principals in the corporate entities associated with Defendants' activities. They also actively contribute to those activities by developing their own digital firearm manufacturing code and making it available for download on Gatalog's Odysee Profiles.

94.      Defendant Holladay is the Treasurer of Gatalog and the Manager of CTRLPew.  He develops his own designs for 3D printed firearms and firearm accessories, using the handle "@ctrlpew."  Posts for his designs are available on CTRLPew's website under that handle, with links to the files available on the Gatalog Odysee profiles.  Defendant Holladay has six designs posted on CTRLPew and available for download on Odysee, including two frames/receivers and a silencer.

95.      Defendant Larosiere is the President and Registered Agent of Gatalog.  He also develops his own designs for 3D printed firearms, using the handle "Fuddbusters" or his name, "Matt Larosiere."  There are two printable frame/receiver designs attributed to Defendant Larosiere on CTRLPew, with linked files available for download on the Gatalog Odysee profiles.

96.      Defendant Elik is the Director of Gatalog. He also develops his own designs for 3D printed firearms and firearm accessories, using the alias "IvanTheTroll."  There are over 20 designs attributable to IvanTheTroll on CTRLPew, with linked files available for download on the Gatalog Odysee profiles.  These include designs for over 15 frames/receivers and several large-capacity magazines.

**CAUSES OF ACTION**

FIRST CAUSE OF ACTION

**VIOLATION OF CIVIL CODE SECTION 3273.61**

**AGAINST ALL DEFENDANTS**

97.      The People reallege and incorporate by reference each of the paragraphs above as fully set forth herein.

24

98.     Under Civil Code section 3273.61(a)(1), a civil action may be brought against "a person who knowingly . . . distributes or causes to be distributed, by any means including the internet, any digital firearm manufacturing code to any other person in this state who is not a federally licensed firearms manufacturer, member of the Armed Forces of the United States or the National Guard, while on duty and acting within the scope and course of employment, or any law enforcement agency or forensic laboratory."

99.     Defendants have violated and continue to violate Civil Code section 3273.61(a)(1) by knowingly distributing or causing to be distributed over the internet digital firearm manufacturing code to persons who are not exempt from receiving such code under the statute.

SECOND CAUSE OF ACTION

**VIOLATION OF CIVIL CODE SECTION 3273.625**

**AGAINST ALL DEFENDANTS**

100.   The People reallege and incorporate by reference each of the paragraphs above as fully set forth herein.

101.   Under Civil Code section 3273.625, a civil action may be brought against a person who "knowingly, willfully, or recklessly cause[s] another person to engage in the unlawful manufacture of firearms," or who "knowingly, willfully, or recklessly aid[s], abet[s], promote[s], or facilitate[s] the unlawful manufacture of firearms."

102.   Defendants have violated and continue to violate Civil Code section 3273.625 by knowingly, willfully, or recklessly causing another person to engage in the unlawful manufacture of firearms, and/or by knowingly, willfully, or recklessly aiding, abetting, promoting, or facilitating the unlawful manufacture of firearms.

THIRD CAUSE OF ACTION

**VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 ET SEQ.**

**AGAINST ALL DEFENDANTS**

103.   The People reallege and incorporate by reference each of the paragraphs above as fully set forth herein.

104.  The UCL prohibits any person from engaging in "any unlawful, unfair, or fraudulent business act or practice." (Bus. & Prof. Code § 17200.)

105.  Defendants have engaged, and continue to engage, in acts or practices that are unlawful and which constitute unfair competition within the meaning of the UCL.  Defendants' unlawful, unfair, or fraudulent acts and practices in violation of the UCL include, but are not limited to, the following:

a.  Defendants have violated Civil Code section 3273.61(a)(1) as alleged in the First Cause of Action by distributing or causing to be distributed digital firearm manufacturing code to persons in California who are not licensed firearms manufacturers, members of the Armed Forces of the United States or National Guard acting within the scope and course of employment, or any law enforcement agency or forensic laboratory;

b.  Defendants have violated Civil Code section 3273.625 as alleged in the Second Cause of Action by aiding, abetting, promoting or facilitating the unlawful manufacture of firearms by making code available to Californians for unlawful firearm manufacturing on 3D printers.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.  That under Civil Code section 3273.61(c) Defendants, their successors, agents, representatives, employees, assigns, and all persons who act in concert with them be enjoined in a manner sufficient to prevent any Defendant from further violating the law, including preliminary and permanent injunctive relief;

2.  That under Civil Code section 3273.625(c) Defendants, their successors, agents, representatives, employees, assigns, and all persons who act in concert with them be enjoined in a manner sufficient to prevent any Defendant from further violating the law, including preliminary and permanent injunctive relief;

3.  That under Business and Professions Code section 17203, Defendants, their successors, agents, representatives, employees, assigns, and all persons who act in concert with

them be permanently enjoined from committing any acts of unfair competition in violation of Business and Professions Code section 17200, including but not limited to the acts and practices alleged in this Complaint;

4.    That the Court make such orders or judgments as may be necessary, including for preliminary injunctive and ancillary relief, to prevent the use or employment by any Defendant of any practice which constitutes unfair competition, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition, under the authority of Business and Professions Code section 17203;

5.    That the Court assess a civil penalty of $25,000 against each Defendant for each violation of Civil Code section 3273.61(a)(1);

6.    That the Court assess a civil penalty of $25,000 against each Defendant for each violation of Civil Code section 3273.625(a);

7.    That the Court assess a civil penalty of $2,500 against each Defendant for each violation of Business and Professions Code section 17200 in an amount according to proof, under the authority of Business and Professions Code section 17206;

8.    That the Court award the remedy of disgorgement in an amount according to proof, under the authority of Government Code section 12527.6;

9.    That the People recover their costs of suit;

10.    That the People receive all other relief to which they are legally entitled; and

11.    For such other and further relief that the Court deems just and proper.

27

Respectfully submitted,

Dated:  February 6, 2026

ROB BONTA
Attorney General of California

By:  */s/ Vesna Cuk*
VESNA CUK
Deputy Attorney General

Dated:  February 6, 2026

DAVID CHIU
City Attorney of San Francisco

By:  */s/ Karun A. Tilak*
KARUN A. TILAK
Deputy City Attorney

*Attorneys for Plaintiff*
*The People of the State of California*

28

# EXHIBIT 2

Colin R. Higgins, Bar No. 268364
chiggins@swlaw.com
Cameron J. Schlagel, Bar No. 320732
cschlagel@swlaw.com
Susan G. Biscardi, Bar No. 366760
sbiscardi@swlaw.com
SNELL & WILMER LLP
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
Telephone:    714.427.7000
Facsimile:    714.427.7799

*Attorneys for Defendants*
*(Specially Appearing Solely for Purpose of*
*Challenging Jurisdiction)*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>GATALOG FOUNDATION INC., a Florida corporation; CTRLPEW LLC, a Florida limited liability company; ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. CGC-26-633508<br><br>Hon. Ethan P. Schulman<br><br>**Defendants CTRLPew LLC and Alexander Holladay's Notice of Motion and Motion to Quash Service of Summons for Lack of Personal Jurisdiction**<br><br>**[C.C.P. § 418.10(a)(1)]**<br><br>Date:   July 28, 2026<br>Time:   11:00 a.m.<br>Dept:   304<br><br>Trial Date:       None Set |

DEFENDANTS CTRLPEW LLC AND ALEXANDER HOLLADAY'S MOTION TO QUASH
4917-5240-0281

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 28, 2026, at 11:00 a.m., or as soon thereafter as the matter may be heard in Department 304 of the Superior Court of California, County of San Francisco, located at 400 McAllister Street, San Francisco, California 94102, specially appearing Defendants CTRLPew LLC ("CTRLPew") and Alexander Holladay ("Holladay") (collectively, "Defendants") will and hereby do move the Court for an order quashing the service of the summons and complaint in this action for lack of personal jurisdiction.

This motion is made under California Code of Civil Procedure section 418.10(a)(1) on the grounds that this Court lacks power to exercise personal jurisdiction over Defendants because no constitutionally sufficient basis for jurisdiction exists. CTRLPew is a Florida limited liability company with its principal place of business in Orlando, Florida. (Declaration of Alexander Holladay ("Holladay Decl.") ¶¶ 8, 25.) CTRLPew maintains no offices, employees, property, bank accounts, or affiliations with California and has not directed any advertising, geotargeted campaigns, or sales of digital files at California residents. (*Id.* ¶¶ 26, 28–29.)

Holladay is a Florida resident and has never been domiciled in California. (*Id.* ¶ 11.) His only presence in California was in approximately 2010 in connection with military service obligations. (*Id.* ¶¶ 11, 13.) He maintains no office, property, bank account, or other presence in California. (*Id.* ¶ 12.)

Neither CTRLPew nor Holladay has directed advertising, solicitations, or geotargeted campaigns at California residents; sold digital files into California; entered into any transaction in California; or conducted any commercial enterprise in the State related to the claims at issue. (*Id.* ¶¶ 14–16, 28.) The CTRLPew Website (ctrlpew.com) and TheGatalog.com function as passive, informational portals linking to third-party hosts without download functionality or geotargeted outreach. (*Id.* ¶¶ 6, 29, 34–35.)

Accordingly, this Court does not have general or specific personal jurisdiction over Defendants. This motion is based on this Notice; the accompanying Memorandum of Points

- 2 -

DEFENDANTS CTRLPEW LLC AND ALEXANDER HOLLADAY'S MOTION TO QUASH

4917-5240-0281

and Authorities; the Declaration of Alexander Holladay; all pleadings and papers on file; and such further evidence and argument as the Court may permit.

CTRLPew and Holladay specially appear for the sole purpose of contesting personal jurisdiction and do not waive any defenses. *See* Code Civ. Proc. § 418.10(e)(1).

Dated: March 30, 2026

SNELL & WILMER L.L.P.

By: _____
Colin R. Higgins
Cameron J. Schlagel
Susan G. Biscardi

*Attorneys for Defendants
(Specially Appearing Solely for
Purpose of Challenging Jurisdiction)*

SNELL
& WILMER

DEFENDANTS CTRLPEW LLC AND ALEXANDER HOLLADAY'S MOTION TO QUASH
4917-5240-0281

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ..................................................................................... 8

II.     STATEMENT OF FACTS......................................................................... 9

        A.      CTRLPew Has No Contacts with California ................................. 9

        B.      Holladay Has No Contacts with California................................... 10

        C.      The State's Allegations Do Not Establish Personal Jurisdiction ................. 11

III.    THIS COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS ................................................................................... 11

        A.      There Are No Traditional Bases for Personal Jurisdiction ....................... 12

        B.      Defendants Do Not Have Sufficient Minimum Contacts with California to Establish Personal Jurisdiction ............................................... 12

                1.      California Lacks General Jurisdiction Over Defendants .................. 13

                2.      California Lacks Specific Jurisdiction Over Defendants.................. 13

                        (a)     Defendants have not purposefully availed themselves of California benefits............................................. 14

                                i.      The "CAG19" file reference does not constitute California targeting ..................................... 16

                                ii.     The CTRLPew "California references" do not establish purposeful direction .................................... 17

                                iii.    The State's unilateral downloads cannot create jurisdiction ............................................... 18

                                iv.     The "special regulation" theory does not apply.......... 19

                        (b)     The State's claims do not arise out of or relate to California-directed contacts by Defendants.......................... 19

                                i.      Conclusory alter ego and conspiracy assertions do not salvage jurisdiction ........................................ 20

        C.      Asserting Jurisdiction Would Offend Fair Play, Substantial Justice, and Interstate Federalism.............................................................. 21

        D.      At Minimum, the State Has Not Met Its Initial Burden and No Jurisdictional Discovery Is Warranted ....................................................... 21

IV.     CONCLUSION ....................................................................................... 21

SNELL
& WILMER

- 4 -

4917-5240-0281

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*
(4th Cir. 2002) 293 F.3d 707 ....................................................................*passim*

*Bristol-Myers Squibb Co. v. Superior Court*
(2017) 582 U.S. 255 ................................................................................*passim*

*Burdick v. Superior Court*
(2015) 233 Cal.App.4th 8 ................................................................ 9, 16, 17, 18

*Burger King Corp. v. Rudzewicz*
(1985) 471 U.S. 462 ................................................................................... 13

*Calder v. Jones*
(1984) 465 U.S. 783 ............................................................................... 11, 16

*Carbone v. Kaal*
(6th Cir. 2025) 140 F.4th 805 ....................................................................... 16

*CenterPoint Energy, Inc. v. Superior Court*
(2007) 157 Cal.App.4th 1101 ................................................................... 20, 21

*Cybersell, Inc. v. Cybersell, Inc.*
(9th Cir. 1997) 130 F.3d 414 ................................................................... 16, 17

*Daimler AG v. Bauman*
(2014) 571 U.S. 117 ............................................................................... 13, 19

*Glazer Capital Management, LP v. Magistri*
(9th Cir. 2008) 549 F.3d 736 ........................................................................ 11

*Goodyear Dunlop Tires Operations, S.A. v. Brown*
(2011) 564 U.S. 915 ............................................................................... 13, 19

*GTE New Media Services Inc. v. BellSouth Corp.*
(D.C. Cir. 2000) 199 F.3d 1343 ..................................................................... 14

*HealthMarkets, Inc. v. Superior Court*
(2009) 171 Cal.App.4th 1160 ....................................................................... 21

*Hogue v. Hogue*
(2017) 16 Cal.App.5th 833 ........................................................................... 19

- 5 -

4917-5240-0281

*In re Marriage of Obrecht*
(2016) 245 Cal.App.4th 1 ................................................................................. 12

*Junior Sports Magazines Inc. v. Bonta*
(9th Cir. 2023) 80 F.4th 1109 .......................................................................... 18

*Kearney v. Salomon Smith Barney, Inc.*
(2006) 39 Cal.4th 95 ........................................................................................ 19

*Kendall Hunt Publishing Co. v. Learning Tree Publishing Corp.*
(8th Cir. 2023) 74 F.4th 928 ............................................................................ 16

*Mavrix Photo, Inc. v. Brand Techs., Inc.*
(9th Cir. 2011) 647 F.3d 1218 ................................................................... 16, 18

*Moore v. Cecil*
(11th Cir. 2024) 109 F.4th 1352 ...................................................................... 16

*Pavlovich v. Superior Court*
(2002) 29 Cal.4th 262 ...............................................................................*passim*

*Safieddine v. MBC FZ LLC*
(2024) 103 Cal.App.5th 1086 ..................................................................... 18, 21

*Shisler v. Sanfer Sports Cars, Inc.*
(2006) 146 Cal.App.4th 1254 .......................................................................... 13

*Shrader v. Biddinger*
(10th Cir. 2011) 633 F.3d 1235 .............................................................. 14, 15, 17

*Snowney v. Harrah's Ent., Inc.*
(2005) 35 Cal.4th 1054 ............................................................................... 17, 20

*Stokinger v. Armslist, LLC*
(1st Cir. 2026) 166 F.4th 229 ...................................................................... 15, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
(2007) 551 U.S. 308 .......................................................................................... 11

*U.S. v. Stevens*
(2010) 559 U.S. 460 .......................................................................................... 17

*ViaView, Inc. v. Retzlaff*
(2016) 1 Cal.App.5th 198 ............................................................................ 12, 21

*Vons Companies, Inc. v. Seabest Foods, Inc.*
(1996) 14 Cal.4th 434 ...............................................................................*passim*

- 6 -

4917-5240-0281

*Walden v. Fiore*
(2014) 571 U.S. 277 ...................................................................................*passim*

*World-Wide Volkswagen Corp. v. Woodson*
(1980) 444 U.S. 286 ................................................................................ 12

*Young v. New Haven Advocate*
(4th Cir. 2002) 315 F.3d 256 ............................................................... 17, 18

**Statutes**

Bus. & Prof. Code § 17200, et seq. .............................................................. 11

Civ. Code § 3273.61 ..................................................................................... 11

Civ. Code § 3273.61(a)(1)(iii) ..................................................................... 19

Civ. Code § 3273.625 ................................................................................... 11

Code Civ. Proc. § 410.10 .............................................................................. 12

Code Civ. Proc. § 418.10 ................................................................................ 9

Code Civ. Proc. § 418.10(a)(1) .................................................................... 22

**Other Authorities**

Cal. Dep't of Just., Press Release, *Ghost Gun Crackdown: Attorney General Bonta Files Landmark Lawsuit* (Feb. 6, 2026) ............................................. 9

- 7 -

DEFENDANTS CTRLPEW LLC AND ALEXANDER HOLLADAY'S MOTION TO QUASH

4917-5240-0281

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

This Court lacks personal jurisdiction over Defendants CTRLPew LLC ("CTRLPew") and Alexander Holladay. These Florida defendants have never sold a product into California, advertised to California residents, conducted a transaction here, or maintained any physical or financial presence in the State. CTRLPew is a Florida LLC headquartered in Orlando. Holladay is a Florida resident who has never been domiciled in California; his only presence was in 2010 during military service. Neither Defendant has directed any California-targeted advertising, geotargeted campaigns, or sales of digital files to California residents.

The governing law is settled. Due process demands a nexus between the forum and the defendant's suit-related conduct, and those contacts must be the defendant's own—not ones manufactured by the plaintiff. *Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 261–66 ("*BMS*"); *Walden v. Fiore* (2014) 571 U.S. 277, 283–91. The California Supreme Court has applied these principles to the Internet, holding that posting content accessible worldwide does not constitute "express aiming" at California and that foreseeability of forum effects is insufficient. *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 270–73 (evidence must demonstrate "express aiming or intentional targeting").

These principles compel dismissal. This is an enforcement action concerning the online availability of digital design files for 3D-printed firearms. But personal jurisdiction turns on whether Defendants purposefully directed conduct at California—not the subject matter of the challenged files. Whether the files contain firearm designs, open-source software, or other digital content, the constitutional analysis is identical. The Complaint itself admits that CTRLPew is a Florida LLC with no offices, employees, bank accounts, or property in California. (*See* Compl. ¶ 10.) The same is true of Holladay. (Declaration of Alexander Holladay ("Holladay Decl.") ¶ 11.) Stripped to its essence, the State's jurisdictional theory is this: CTRLPew operates a website that links to a third-party platform where digital design files can be downloaded anywhere in the world, and a government

- 8 -

investigator in California performed test downloads. (*Id.* ¶¶ 53–62, 79–83.) But downloading files accessible to anyone, anywhere, is the unilateral act of the forum's agents—precisely the type of State-manufactured contact the Due Process Clause forbids. *Walden*, 571 U.S. at 284–91; *Pavlovich*, 29 Cal.4th at 276; *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 24–25.

The State's[1] own words confirm the weakness of its position. The Attorney General described this lawsuit as "creative[]," "trailblazing," and "groundbreaking"—labels that betray an awareness that existing law does not support the State's jurisdictional theory. *See* Cal. Dep't of Just., Press Release, *Ghost Gun Crackdown: Attorney General Bonta Files Landmark Lawsuit* (Feb. 6, 2026). This Court should decline the invitation to extend jurisdictional principles beyond their settled constitutional bounds. *Walden*, 571 U.S. at 284–91; *Pavlovich*, 29 Cal.4th at 274–78.

Because the State cannot meet its burden to demonstrate facts justifying the exercise of personal jurisdiction over these Florida defendants, the Court should grant this motion and quash service of the summons and complaint. Civ. Proc. Code § 418.10.

## II.      STATEMENT OF FACTS

### A.      CTRLPew Has No Contacts with California

CTRLPew is a Florida limited liability company with its principal place of business in Orlando, Florida. (Holladay Decl. ¶¶ 8, 25.) It maintains no physical presence in California—no offices, facilities, mailing addresses, telephone listings, bank accounts, registered agents, or property. (*Id.* ¶ 26.) It has no California-based employees and does not conduct business operations from California. (*Id.*)

Neither Holladay nor any CTRLPew authorized agent has traveled to California for business relating to this lawsuit. (*Id.* ¶ 27.) CTRLPew has not directed advertising, paid media, geotargeted campaigns, or solicitations at California residents. (*Id.* ¶ 28.)

CTRLPew's website, ctrlpew.com (the "CTRLPew Website") is accessible globally, like any website. It does not deploy geofencing, geotargeting, or California-specific

---

[1] Plaintiff The People of the State of California (the "State").

- 9 -

4917-5240-0281

features, and CTRLPew has not taken affirmative steps to cultivate a California audience. (*Id.* ¶ 29.)

CTRLPew also operates thegatalog.com ("TheGatalog.com") as a fan site and an informational resource. (*Id.* ¶ 4.) Registered around April 2021, it functions as a passive hub containing hyperlinks to profiles on Odysee.com, a third-party file-sharing platform. (*Id.* ¶¶ 6, 34.) TheGatalog.com does not host files for download; its content consists of commentary, analysis, and curation of links to externally hosted resources. (*Id.* ¶ 6.) It generates no revenue, is not monetized, deploys no geofencing or California-specific features, does not list file names referencing California, and provides no California-specific payment mechanisms, order forms, or delivery options. (*Id.* ¶¶ 7, 35–36.)

TheGatalog.com is not owned or operated by Gatalog Foundation, Inc., which has never been operational. (*Id.* ¶¶ 3–4, 23.) The profiles linked from TheGatalog.com and the CTRLPew Website are hosted on Odysee.com (a third-party platform), are accessible worldwide, and CTRLPew undertook no Odysee-related activity aimed at California residents. (*Id.* ¶¶ 17, 33.) As CTRLPew's agent for service of process, Holladay received the Summons and Complaint in Florida. (*Id.* ¶ 37.)

**B.    Holladay Has No Contacts with California**

Holladay is a Florida resident since March 2023, has never been domiciled in California, and his only presence in the State was in 2010 at Fort Hunter Liggett during military service. (*Id.* ¶¶ 11, 13.) Holladay owns no California property, maintains no office, mailing address, telephone listing, or bank account there, and has not traveled to California for any purpose connected to this lawsuit. (*Id.* ¶¶ 12–13.)

Holladay has not directed or engaged in advertising, paid media, geotargeted campaigns, or solicitations at California residents, nor purchased California-targeted ads or targeted California through any platform. (*Id.* ¶ 14.) He did not upload files to the Odysee profiles from California or for a California audience, does not control any Odysee profile associated with "The Gatalog," and conducted all activities relating to his works and

- 10 -

SNELL
& WILMER

CTRLPew's operations entirely within Florida. (*Id.* ¶¶ 15–18, 38.) Holladay received the Summons and Complaint in Florida. (*Id.* ¶ 24.)

### C.     The State's Allegations Do Not Establish Personal Jurisdiction

The State, through the California Department of Justice and the San Francisco City Attorney, filed this civil enforcement action against CTRLPew, Holladay, and other defendants, alleging violations of Civil Code sections 3273.61 and 3273.625 and California's Unfair Competition Law, Bus. & Prof. Code § 17200 et seq. (Compl. ¶¶ 1, 8.)

The Complaint admits CTRLPew is a Florida LLC headquartered in Orlando (*id.* ¶ 10), but contains no allegation that CTRLPew maintains offices, employees, property, or bank accounts in California. Instead, it substitutes legal conclusions for facts, asserting "Defendants intentionally availed themselves" of California's benefits without identifying any California transactions or acts purposefully directed at California residents—because there are none. (*Id.* ¶ 24.)[2]

Stripped of conclusions, the State's theory reduces to this: (1) TheGatalog.com links to third-party Odysee.com, where digital files are globally accessible (*id.* ¶¶ 50, 53–57, 65, 84–89); (2) "[n]othing" prevents California downloads (*id.* ¶¶ 58–61); and (3) a California DOJ analyst downloaded design files from Odysee and assembled a firearm (*id.* ¶¶ 79–83). These are allegations of passive Internet availability and unilateral forum downloads—not purposeful targeting of California.

### III.    THIS COURT CANNOT EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS

The State bears the initial burden to demonstrate facts justifying the exercise of jurisdiction by a preponderance of the evidence. *Vons Companies, Inc. v. Seabest Foods,*

---

[2] The State intentionally conflates the individual defendants throughout the Complaint, beginning in paragraph 15, which defines the defendants collectively as "Gatalog" or "Defendants." (Compl. ¶ 15.) This "group pleading" is particularly inappropriate here because the statutes on which the claims are based impose a scienter requirement that must be alleged for each defendant. (Compl. ¶¶ 98, 101.) *See, e.g., Glazer Capital Management, LP v. Magistri* (9th Cir. 2008) 549 F.3d 736, 743–45; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (2007) 551 U.S. 308, 326 n.6. It also proves problematic for the jurisdictional analysis, because "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder v. Jones* (1984) 465 U.S. 783, 790; *BMS*, 582 U.S. at 268 (similar).

- 11 -

SNELL & WILMER

*Inc.* (1996) 14 Cal.4th 434, 449; *ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 216–17. The State cannot meet that burden.

California's long-arm statute extends jurisdiction to the outer limits of federal due process. Code Civ. Proc. § 410.10; *Vons*, 14 Cal.4th at 444. To establish personal jurisdiction over a nonresident defendant, the plaintiff must demonstrate either (1) a traditional basis for jurisdiction, or (2) that the defendant has sufficient "minimum contacts" with the forum such that jurisdiction comports with traditional notions of fair play and substantial justice. *Vons*, 14 Cal.4th at 444–45. Minimum contacts may support either general jurisdiction or specific jurisdiction. *BMS*, 582 U.S. at 262–67; *Vons*, 14 Cal.4th at 445–46. None of these bases exist here.

### A.   There Are No Traditional Bases for Personal Jurisdiction

None of the traditional bases—physical presence when served, domicile, or consent—exist here. Defendants were served in Florida. (Holladay Decl. ¶¶ 24, 37.) CTRLPew is a Florida LLC headquartered in Orlando; Holladay is a Florida domiciliary who has never been domiciled in California. (*Id.* ¶¶ 11, 25.) And Defendants appear specially to contest jurisdiction, not having consented or made a general appearance. *In re Marriage of Obrecht* (2016) 245 Cal.App.4th 1, 8.

### B.   Defendants Do Not Have Sufficient Minimum Contacts with California to Establish Personal Jurisdiction

The minimum contacts doctrine protects two constitutional interests: the defendant's "liberty interest in not being subject to the judgments of a forum with which he or she has established no meaningful minimum 'contacts, ties or relations,'" and the "mutual limits on the states' sovereign power to exercise jurisdiction in a federal system." *Vons*, 14 Cal.4th at 445; *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 292. These restrictions "are more than a guarantee of immunity from inconvenient or distant litigation"—they reflect "territorial limitations on the power of the respective States." *BMS*, 582 U.S. at 263.

- 12 -

Minimum contacts may support either general jurisdiction (where the defendant is essentially "at home" in the forum) or specific jurisdiction (where the claims "arise out of or relate to" the defendant's forum contacts). *BMS*, 582 U.S. at 262. General jurisdiction is reserved for a defendant's place of incorporation or principal place of business—the paradigm forums where a defendant can be sued on any claim, even one unrelated to forum activities. *Id.* Specific jurisdiction, by contrast, requires an "affiliation between the forum and the underlying controversy." *Id.* at 264. Both inquiries are defendant-focused: the relevant contacts are those "the defendant himself creates with the forum State"—not the "unilateral activity" of the plaintiff. *Walden*, 571 U.S. at 284–85; *Burger King Corp. v. Rudzewicz* (1985) 471 U.S. 462, 475. Neither form of jurisdiction exists here.

### 1. California Lacks General Jurisdiction Over Defendants

General jurisdiction exists only where the defendant is fairly regarded as "at home" in the forum—typically where incorporated or maintaining its principal place of business. *Daimler AG v. Bauman* (2014) 571 U.S. 117, 137–39; *Goodyear Dunlop Tires Operations, S.A. v. Brown* (2011) 564 U.S. 915, 924. For individuals, the paradigm forum is domicile. *BMS*, 582 U.S. at 262. Outside these paradigm forums, "only a limited set of affiliations" will suffice. *Daimler*, 571 U.S. at 137; *see Shisler v. Sanfer Sports Cars, Inc.* (2006) 146 Cal.App.4th 1254, 1259–60.

General jurisdiction is foreclosed as a matter of law. CTRLPew is a Florida LLC headquartered in Orlando (Holladay Decl. ¶¶ 8, 25; Compl. ¶ 10), and Holladay is a Florida resident since March 2023 who has never been domiciled in California (Holladay Decl. ¶ 11). There is no allegation of California incorporation, headquarters, domicile, or the "exceptional" circumstances needed to displace the paradigm forums. *Daimler*, 571 U.S. at 139 n.19.

### 2. California Lacks Specific Jurisdiction Over Defendants

Specific jurisdiction requires: (1) purposeful availment or purposeful direction by the defendant toward the forum; (2) claims arising out of or related to the defendant's forum-related contacts; and (3) that jurisdiction comports with fair play and substantial

- 13 -

SNELL & WILMER

justice. *Vons*, 14 Cal.4th at 446–48; *BMS*, 582 U.S. at 262–63. The jurisdictional contacts must be the defendant's own, not the plaintiff's unilateral acts or the conduct of a third party. *Walden*, 571 U.S. at 286–91; *BMS*, 582 U.S. at 265–66; *Pavlovich*, 29 Cal.4th at 276. And for Internet contacts, general website accessibility does not equal forum targeting; there must be "express aiming" at the forum. *See, e.g.*, *Pavlovich*, 29 Cal.4th at 270–78; *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.* (4th Cir. 2002) 293 F.3d 707, 713–15; *Shrader v. Biddinger* (10th Cir. 2011) 633 F.3d 1235, 1240–42.

### (a)  Defendants have not purposefully availed themselves of California benefits

The purposeful-direction inquiry asks whether the defendant deliberately "reached out beyond" its home state to target forum residents. *Vons*, 14 Cal.4th at 446–50. "[T]he plaintiff cannot be the only link between the defendant and the forum"; the defendant must create the "necessary connection with the forum State" *through his own* "suit-related conduct." *Walden*, 571 U.S. at 285; *Pavlovich*, 29 Cal.4th at 276. The inquiry focuses on "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285.

*Pavlovich* squarely rejected jurisdiction based on passive Internet postings accessible worldwide. There, a Texas resident posted DVD decryption software online. *Pavlovich*, 29 Cal.4th at 265–66. The DVD Copy Control Association sued, arguing jurisdiction was proper because the defendant knew California's industries would be harmed. *Id.* at 269–70. The Court held that knowledge of California's industries, foreseeability of harm, and even intent to cause harm were each insufficient absent "express aiming" at California. *Id.* at 275–78. Equating accessibility with targeting would "vitiate long-held and inviolate principles of personal jurisdiction." *Id.* at 275 (quoting *GTE New Media Services Inc. v. BellSouth Corp.* (D.C. Cir. 2000) 199 F.3d 1343, 1350).

- 14 -

4917-5240-0281

Federal courts agree.[3] The Fourth Circuit requires that the defendant (1) direct electronic activity into the forum, (2) with manifested intent to engage in business there, and (3) cause a cognizable in-forum claim. *ALS Scan*, 293 F.3d at 714. Merely placing information online does not suffice, because "[s]uch passive Internet activity does not generally include directing electronic activity into the State with the manifested intent of engaging business or other interactions." *Id.*; *see also id.* at 712. The Tenth Circuit has held that untargeted Internet posting is analogous to placing an advertisement in a nationally circulated magazine—it can be read in every state but is not aimed at any one state. *Shrader*, 633 F.3d at 1240–44.

Here, the State alleges only that the CTRLPew Website and TheGatalog.com link to globally accessible Odysee profiles with download buttons, that "[n]othing" prevents California downloads, and that a State agent downloaded files. (Compl. ¶¶ 56–61, 79–83.) This case parallels *Pavlovich* in all material respects. The Odysee profiles are similarly passive—they are globally accessible and devoid of California-specific targeting, solicitation, or commercial activity. Neither the CTRLPew Website nor TheGatalog.com deploys geofencing, geotargeting, or California-specific features, and Defendants have not taken steps to cultivate a California audience. (Holladay Decl. ¶¶ 17, 29, 35.) If mere knowledge of potential harm to industries "centered in California" was insufficient in *Pavlovich*, 29 Cal.4th at 275–76, then the State's theory fails *a fortiori* here.

This conclusion is confirmed by recent authority where defendants engaged in far more forum-directed activity than the State alleges here. In *Stokinger v. Armslist, LLC* (1st Cir. 2026) 166 F.4th 229, the First Circuit held that a website designed to facilitate "local" firearm transactions—with state-specific language, geographic filtering, and tools advising sellers to list firearms where they are "physically located"—could not establish purposeful availment through design features alone. *Id.* at 236–39. Jurisdiction required affirmative

---

[3] Because California's long-arm statute reaches the limits of federal due process, the jurisdictional analysis under California and federal law is identical. California courts therefore often look to federal decisions, including federal circuit precedent. *See Pavlovich*, 29 Cal.4th at 268–71.

- 15 -

evidence the defendant knew its website was actively being used in the forum: thousands of forum-specific listings. *Id.* at 239–41.

By comparison, the CTRLPew Website, TheGatalog.com, and Odysee profiles associated with "The Gatalog" are far more passive. They lack geographic filtering, state-specific listings, targeted solicitation, or any mechanism to channel transactions to California. The State does not allege a single commercial transaction or contact with California; the only download identified was by the State's investigator. (*Cf.* Compl. ¶¶ 50–83.) This evidentiary void is fatal.[4] The allegation that "nothing" prevents California downloads lacks any limiting principle—under that logic, every website would be subject to jurisdiction everywhere. *Cf. Pavlovich*, 29 Cal.4th at 275–76; *Mavrix Photo, Inc. v. Brand Techs., Inc.* (9th Cir. 2011) 647 F.3d 1218, 1229–31; *Cybersell, Inc. v. Cybersell, Inc.* (9th Cir. 1997) 130 F.3d 414, 418–20.

The evidence confirms Defendants lack any California-directed contacts: neither advertised into California, conducted geotargeted outreach, sold files or parts to California residents, or uploaded content from or for California. (Holladay Decl. ¶¶ 12–16, 26–29, 33.) Holladay has not traveled to California since 2010, during military service. (*Id.* ¶¶ 11, 13.) These facts foreclose purposeful availment. *Vons*, 14 Cal.4th at 449–56; *Burdick*, 233 Cal.App.4th at 24–25; *ALS Scan*, 293 F.3d at 713–15.

### i.    The "CAG19" file reference does not constitute California targeting

The State highlights a "CAG19" file on Odysee described as referencing California compliance. (Compl. ¶ 69.) But Holladay did not create the "CAG19" file or its description. (Holladay Decl. ¶ 19.) These labels reside on a third-party platform (Compl. ¶¶ 56–71), and the Complaint does not allege they constitute Defendants' statements. Jurisdictional

---

[4] Other circuits are in accord. *See, e.g.*, *Carbone v. Kaal* (6th Cir. 2025) 140 F.4th 805, 812–14 (hosting content on forum-state servers does not establish purposeful availment where defendant did not direct tortious activity toward the forum); *Moore v. Cecil* (11th Cir. 2024) 109 F.4th 1352, 1363–64 (social media posts accessible in forum state do not satisfy *Calder* effects test absent evidence defendant targeted the forum specifically); *Kendall Hunt Publishing Co. v. Learning Tree Publishing Corp.* (8th Cir. 2023) 74 F.4th 928, 931.

- 16 -

contacts must be the defendant's own conduct, not publicly available third-party content. *Walden*, 571 U.S. at 284; *Burdick*, 233 Cal.App.4th at 24–25. The forum-jurisdiction analysis asks whether the defendant *expressly aimed conduct* at the forum, not whether publicly available third-party content contains compliance-oriented nomenclature. *See Pavlovich*, 29 Cal.4th at 276–78. Generic compliance references do not constitute California-directed solicitation.

The "CAG19" descriptor does not become marketing conduct simply because it nominally references California legal constraints. Absent California-directed solicitation, transactions, or conduct, there is no purposeful availment. *Pavlovich*, 29 Cal.4th at 274–78; *Shrader*, 633 F.3d at 1240–42; *Cybersell, Inc.*, 130 F.3d at 418–19 ("no court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state"). The contrast with *Snowney v. Harrah's Ent., Inc.* (2005) 35 Cal.4th 1054 is instructive: there, the defendant purchased California-directed advertising, offered inducements through California media, maintained a website accepting California reservations, and derived substantial revenue from California. *Id.* at 1063–70. Defendants engaged in no such California-directed commercial activity.

### ii.    The CTRLPew "California references" do not establish purposeful direction

The Complaint cites a clause allegedly in the CTRLPew Website's terms of service instructing "California Users and Residents" to contact the California Department of Consumer Affairs for complaints. (Compl. ¶ 91.) This is standard boilerplate from termsfeed.com templates, not targeted solicitation. (Holladay Decl. ¶ 32.) *See Pavlovich*, 29 Cal.4th at 274–78; *Young v. New Haven Advocate* (4th Cir. 2002) 315 F.3d 256, 262–64. Moreover, even if these references constituted purposeful direction (they do not), none are claim-related. *See* Section III(B)(2)(b), *infra*.

The Complaint references CTRLPew merchandise allegedly "mock[ing]" California laws. (Compl. ¶ 91.) But this merchandise—hats, shirts, patches, and stickers—constitutes expressive speech protected by the First Amendment. *See U.S. v. Stevens* (2010) 559 U.S.

- 17 -

4917-5240-0281

460, 468–69; *Junior Sports Magazines Inc. v. Bonta* (9th Cir. 2023) 80 F.4th 1109, 1116–20; *id.* at 1123–27 (VanDyke, J., concurring). The "warning" and "10 rounds only" stickers do not reference California, these products are available worldwide, and they are unrelated to the claims asserted here. (Holladay Decl. ¶¶ 30–31.)

Absent evidence of California-directed ad buys, geotargeted campaigns, or actual California transactions related to the State's claims, these references are legally insufficient. *Pavlovich*, 29 Cal.4th at 274–78; *Young*, 315 F.3d at 262–64.

### iii.   The State's unilateral downloads cannot create jurisdiction

The State's principal "California contact" is that an AG analyst downloaded files from Odysee using a California IP address. (Compl. ¶¶ 79–83.) That is precisely the plaintiff-contrived, unilateral conduct that cannot create jurisdiction. *Walden*, 571 U.S. at 284–85 ("[T]he plaintiff cannot be the only link between the defendant and the forum."). Because the defendant's suit-related conduct must create a substantial connection with the forum state, the State's own investigative activities cannot supply Defendants' forum contacts. *Id.* at 284; *Pavlovich*, 29 Cal.4th at 276; *Burdick*, 233 Cal.App.4th at 24–25; *Safieddine v. MBC FZ LLC* (2024) 103 Cal.App.5th 1086, 1101–02.

Holladay did not direct, authorize, or facilitate these downloads and had no knowledge of them until served with this lawsuit. (Holladay Decl. ¶ 20.) Finding personal jurisdiction here would let any plaintiff manufacture jurisdiction by accessing content from within the forum, eviscerating due process limits.

The Complaint further alleges the State 3D printed and assembled a firearm from a downloaded file. (Compl. ¶¶ 80–83.) Holladay was not involved in nor had knowledge of these actions—they were unilateral State conduct. (Holladay Decl. ¶ 21.) Like the *Walden* defendant, these Defendants "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" the forum. 571 U.S. at 288–89. Mere forum state access or downloads does not constitute purposeful direction. *Pavlovich*, 29 Cal.4th at 274–78; *ALS Scan*, 293 F.3d at 713–15; *Mavrix Photo, Inc.*, 647 F.3d at 1229–31.

- 18 -

The statutory scheme reinforces this conclusion. Civil Code section 3273.61(a)(1) exempts transfers to "any law enforcement agency." The very conduct the State relies upon—its investigator's downloads—is exempt from the statute's substantive reach. It would be anomalous to permit the State to manufacture jurisdiction over an out-of-state defendant through conduct the Legislature determined should not give rise to liability.

### iv.    The "special regulation" theory does not apply

The State may suggest that California's recent laws addressing digital firearm code supply a "special regulation" basis for jurisdiction. California courts have recognized narrow circumstances where specially regulated conduct, purposefully directed at the forum, can support jurisdiction. *Hogue v. Hogue* (2017) 16 Cal.App.5th 833, 838–39. But even in "special regulation" contexts, the defendant's conduct must still be expressly aimed at California. *Pavlovich*, 29 Cal.4th at 272–73, n.3.

Here, the State alleges no California-targeted conduct—only globally accessible postings and State-engineered downloads. (Compl. ¶¶ 56–61, 79–83; Holladay Decl. ¶¶ 14–16, 28–29.) The "special regulation" concept therefore offers no jurisdictional shortcut. *Cf. Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 117–20. The State may not expand judicial reach simply by enacting a regulatory scheme and arguing that any out-of-state conduct potentially violating it is thereby "aimed at" California. Such a rule would allow any state to bootstrap substantive regulation into unlimited personal jurisdiction, undermining the structural safeguards the Due Process Clause provides.

### (b)    The State's claims do not arise out of or relate to California-directed contacts by Defendants

Even if the State could demonstrate purposeful direction (it cannot), specific jurisdiction requires that "the suit" arise "out of or relat[e] to the defendant's contacts with the forum." *BMS*, 582 U.S. at 262 (quoting *Daimler*, 571 U.S. at 127). Courts demand "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Id.* (quoting *Goodyear*, 564 U.S. at 919).

- 19 -

Without such connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.* at 264; *Pavlovich*, 29 Cal.4th at 269.

The State's causes of action center on alleged Internet distribution of digital files via the third-party Odysee site and the State's own downloads and test build. (Compl. ¶¶ 58–61, 79–83, 97–105.) Those are not California-directed acts by Defendants. They are general postings accessible everywhere, followed by the forum's unilateral conduct. Such allegations cannot supply the requisite affiliation. *Walden*, 571 U.S. at 284–91.

*Snowney* illustrates the proper application where a defendant actually targets California residents with advertising and consummates online transactions. 35 Cal.4th at 1064–70. Here, by contrast, the State pleads no California transactions for digital code, no California customer relationships, and no in-state uploading, fulfillment, or distribution. (*See* Compl. ¶¶ 24, 50–61, 79–83.) To the extent CTRLPew sells merchandise, the State connects no California sale to the claims asserted, which concern alleged unlawful distribution of code, not merchandise. (*Id.* ¶¶ 84–92, 97–105.) The required relatedness is absent. *BMS*, 582 U.S. at 264–66.

### i. Conclusory alter ego and conspiracy assertions do not salvage jurisdiction

The Complaint asserts alter ego, agency, and conspiracy theories in general terms. (Compl. ¶¶ 16–21.) None can salvage jurisdiction. Jurisdiction must be established as to each defendant individually—acts of one party, even an alleged coconspirator or alter ego, cannot be imputed to another. *BMS*, 582 U.S. at 265–66, 268; *Walden*, 571 U.S. at 286; *CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1118.

The Complaint's alter ego allegations recite that defendants acted as "alter egos" and "agents" but plead no concrete facts—no commingling, no disregard of formalities, no undercapitalization, no pervasive control. (Compl. ¶¶ 16–21.) The evidence contradicts these assertions: CTRLPew maintains its own bank accounts and records and operates as a distinct entity, and Holladay's role as Treasurer of the Gatalog Foundation is nominal—that entity has never been operational. (Holladay Decl. ¶¶ 3, 22–23.) To impute jurisdictional

- 20 -

SNELL &WILMER

contacts via alter ego, the State must demonstrate (1) facts showing such unity of interest that separate personalities no longer exist, and (2) that the jurisdictionally relevant conduct was the alter ego's own. *CenterPoint Energy*, 157 Cal.App.4th at 1119–20. The State's conclusory assertions fall far short of this demanding showing.

### C.      Asserting Jurisdiction Would Offend Fair Play, Substantial Justice, and Interstate Federalism

Even assuming, *arguendo*, the State could establish minimal contacts (it cannot), exercising jurisdiction would be unreasonable. *Vons*, 14 Cal.4th at 475–79. Litigating in California would impose undue burdens on Defendants inconsistent with the Due Process Clause's role as an instrument of interstate federalism. *BMS*, 582 U.S. at 261–66. California's policy views on firearms regulation cannot displace the structural limits on state judicial power. *Id.* at 263.

### D.      At Minimum, the State Has Not Met Its Initial Burden and No Jurisdictional Discovery Is Warranted

The State bears the initial burden to demonstrate jurisdiction through competent evidence. *Vons*, 14 Cal.4th at 449; *ViaView*, 1 Cal.App.5th at 216–18. It has not done so. The undisputed evidence establishes Defendants did not purposefully direct any conduct toward California. (Holladay Decl. ¶¶ 12–16, 26–29, 33.) The Complaint identifies no California advertisements, no California sales beyond the State's own downloads, no geotargeted campaigns, and no in-forum distribution.

Jurisdictional discovery would fare no better. Such discovery is permitted only where the plaintiff identifies specific facts discovery might produce. *HealthMarkets, Inc. v. Superior Court* (2009) 171 Cal.App.4th 1160, 1173; *Safieddine*, 103 Cal.App.5th at 1108–09. The State cannot identify any such facts. Under these circumstances, jurisdictional discovery would amount to a prosecutorial fishing expedition. *ALS Scan*, 293 F.3d at 716.

## IV.      CONCLUSION

The State seeks to test the outer limits of California's power over out-of-state entities based on globally accessible Internet content and the forum's own unilateral downloads.

SNELL & WILMER

- 21 -

Settled principles of due process foreclose personal jurisdiction on these facts. The State has not identified California-directed conduct by CTRLPew or Holladay giving rise to these claims—because there is none. Conclusory alter ego labels and boilerplate terms-of-service references cannot substitute for defendant-specific minimum contacts.

Because the Due Process Clause, as an instrument of interstate federalism, denies California the power to hale these Florida defendants into its courts on the allegations pleaded, Defendants respectfully request that this Court grant their special appearance motion and quash service of the summons and complaint under Code of Civil Procedure section 418.10(a)(1).

Dated: March 30, 2026                    SNELL & WILMER L.L.P.

By: _____
        Colin R. Higgins
        Cameron J. Schlagel
        Susan G. Biscardi
        *Attorneys for Defendants*
        *(Specially Appearing Solely for*
        *Purpose of Challenging Jurisdiction)*

- 22 -

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Suite 1400, Costa Mesa, CA 92626-7689.

On March 30, 2026, I served, in the manner indicated below, the foregoing document described as **DEFENDANTS CTRLPEW LLC AND ALEXANDER HOLLADAY'S NOTICE OF MOTION AND MOTION TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURISDICTION** on the interested parties in this action as follows:

BY REGULAR MAIL: I caused such envelopes to be deposited in the United States mail at Costa Mesa, California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to [As indicated on the attached Service List]

BY OVERNIGHT DELIVERY: I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees as set forth on the attached Service List.

BY PERSONAL SERVICE: I caused such envelopes to be delivered by hand to the offices of the addressees.

**X**   BY ELECTRONIC MAIL: I served a true and correct copy by electronic transmission through this Court's File & Serve Xpress system. Participants who are registered with File & Serve Xpress will be served electronically.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on March 30. 2026, at Costa Mesa, California.

*Deanna Kunz*
Deanna Kunz

- 1 -

4917-5240-0281

# EXHIBIT 3

ROB BONTA (SBN 202668)
Attorney General of California
NICKLAS A. AKERS (SBN 211222)
Senior Assistant Attorney General
MICHAEL E. ELISOFON (SBN 240707)
Supervising Deputy Attorney General
VESNA CUK (SBN 309157)
ANDREW J. WIENER (SBN 282414)
DANIEL DUBOIS (SBN 345123)
REBECCA S. ROBERTS (SBN 225757)
BRENDAN RUDDY (SBN 297896)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3782
  Fax:  (415) 703-5480
  E-mail:  vesna.cuk@doj.ca.gov

DAVID CHIU (SBN 189542)
San Francisco City Attorney
YVONNE R. MERÉ (SBN 175394)
Chief Deputy City Attorney
SARA J. EISENBERG (SBN 269303)
Chief of Complex and Affirmative Litigation
RONALD H. LEE (SBN 238720)
Asst. Chief of Complex and Affirmative Litigation
KARUN A. TILAK (SBN 323939)
Deputy City Attorney
  Fox Plaza
  1390 Market Street, 6th Floor
  San Francisco, CA  94102-5408
  Telephone:  (415) 355-3308
  Fax:  (415) 437-4644
  E-mail:  karun.tilak@sfcityatty.org

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**04/01/2026**
**Clerk of the Court**
**BY: SANDRA SCHIRO**
**Deputy Clerk**

[EXEMPT FROM FILING FEES
PURSUANT TO
GOVERNMENT CODE
SECTION 6103]

*Attorneys for Plaintiff, The People of the State of California*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>        **Plaintiff,**<br><br>        v.<br><br>**GATALOG FOUNDATION INC., a Florida corporation; CTRLPEW LLC, a Florida limited liability company; ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive,**<br><br>        **Defendants.** | Case No. CGC-26-633508<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE PEOPLE'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Dept:      304<br>Judge:    Hon. Ethan P. Schulman<br>Action Filed:  February 6, 2026<br>Trial Date:   None set |

1

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 5

    I.     INTRODUCTION ..................................................................................... 5

    II.    FACTUAL BACKGROUND ...................................................................... 6

        A.    Ghost guns and accessories are made to be untraceable ............................ 6

        B.    Defendants openly distribute digital code and instructions for 3D printing firearms and prohibited accessories into California ...................... 7

            1.    The Gatalog website neatly organizes the files Defendants distribute ................................................................................... 8

            2.    Defendants distribute their files, without limitation, to anyone in California ................................................................... 8

            3.    Defendants' files make 3D printing firearms and prohibited accessories easy .............................................................. 9

            4.    Ctrl Pew generates revenue for Defendants and specifically targets California .................................................... 10

        C.    Defendants' conduct presents a major threat to public safety in California ....................................................................................... 12

    III.   LEGAL STANDARD ............................................................................... 14

    IV.   LEGAL ARGUMENT .............................................................................. 14

        A.    The People are reasonably probable to prevail on their claim under Civil Code section 3273.61 ...................................................... 14

            1.    There is a rebuttable presumption that Defendants have violated the law. ........................................................................ 15

            2.    The evidence reflects Defendants' knowing distribution of digital firearm manufacturing code to California ........................ 16

        B.    The People are reasonably probable to prevail on their claim under Civil Code § 3273.625 ........................................................... 17

        C.    The People are reasonably probable to prevail on their claim under the UCL ..................................................................................... 18

        D.    The People have established irreparable harm absent a preliminary injunction ........................................................................... 19

    V.    CONCLUSION ....................................................................................... 19

2

# TABLE OF AUTHORITIES

**Page**

**CASES**

*BBBB Bonding Corp. v. Caldwell*
(2021) 73 Cal.App.5th 349 ........................................................................................... 14

*Bondi v. VanDerStok*
604 U.S. 458 (2025) ...................................................................................................... 13

*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*
(1999) 20 Cal.4th 163 ................................................................................................... 18

*Farmers Ins. Exch. v. Superior Ct.*
(1992) 2 Cal.4th 377 ..................................................................................................... 18

*IT Corp. v. Cnty. of Imperial*
(1983) 35 Cal.3d 63 ................................................................................................ 14, 19

**STATUTES**

18 U.S.C.
§ 922................................................................................................................................. 12

27 C.F.R.
§ 478.92 ............................................................................................................................. 6

Bus. & Prof. Code
§ 17200, et seq. ............................................................................................................... 18
§ 17203 ............................................................................................................................. 14

Civ. Code
§ 3273.60, subd. (a)......................................................................................................... 14
§ 3273.61............................................................................................................... 7, 14, 15
§ 3273.625........................................................................................................... 7, 10, 17, 18

Pen. Code,
§ 2.02, subd. (2)(c) .......................................................................................................... 18
§ 16520............................................................................................................................. 10
§ 16531............................................................................................................................. 10
§ 16740............................................................................................................................... 6
§ 16880............................................................................................................................... 6
§ 17210............................................................................................................................... 6

## TABLE OF AUTHORITIES
### (continued)

**Page**

§ 28160 *et seq.* ................................................................................................................ 12
§ 29180 ................................................................................................................................. 6
§ 29185 ............................................................................................................................. 9, 10
§ 29186 ................................................................................................................ 7,  16, 17, 19
§ 30400 ............................................................................................................................... 13
§ 31910, subd. (a) .............................................................................................................. 12
§ 32310 ................................................................................................................................. 6
§ 32311 ................................................................................................................................. 6
§ 32625 ................................................................................................................................. 6
§ 33410 ................................................................................................................................. 6

4

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

California faces a public safety crisis from the proliferation of unserialized, untraceable, privately assembled firearms, commonly called ghost guns, and dangerous firearm accessories such as machinegun conversion devices (i.e., auto-sears). In the course of a decade, the number of ghost guns and auto-sears recovered annually by law enforcement jumped from just 26 ghost guns in 2015 to over 11,000 ghost guns and auto-sears on average per year by 2021-2025.

The Legislature has taken notice and responded.  California law unequivocally and explicitly prohibits the distribution of computer code for producing firearms and dangerous firearm accessories with a 3D printer to individuals who are not licensed to manufacture firearms. Most recently, in October 2025, California enacted new provisions of the Civil Code that clarify and expand existing law specifically to address "the increasing number of ghost guns being produced via consumer-level computer operated machines such as 3D printers." (Sen. Com. on Public Safety, Rep. on Assem. Bill No. 1263 (2025-2026 Reg. Sess.) Mar. 24, 2025, p. 7.)

Defendants undisputedly distribute into California computer code for 3D printing firearms and dangerous firearm accessories.  Indeed, Defendants actively encourage visitors to their websites to "[b]ecome [u]ngovernable . . . [b]y owning an untraceable firearm" and provide detailed instructions to "print guns." With just a few keystrokes, a legal analyst with the California Attorney General's office downloaded code disseminated by Defendants that can be used to assemble over 130 different models of firearms and more than a dozen dangerous firearm accessories that make firearms more harmful and lethal. The legal analyst in no way concealed that he was downloading these files from a computer in California and Defendants made no efforts to prevent the analyst from doing so.

Defendants' code works exactly as intended.  Using Defendants' code and readily available equipment and materials—a 3D printer, plastic filament and filament drying box, open-source 3D printing software, and easy-to-purchase firearm parts—the People printed and assembled a fully functioning handgun modeled after a Glock 19 pistol in approximately 8 hours. A similar model 3D printed gun released by Deterrence Dispensed, the predecessor entity to Defendant Gatalog

5

Foundation Inc., was used to murder UnitedHealthcare CEO Brian Thompson.[1]

Without intervention, Defendants will continue to cause significant and irreparable harm by contributing to the proliferation of dangerous and illegal ghost guns and accessories in California. The People ask the Court to preliminary enjoin Defendants from distributing digital firearm manufacturing code into California and from promoting and facilitating the unlawful manufacture of firearms.

## II.    FACTUAL BACKGROUND

### A.    Ghost guns and accessories are made to be untraceable

Ghost guns are privately made firearms (or "PMFs") that lack a serial number and are manufactured from products sold or produced without a background check.  (Declaration of San Francisco Police Department Chief of Police Derrick Lew ("Lew Decl.") ¶¶ 4-6.)  As relevant here, they can be manufactured using consumer-grade 3D printers—so-called "3D printed firearms."  (*See id.* at ¶¶ 9-10; Declaration of Paul Briant, Ph.D., P.E. ("Briant Decl.") p. 30.) While state and federal law require that the key component of a gun—the frame or lower receiver—bear a serial number to enable tracing (see Pen. Code § 29180; 27 C.F.R. § 478.92), 3D printers can be used to print frames and receivers without a serial number.  A 3D printed frame or receiver can then be combined with other parts—which may be commercially available or also 3D printed—to produce an untraceable, unserialized ghost gun.

In addition, 3D printers can be used to print firearm accessories that can be installed on ghost guns or commercially purchased firearms to increase their lethality.  Many of these accessories are illegal to manufacture or possess under California law, including:  auto-sears (see Pen. Code §§ 16880, 32625); large-capacity magazines, which are magazines that have the capacity to accept more than 10 rounds (see Pen. Code §§ 16740, 32310, 32311); and silencers, which dampen the sound of a shot to help conceal a shooter (see Pen. Code §§ 17210, 33410).

3D printed firearms and prohibited accessories can be produced with relative ease at home. They can be printed using standard consumer-grade 3D printers and plastic filament that are

---

[1] Andy Greenberg, *The 'Ghost Gun' Linked to Luigi Mangione Shows Just How Far 3D-Printed Weapons Have Come*, WIRED (Dec. 10, 2024), https://www.wired.com/story/luigi-mangione-united-healthcare-3d-printed-gun-fmda-chairmanwon-v1/.

inexpensive and widely available online—often costing only several hundred dollars—and assembled with easy-to-purchase parts.  (See Briant Decl. p. 30; Declaration of Special Agent Supervisor Salvador Gonzalez ("Gonzalez Decl.") ¶¶ 22-23, 63, 68.)  Similarly, the generic software needed to transmit programming instructions to a 3D printer ("slicer" software) is freely available online.  (Declaration of Belinda Chan ("Chan Decl.") Ex. B p. 4.)  And as described below, Defendants make it easy for a user to program a 3D printer to produce a functional firearm or accessory by providing not only code files but also the necessary printer settings.

While the ease of 3D printing firearms has enabled bad actors to evade background checks and other firearm laws, recent California laws aim to address the serious public safety threat posed by 3D printed firearms and dangerous accessories.  As relevant here, Civil Code section 3273.61 prohibits knowingly distributing or causing to be distributed "digital firearm manufacturing code" to persons in California who are not licensed to manufacture firearms or a member of law enforcement or the military.  And as of the first of this year, Civil Code section 3273.625 makes it unlawful to knowingly, willfully, or recklessly aid, abet, promote, or facilitate the "unlawful manufacture of firearms," including the manufacture of a firearm using a 3D printer by an unlicensed individual and the manufacture of accessories such as auto-sears and large-capacity magazines. (See Pen. Code § 29186, subd. (b).)

**B.      Defendants openly distribute digital code and instructions for 3D printing firearms and prohibited accessories into California**

Defendants distribute files[2] containing digital code and instructions for manufacturing or producing firearms and prohibited firearm accessories using a 3D printer.  The individual Defendants are principals in the corporate entities (Chan Decl. Exs. PP, QQ) and have developed several of the files themselves. (Chan Decl. Exs. D-F, H-Q, S-Y, CC.)  Defendants also review, approve, and disseminate files submitted by third party gun developers.  Defendants distribute these files through two websites—"The Gatalog" (thegatalog.com) and "Ctrl Pew" (ctrlpew.com)—and related profiles on an online video and filesharing platform called Odysee.

---

[2] Throughout, the general term "files" refers to the files available for download from Defendants' Odysee profiles, as discussed in Section II.B.2., *infra*, which contain both digital code and instructions for 3D printing and assembling specific firearm and accessory designs.

7

**1.    The Gatalog website neatly organizes the files Defendants distribute**

The Gatalog[3] website primarily directs users to profiles containing code files that Defendants maintain on Odysee (https://odysee.com).[4]  The homepage of the Gatalog website contains links to these profiles, each bearing the name of a category of files, for example, "Printable Frames and Receivers." (Declaration of Jacinto Fernandez ("Fernandez Decl.") Ex. E.) The Gatalog website also directs developers to a platform to submit their designs, but Defendants make clear that Gatalog leadership—i.e., Defendants—vet these designs and ultimately control what is posted to the website and associated Odysee profiles.  (Chan Decl. Exs. NN, OO pp. 8–9.) The website also links to the Ctrl Pew website.  (Fernandez Decl. Ex. B.)  A snapshot of the Gatalog homepage appears below.



**2.    Defendants distribute their files, without limitation, to anyone in California**

Through nine Gatalog Odysee profiles, Defendants make digital code and instructions for 3D printing firearms and accessories available for download. (Briant Decl. pp. 10-11, 28-29.) The names of the Odysee profiles are nearly the same as the links on the Gatalog website, except with "The Gatalog's" in front of the title.  (E.g., Fernandez Decl. ¶ 26, Ex. G.) The profiles and individual design pages bear a Gatalog logo.  (See, e.g., *id.* ¶¶ 26, Exs. G, Q.)  And the individual pages further note that the files are "present[ed]" by "The Gatalog" and invite the user to "Join the community at thegatalog.com."  (See, e.g., *id.* ¶ 26, Ex. Q)

---

[3] "Gatalog" is a play on words, a cross between "gat," which is slang for a firearm and "catalog."
[4] Odysee is similar to video-sharing platform YouTube but also allows users to share non-video files. Odysee is not a defendant in this action.

8

The files on Odysee are available for free and can be downloaded by simply clicking "download." (E.g., Fernandez Decl. ¶ 26, Ex. Q.)  Nothing on the Gatalog website or the corresponding Odysee profiles prevents downloads from California or requires users to demonstrate that they have state and federal manufacturer's licenses or are otherwise subject to an exception.  On January 7, 2026, a legal analyst of the California Attorney General's Office using a California-based IP address visited each of the Gatalog Odysee profiles, accessed from the Gatalog homepage.  (Fernandez Decl. ¶¶ 17-28.)  The legal analyst downloaded all of the files available without issue, which consisted of 243 .zip files.  (*Id.*)  The Gatalog website makes available files for at least one design directed to California, a printable frame called "The CAG19," described as a "California Compliant Glock 19-based Carbine kit."[5]  (*Id.* Ex. P.)

### 3.    Defendants' files make 3D printing firearms and prohibited accessories easy

The Gatalog Odysee profiles contain files for over 130 different models of 3D printed firearms and more than a dozen different designs of prohibited firearm accessories, including for auto-sears, large-capacity magazines, and silencers.  (Fernandez Decl. Exs. F-K, M-DD; Gonzalez Decl. ¶¶ 62, 64, 67, 74, 77, 85 and Exs. H and P at p. 3.)  The files themselves consist of individual zip folders for each design.  (Fernandez Decl. ¶¶ 25-26.)  According to the People's expert in mechanical engineering, the zip folders contain computer-aided design ("CAD") files that can be used to program 3D-printers.  (Briant Decl. pp. 10-11.)  Most folders also include instructions for how to use the CAD files to print the design, which often provide recommended materials and specific print settings.  (*Ibid.*)  And many folders include further instructions for how to assemble or complete the design with additional parts or tools, after it has been printed. (*Ibid.*; Gonzalez Decl. ¶¶ 21-22, 63, 68, 79-80, Exs. B, C, H, and P.)

The CAD files and instructions may be readily used to program a 3D printer to print the designs reflected in the files.  (Briant Decl. pp. 4, 14, 19, 21, 24.)  This is done by first uploading the CAD files to a "slicer" software and applying the printer settings provided in the instructions and/or default settings where none are provided.  (Briant Decl. pp. 7, 10.)  The slicer software

---

[5] Despite the name, 3D printing such a firearm without a manufacturer's license is illegal under California law. (Pen. Code § 29185, subd. (a).)

9

then transmits programming instructions for the printer (called "gcode"), which are then loaded onto a 3D printer to print the item.  (Briant Decl. p. 7.)

Using the files for one of the frame designs in the Gatalog files, the "FMDA DD 19.2," the People 3D printed and assembled a functioning firearm modeled after a Glock 19 handgun. Beginning on June 3, 2025, following the printer settings and filament type recommended in the design file and using a printer model recommended in other Gatalog files, the People's expert performed three prints of the frame design.[6] (Briant Decl. pp. 30-39.)  Each print took approximately 7.5 hours.  (*Id.* at p. 30.)  On July 16, 2025, a Special Agent Supervisor at the California Department of Justice, Bureau of Firearms, Salvador Gonzalez ("SAS Gonzalez"), assembled an operational handgun using one of the prints.  (Gonzalez Decl. ¶¶ 20-38.)  He followed the written assembly instructions provided in the Gatalog file, which explained which firearm parts to purchase and what tools to use, and assembled the firearm in one hour.  (*Id.*)  In short, the People produced an operational handgun in approximately 8.5 hours.

The People's expert and SAS Gonzalez also reviewed files for several firearm accessories made available by Defendants, including an auto-sear (the "'Make Glocks Full Auto' Glock autosear"), various 3D printable 9mm large-capacity magazines (including a 17 round, 25 round, and 30 round), and silencers of different sizes. (Briant Decl. pp. 19-28; Gonzalez Decl. ¶¶ 59-85 and Exs. C, H, and P at p. 3.) The files appear to be designed to produce functioning accessories. (Briant Decl. pp. 19, 21, 24; Gonzalez Decl. ¶¶ 59-85.)

### 4.    Ctrl Pew generates revenue for Defendants and specifically targets California

Like the Gatalog website, the Ctrl Pew[7] website links to the 3D printing files available for download on the Gatalog's Odysee profiles. The homepage invites users to "Browse All The Gatalog Releases" and includes a search box to "Search The Gatalog."  (Chan Decl. Ex. A.) Individual design pages contain a "[d]ownload" button that takes users to the corresponding page

---

[6] Prior to any modification, the three items that came out of the printer already constituted firearm precursor parts, which are regulated under Civil Code sections 3273.61 and 3273.625.  (Gonzalez Decl. ¶¶ 19; see Pen. Code §§ 29186, subd. (b)(3), 29185, subd. (a), 16520, subd. (b)(18), and 16531, subd. (a).)

[7] The name Ctrl Pew stands for 3D printing weapons: "ctrl" for the keyboard key and "Pew" for "Print Every Weapon."  (Chan Decl. Ex. A.)

10

on Odysee.  (E.g., Chan Decl. Ex. C.)

Defendants Holladay, Larosiere, and Elik each develop their own designs for 3D printed firearms and firearm accessories, which have individual pages on the Ctrl Pew site and are available for download on the Gatalog Odysee profiles. The Ctrl Pew site attributes the designs to Defendants or their online handles:  "@ctrlpew," "Matt Larosiere" (who also goes by "Fuddbusters"), and "IvanTheTroll," respectively. Collectively, there are over twenty 3D printed designs attributable to Holladay, Larosiere, and Elik.  (Chan Decl. Exs. D-F, H-Q, S-Y, CC.)

The Ctrl Pew site also provides general guides for 3D printing firearms and firearm accessories, sells merchandise, solicits donations for gun developers, gives product recommendations, and earns commissions through affiliate links to various 3D printing equipment, material, and other products.  (Chan Decl. Exs. B, Z, BB.)  Defendants Holladay, Larosiere, and Elik each have pages for receiving donations through the Ctrl Pew website. (*Id.* Ex. BB.)  The Ctrl Pew website also directs users to purchase parts kits to complete their 3D printed firearm designs from a "preferred parts vendor" (E.g., *Id.* Exs. CC, U, DD, O, EE) that is in fact owned and operated by Defendants Larosiere and Holladay.  (*Id.* Ex. RR.)

Ctrl Pew directs its 3D printed gun content to California residents.  It sells merchandise directed to California, including a "warning" sticker mocking California law that places restrictions on 3D printers for manufacturing firearms and a "10 rounds only" sticker making fun of state law restrictions on large-capacity magazines.[8]  (Chan Decl. Exs. AA, MM.)  In addition, the Ctrl Pew terms of service instruct "California Users and Residents" to resolve complaints by contacting the California Department of Consumer Affairs.  (*Id.* Ex. FF.)

The Ctrl Pew site encourages users to circumvent firearms laws through 3D printing.  For example, one piece of merchandise it sells states "Go and make it.  Print one of everything. Laugh on the grave of gun control."  (Chan Decl. Ex. GG.)  And the site describes the FGC-9, a design that stands for "F*** Gun Control," as an untraceable firearm enabling individuals to

---

[8] The sticker is a yellow hazard triangle sign that states, "Not for Making Guns." (Chan Decl. Ex. AA.) The product posting refers to California legislation prohibiting the sale of 3D printers with the primary function of manufacturing firearms, and it jokes, "we're sure you weren't planning on using your . . . 3D printer [for making guns] anyway, right?" (*Id.*)

11

"[b]ecome [u]ngovernable" with a "veto power on par with their government." *(Id.* Exs. HH, II.)

**C.    Defendants' conduct presents a major threat to public safety in California**

Ghost guns and prohibited firearm accessories pose a grave threat to public safety. Because they can be procured without a background check, ghost guns make it easier for prohibited persons such as people convicted of dangerous felonies and violent crimes, adjudicated domestic abusers, and minors to obtain firearms. (Lew Decl. ¶¶ 5-6; see also 18 U.S.C. § 922(d), (t); Pen. Code § 28160 *et seq.*) And because they lack serial numbers, ghost guns impede law enforcement's ability to trace firearm ownership and prevent and solve crimes. (Lew Decl. ¶¶ 5-7; Declaration of San Mateo District Attorney Stephen Wagstaffe ("Wagstaffe Decl.") ¶ 9.) Ghost guns also endanger law enforcement officers executing search warrants and restraining orders, as they cannot check in advance if residents may be in possession of ghost guns like they do with registered firearms. (Wagstaffe Decl. ¶ 11.) And ghost guns are inherently more dangerous than commercial firearms because of the variability in the manufacturing and assembly process and they have been found unsafe to fire. (Declaration of Oakland Police Department Officer Bryant Weatheroy ("Weatheroy Decl.") ¶ 7.) Moreover, many ghost-gun handgun designs lack important safety features required by California law that are intended to prevent accidental discharges and reduce the resulting risk of injury or death. (See Gonzalez Decl. ¶¶ 40-58; Pen. Code § 31910, subd. (a).) Finally, prohibited accessories dangerously increase the capacity of a firearm to inflict harm, such as with auto-sears. (See Lew Decl. ¶ 10(b).)

California is suffering from a ghost-gun crisis that has escalated dramatically over the course of a decade. Statewide, law enforcement agencies recovered just 26 ghost guns in 2015 and more than 11,000 ghost guns and auto-sears on average per year over the past five years.[9] (Gonzalez Decl. ¶ 92.) In San Francisco, 44% of guns recovered in homicide cases in 2020 were ghost guns, and hundreds of ghost guns were recovered between 2022 and 2025. (Lew Decl. ¶ 7.) In Oakland, more than 1,100 ghost guns were recovered over the past five years. (Weatheroy Decl. at ¶ 6.) In San Mateo County, approximately 33%-50% of all firearms-related crimes

---

[9] Data for 2015-2025 includes reports of seized ghost guns and data for 2024-2025 includes reports of seized ghost guns as well as auto-sears. (Gonzalez Decl. ¶ 92.)

12

charged by the District Attorney's Office involve ghost guns. (Wagstaffe Decl. ¶ 5.) And in San Diego County, the Sheriff's Office has recovered at least 830 ghost guns since 2020. (Declaration of San Diego County Sheriff's Office Crime and Intelligence Analysis Manager Brent Jordan ("Jordan Decl.") ¶ 4.)

3D printed firearms and prohibited accessories are a rapidly expanding part of the ghost gun problem. Since federal and state regulations have restricted the sale of ghost gun "kits" and unfinished frames and receivers used to produce ghost guns, 3D printed guns have become more appealing for evading gun control laws. (See *Bondi v. VanDerStok*, 604 U.S. 458 (2025); Pen. Code § 30400.) In San Francisco, while 3D printed firearms were rarely recovered before 2022, since then, approximately 40 have been recovered. (Lew Decl. ¶ 9.) And local law enforcement agencies in the state have recovered 3D printed firearms in cases involving drugs, assaults, thefts, and criminal threats, and from prohibited persons including felons and minors. (*Id.* Decl. ¶ 10; Weatheroy Decl. ¶ 9; Jordan Decl. ¶ 6.) They have also recovered exceptionally dangerous 3D printed firearms and accessories, including illegal assault rifles, machineguns, auto-sears, and large-capacity magazines. (Wagstaffe Decl. ¶ 7; Lew Decl. ¶¶ 9-10.)

Specific cases underscore the real and substantial danger posed by ghost guns and illegal firearm accessories. For example, in May 2023, a San Francisco resident prohibited from possessing firearms due to a prior felony conviction was arrested for manufacturing and selling firearms, including 3D printed ghost guns, machineguns converted with auto-sears, and a gun that had been used to shoot at police officers. (Lew Decl. ¶ 10(c).) He had more than a dozen frames and receivers, four pistols, an AR-15 style rifle, and hundreds of rounds of ammunition in his possession. (*Id.*) In 2025, SFPD officers investigating the illegal sale of an auto-sear recovered several 3D printed firearms, multiple 3D printers, and various magazines, firearm parts, and ammunition from the suspect's home. (*Id.* ¶ 10(b).) In 2025, police officers arrested a San Mateo County resident for stalking and firearm-related crimes and recovered from his home six illegal assault weapons, all of which were ghost guns, as well as a 3D printer and other machinery for building guns. (Wagstaffe Decl. ¶ 7.) And in November 2025, two minors were arrested in

13

connection with a school shooting in Oakland involving a ghost gun in which a minor student had been shot in the back. (Weatheroy Decl. ¶ 9.)

## III.   LEGAL STANDARD

The Attorney General and City Attorney have the authority to seek injunctive relief under each of the three causes of action here. (Civ. Code §§ 3273.61, subd. (c)(2), 3273.625, subd. (c)(2); Bus. & Prof. Code § 17203.) When the People seek to preliminarily enjoin the violation of laws that provide for such injunctive relief and establish that it is "reasonably probable" they will prevail on the merits, "a rebuttable presumption arises that the potential harm to the public outweighs the potential harm to the defendant." (*IT Corp. v. Cnty. of Imperial* (1983) 35 Cal.3d 63, 72.) A court need not balance the harms to the parties unless the defendant can show that "it would suffer grave or irreparable harm from the issuance of the preliminary injunction." (*Ibid.*) In conducting that inquiry, "the cost of ceasing illegal conduct is not a cognizable injury." (*BBBB Bonding Corp. v. Caldwell* (2021) 73 Cal.App.5th 349, 378.) Furthermore, where it is not only reasonably probable but "fairly clear" the plaintiff will prevail on the merits, a preliminary injunction may issue even if "the plaintiff is unable to prevail in a balancing of the harms." (*IT Corp.*, *supra*, 35 Cal.3d at pp. 72–73.)

## IV.   LEGAL ARGUMENT

### A.   The People are reasonably probable to prevail on their claim under Civil Code section 3273.61

Civil Code section 3273.61(a)(1) makes it unlawful for any person to knowingly distribute or cause to be distributed any digital firearm manufacturing code to anyone in California who is not a federally licensed firearms manufacturer or a member of law enforcement or the military. "Digital firearm manufacturing code" means "any digital instructions in the form of computer-aided design ["CAD"] files . . . or other code or instructions stored and displayed in electronic format as a digital model that may be used to program . . . a three-dimensional printer . . . to manufacture or produce" a firearm, firearm precursor part, or certain firearm-related products or accessories, including auto-sears, large-capacity magazines, and silencers.  (Civil Code § 3273.60, subd. (a).)

14

**1.    There is a rebuttable presumption that Defendants have violated the law.**

As of January 1, 2026, the law includes a rebuttable presumption that a person has violated the law if: (1) the person owns or participates in the management of an internet website or other electronic portal, database, or platform that makes digital firearm manufacturing code available for download or other distribution to unlicensed individuals in California, and (2) "[u]nder the totality of circumstances," the website or other electronic portal, database, or platform encourages visitors to use the code to manufacture firearms or firearm accessories.  (Civ. Code § 3273.61, subd. (f).)  Both conditions are plainly met here.

As to the first condition, the People have shown that Defendants make digital firearm manufacturing code available to unlicensed individuals in California through their websites and Odysee profiles.  On January 7, 2026, a legal analyst from the California Attorney General's Office visited Defendants' website from a computer located in San Francisco.  (Fernandez Decl. ¶¶ 17-28.)  With a few keystrokes he downloaded a series of CAD files that may readily be used to program a 3D printer to print the firearm designs reflected in the files. (See *id.*; Briant Decl. p. 4.)  The People have used the code from one of the downloaded files to print and assemble a functioning handgun modeled after a Glock 19 pistol.  (Briant Decl. pp. 30-39; Gonzalez Decl. ¶¶ 20-38.)  SAS Gonazalez, the People's firearms expert, has also determined that several of the files appear to be designed to produce functioning prohibited firearms accessories, including an auto-sear, a large-capacity magazine, and a silencer, just as advertised.  (Gonzalez. Decl. ¶¶ 59-85.)

The second condition is likewise easily established here.  Under the totality of the circumstances, Defendants' websites and Odysee profiles encourage individuals who access them to use the digital firearm manufacturing code to manufacture firearms or firearm accessories.  Indeed, this is the core purpose of Defendants' online presence.  For example, the digital firearm code files available from the Odysee profiles—and linked from the Gatalog and Ctrl Pew websites—are often accompanied by detailed instructions on how to 3D print the firearm or accessory (including recommended printer settings) and many are also accompanied by instructions on how to assemble the parts into an operational gun or accessory. (Briant Decl. pp.

15

10-11; Gonzalez Decl. ¶¶ 21-22, 63, 68, 79-80, Exs. B, C, H, and P.)

Defendants also make numerous statements explicitly encouraging the use of the codes to build firearms and accessories.  On the Gatalog and Ctrl Pew websites, Defendants state that they want anyone who finds the digital codes to "[be] able to construct them successfully" and to "build whatever we have released," respectively.  (Chan Decl. Exs. NN, JJ.)  The Ctrl Pew site further encourages users by providing "project documentation" for certain designs and telling users to "print every weapon" and "print more guns."  (*Id.* Exs. C, KK.)  Defendants even encourage users to "print" the firearms or firearm accessories in the names of the profiles and the designs (e.g., "The Gatalog's *Printable* Frames and Receivers," "The Gatalog's *3D Printable* Magazines," and "The FMDA DD 19.2 *3D Printable* Glock Frame") (emphasis added). (Fernandez Decl. Exs. G, J, Q.)

### 2.    The evidence reflects Defendants' knowing distribution of digital firearm manufacturing code to California.

Additionally, the People's investigation has adduced facts sufficient to establish directly that Defendants knowingly distribute or cause to be distributed digital firearm manufacturing code into California.

As a threshold matter, Defendants cannot feign ignorance about the content of the code files.  Rather, they proudly assert that they have contributed code file designs themselves and control what files are disseminated as official Gatalog releases.  (See Sections II.B.1, II.B.4, *supra*.) The files disseminated by Defendants include detailed instructions on how to 3D print and assemble firearms and prohibited accessories using the code, and Defendants' websites are filled with content that instructs and encourages users to do so.  (See Section IV.A.1, *supra*.)

Defendants' statements also illustrate their clear intention to distribute their code files in California.  As described above, Defendants make no attempt to screen out California users and instead market directly to visitors from California by offering a "California compliant" Glock 19-based Carbine kit, referring users to the California Department of Consumer Affairs, and selling 3D-printing related merchandise encouraging violation of California laws.  (Fernandez Decl. Ex. P; Chan Decl. Exs. FF, AA.)  Indeed, Defendants' stated purpose for distributing the files is to

16

evade firearms laws—they urge users to "Print one of everything.  Laugh on the grave of gun control."  (Chan Decl. Ex. GG.)

### B.    The People are reasonably probable to prevail on their claim under Civil Code § 3273.625

The People are reasonably probable to prevail on their claim that Defendants' distribution of code and instructions for 3D printing firearms and prohibited firearm accessories furthers the unlawful manufacture of firearms in California.

Civil Code section 3273.625 is broad. It provides that it shall be unlawful "to knowingly, willfully, or recklessly cause another person to engage in the unlawful manufacture of firearms, or to knowingly, willfully, or *recklessly* aid, abet, *promote*, or *facilitate* the unlawful manufacture of firearms." (Civ. Code § 3273.625, subd. (a) (emphasis added).)

Civil Code Section 3273.625(b) expressly incorporates the expansive definition of "unlawful manufacture of firearms" from Penal Code section 29186, which includes, but is not limited to, the manufacture of: any firearm using a three-dimensional printer by an individual unlicensed to manufacture firearms (Pen. Code § 29186, subd. (b)(3)); firearms not imprinted with a valid serial number or mark of identification (Pen. Code § 29186, subd. (b)(6)(C)); large-capacity magazines (Pen. Code § 29186, subd. (b)(6)(D)); machineguns (Pen. Code § 29186, subd. (b)(6)(E)); and unsafe handguns (Pen. Code § 29186, subd. (b)(6)(I)).

While Defendants' conduct strongly suggests they know and intend that visitors to their websites will 3D print firearms and firearm accessories, the People need not show such knowledge or intent to prove a violation of section 3273.625. Instead, the People must only demonstrate it is reasonably probable that Defendants "recklessly" "promote" or "facilitate" the unlawful manufacture of firearms.

Defendants clearly "promote" or "facilitate" the unlawful manufacture of firearms. To "promote" means to "contribute to the growth or prosperity of" or to "help bring (something, such as an enterprise) into being." (*Promote*, Merriam-Webster, https://www.merriam-webster.com/dictionary/promote (Feb. 27, 2026).) To "facilitate" means to "make (something) easier" or to "help bring (something) about." (*Facilitate*, Merriam-Webster,

17

https://www.merriam-webster.com/dictionary/facilitate (Feb. 27, 2026).) As described above, Defendants distribute or cause to be distributed computer code and detailed accompanying instructions for 3D printing firearms and prohibited firearm accessories. The code is intended for 3D printing, and the instructions make it easy for anyone accessing the codes to successfully print firearms or firearm accessories.  By providing the code and related instructions, Defendants undoubtedly "make[] easier" and "bring[] about" the unlawful manufacture of firearms.

Nor is there any question that Defendants' conduct is, at a minimum, reckless.  A defendant acts recklessly when he "consciously disregards a substantial and unjustifiable risk that [a] material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." (Model Pen. Code, § 2.02, subd. (2)(c).)  As described above, Defendants make their 3D printing code and instructions available to all.  And, despite displaying an awareness of California's laws, Defendants direct their websites to California users and their code files and websites actively encourage users to flout those laws by printing firearms.  Notwithstanding the substantial and unjustifiable risk that their codes will be used to unlawfully manufacture firearms in California, Defendants make no effort to prevent their code and instructions from being downloaded in the state or to ensure that distribution is limited to individuals licensed to manufacture firearms.

### C. The People are reasonably probable to prevail on their claim under the UCL

The UCL, Business and Professions Code section 17200, et seq., prohibits "any unlawful, unfair, or fraudulent business act or practice."  (*Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) Claims under the UCL's "unlawful" prong "'borrow[]' violations of other laws and treat these violations, when committed pursuant to business activity, as unlawful practices independently actionable under" the UCL.  (*Farmers Ins. Exch. v. Superior Ct.* (1992) 2 Cal.4th 377, 383.) As discussed above, Defendants have violated and are continuing to violate Civil Code sections 3273.61 and 3273.625. The People therefore are

18

reasonably probable to prevail on their UCL claims predicated on violations of these statutes.

### D. The People have established irreparable harm absent a preliminary injunction

Because the People have demonstrated a reasonable probability of success on the merits of their claims, the Court should presume harm to the public. (*IT Corp. v. Cty. of Imperial*, 35 Cal.3d 63, at 72.) Beyond the presumption, the irreparable harm to the public flowing from Defendants' business practices is clear.

By providing digital code and instructions for 3D printing ghost guns and prohibited accessories, Defendants cause irreparable harm. They make it easier for prohibited persons to obtain firearms, facilitate the production of unserialized and untraceable firearms that impede law enforcement's ability to prevent and solve crimes and endanger officer safety, enable the manufacture of dangerous and illegal firearm accessories such as machinegun conversion devices, and facilitate the manufacture of unsafe firearms and unsafe handguns. (See Section II.C, *supra*.)

Ghost guns and prohibited firearm accessories such as those produced using Defendants' code are a widespread problem in California.  Since 2015, the number of ghost guns and auto-sears seized across the state has increased by over 40,000% to an average of over 11,000 per year (Gonzalez Decl. ¶ 92).  In some localities, ghost guns have accounted for between one-third and one-half of homicide and firearms-related cases.  (Section II.C, *supra*.)  And the harm posed by 3D printed ghost guns and prohibited accessories is clear from a variety of alarming incidents, including shootings involving minors and the mass manufacture and sale of ghost guns and auto-sears by prohibited persons.  (See *id.*)

## V.    CONCLUSION

The People respectfully request that this Court enter the requested preliminary injunction enjoining Defendants from distributing or causing to be distributed digital firearm manufacturing code into California; aiding, abetting, promoting, or facilitating the unlawful manufacture of firearms in California by distributing or causing to be distributed digital firearm manufacturing code and/or accompanying instructions into California that may be used to produce the firearm-related products identified in Penal Code § 29186.

19

Respectfully submitted,

Dated:  April 1, 2026

ROB BONTA
Attorney General of California

By:  */s/ Vesna Cuk*

VESNA CUK
Deputy Attorney General

Dated:  April 1, 2026

DAVID CHIU
San Francisco City Attorney

By:  */s/ Karun A. Tilak*

KARUN A. TILAK
Deputy City Attorney

*Attorneys for Plaintiff*
*The People of the State of California*

20

# EXHIBIT 4

ROB BONTA (SBN 202668)
Attorney General of California
NICKLAS A. AKERS (SBN 211222)
Senior Assistant Attorney General
MICHAEL E. ELISOFON (SBN 240707)
Supervising Deputy Attorney General
VESNA CUK (SBN 309157)
ANDREW J. WIENER (SBN 282414)
DANIEL DUBOIS (SBN 345123)
REBECCA S. ROBERTS (SBN 225757)
BRENDAN RUDDY (SBN 297896)
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3782
  Fax:  (415) 703-5480
  E-mail:  vesna.cuk@doj.ca.gov

DAVID CHIU (SBN 189542)
San Francisco City Attorney
YVONNE R. MERÉ (SBN 175394)
Chief Deputy City Attorney
SARA J. EISENBERG (SBN 269303)
Chief of Complex and Affirmative Litigation
RONALD H. LEE (SBN 238720)
Asst. Chief of Complex and Affirmative Litigation
KARUN A. TILAK (SBN 323939)
Deputy City Attorney
  Fox Plaza
  1390 Market Street, 6th Floor
  San Francisco, CA  94102-5408
  Telephone:  (415) 355-3308
  Fax:  (415) 437-4644
  E-mail:  karun.tilak@sfcityatty.org

[EXEMPT FROM FILING FEES PURSUANT TO GOVERNMENT CODE SECTION 6103]

*Attorneys for Plaintiff, The People of the State of California*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**GATALOG FOUNDATION INC., a Florida corporation; CTRLPEW LLC, a Florida limited liability company; ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive,**<br><br>Defendants. | Case No. CGC-26-633508<br><br>**[PROPOSED] ORDER GRANTING THE PEOPLE'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Action Filed:  February 6, 2026<br>Trial Date:  None set |

1

The motion of Plaintiff, the People of the State of California ("People" or "Plaintiff"), for a preliminary injunction came up for hearing by the Court on _____, in Department 304 by order to show cause. All parties were represented by counsel.

On proof made to the Court's satisfaction, and good cause appearing:

IT IS ORDERED that, pursuant to Civil Code §§ 3273.61(c)(2) and 3273.625(c)(2) and Business and Professions Code § 17203, Defendants, GATALOG FOUNDATION INC., a Florida corporation; CTRLPEW LLC, a Florida limited liability company; ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive, (collectively, "Defendants"), and their agents, employees, officers, representatives, successors, partners, assigns, and those acting in concert or in participation with them, whether acting directly or through any corporation, subsidiary, division, or other device, are immediately enjoined as follows:

1) Defendants are enjoined from distributing, or causing to be distributed by any means, including, but not limited to, via the internet, any digital firearm manufacturing code to any other person in this state who is not a federally licensed firearms manufacturer, member of the Armed Forces of the United States or the National Guard, while on duty and acting within the scope and course of employment, or any law enforcement agency or forensic laboratory in violation of Civil Code § 3273.61.

2) Defendants are enjoined from aiding, abetting, promoting, or facilitating the unlawful manufacture of firearms, as defined in Penal Code § 29186, by distributing or causing to be distributed into this state by any means, including, but not limited to, via the internet, any digital firearm manufacturing code and/or instructions for using specific digital firearm manufacturing code that may be used to manufacture, produce, assemble, convert, or complete the firearm-related products identified in Penal Code § 29186 in violation of Civil Code § 3273.625.

3) Defendants are enjoined from engaging in unlawful business practices prohibited by California Business and Professions Code §§ 17200 *et seq.* by engaging in conduct that violates Civil Code § 3273.61.

[PROPOSED] ORDER GRANTING THE PEOPLE'S MOTION FOR PRELIMINARY INJUNCTION
(Case No. CGC-26-633508)

4) Defendants are enjoined from engaging in unlawful business practices prohibited by California Business and Professions Code §§ 17200 *et seq.* by engaging in conduct that violates Civil Code § 3273.625.

**IT IS SO ORDERED.**

DATED: _____          _____

                                                    JUDGE OF THE SUPERIOR COURT

3

# EXHIBIT 5

Colin R. Higgins, Bar No. 268364
chiggins@swlaw.com
Cameron J. Schlagel, Bar No. 320732
cschlagel@swlaw.com
Susan G. Biscardi, Bar No. 366760
sbiscardi@swlaw.com
SNELL & WILMER LLP
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
Telephone:    714.427.7000
Facsimile:     714.427.7799

*Attorneys for Defendants
(Specially Appearing Solely for Purpose of
Challenging Jurisdiction)*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>GATALOG FOUNDATION INC., a Florida corporation; CTRLPEW LLC, a Florida limited liability company; ALEXANDER HOLLADAY; MATTHEW LAROSIERE; JOHN ELIK AKA "Ivan The Troll"; and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No. CGC-26-633508<br><br>Hon. Ethan P. Schulman<br><br>**Specially Appearing Defendants' Omnibus Reply in Support of Motions to Quash Service of Summons for Lack of Personal Jurisdiction**<br><br>**[C.C.P. § 418.10(a)(1)]**<br><br>Date:   May 29, 2026<br>Time:   11:00 a.m.<br>Dept:   304<br><br>Trial Date:     None Set |

SNELL & WILMER

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 7 |
| II. | THE STATE FAILS TO SHOW PURPOSEFUL DIRECTION | | 9 |
| | A. | The State Improperly Groups the Defendant's California "Contacts" | 10 |
| | B. | The State's Unilateral Investigative Activities Do Not Create Jurisdiction Over Defendants | 11 |
| | C. | The CAG19 File Label Cannot Convert Third-Party Platform Content into Express Aiming | 12 |
| | D. | The CTRLPew Merchandise, Boilerplate Terms, and "California Room" Do Not Establish Express Aiming | 14 |
| | E. | The MAF Corp. Parts-Kit Shipment to a State Agent Is Not Defendants' California Contact | 17 |
| | F. | Use of California Third-Party Vendors and Content Delivery Network ("CDN") Servers Is Not Purposeful Availment | 18 |
| | G. | The State's Other-Litigation Evidence Does Not Establish Jurisdiction and Is Inadmissible | 19 |
| III. | THE STATE'S CLAIMS DO NOT ARISE OUT OF OR RELATE TO ANY DEFENDANT-CREATED CALIFORNIA CONTACT | | 21 |
| | A. | Civil Code Section 3273.61 Cannot Expand California's Reach | 21 |
| | B. | The Rebuttable Presumption Under Section 3273.61(f) Cannot Supply Jurisdiction the Due Process Clause Forbids | 23 |
| | C. | Section 3273.625 Reaches Only In-State, Identifiable Manufacture | 24 |
| IV. | EXERCISING JURISDICTION WOULD VIOLATE FAIR PLAY AND SUBSTANTIAL JUSTICE | | 25 |
| V. | THE COURT SHOULD DENY JURISDICTIONAL DISCOVERY | | 25 |
| VI. | CONCLUSION | | 26 |

SNELL
& WILMER

- 2 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*
(7th Cir. 2014) 751 F.3d 796.................................................................................. 13, 14

*ALS Scan, Inc. v. Digital Service Consultants, Inc.*
(4th Cir. 2002) 293 F.3d 707............................................................................ 16, 19, 26

*Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.*
(1st Cir. 1998) 163 F.3d 74 ......................................................................................... 13

*AMA Multimedia, LLC v. Wanat*
(9th Cir. 2020) 970 F.3d 1201.............................................................................. 18, 26

*Ashcroft v. Free Speech Coalition*
(2002) 535 U.S. 234 .................................................................................................... 24

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*
(9th Cir. 2017) 874 F.3d 1064......................................................................... 11, 13, 23

*Bensusan Restaurant Corp. v. King*
(2d Cir. 1997) 126 F.3d 25 ..................................................................................... 9, 15

*Brandenburg v. Ohio*
(1969) 395 U.S. 444 .................................................................................................... 24

*Briskin v. Shopify, Inc.*
(9th Cir. 2025) 135 F.4th 739 ....................................................... 8, 14, 16, 17, 18

*Bristol-Myers Squibb Co. v. Superior Court*
(2017) 582 U.S. 255 ............................................................................................. *passim*

*Brophy v. Almanzar*
(C.D. Cal. 2018) 359 F.Supp.3d 917 .......................................................................... 18

*Burdick v. Superior Court*
(2015) 233 Cal.App.4th 8 ..................................................................................... *passim*

*Calder v. Jones*
(1984) 465 U.S. 783 ................................................................................................. 9, 10

*Carbone v. Kaal*
(6th Cir. 2025) 140 F.4th 805 .............................................................................. 18, 19

*Cornelison v. Chaney*
(1976) 16 Cal.3d 143 ................................................................................................... 24

- 3 -

4923-6456-2346

SNELL
& WILMER

*Daimler AG v. Bauman*
(2014) 571 U.S. 117 ........................................................................................... 21

*Engine Mfrs. Ass'n v. United States EPA*
(D.C. Cir. 1996) 88 F.3d 1075 ......................................................................... 13

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*
(2021) 592 U.S. 351 ..................................................................................... 14, 15

*Gonzalez v. Google LLC,*
2 F.4th 871 (9th Cir. 2021) ............................................................................... 7

*Gonzalez v. Google LLC,*
598 U.S. 617 (2023) ........................................................................................... 7

*Hogue v. Hogue*
(2017) 16 Cal.App.5th 833 ............................................................................... 25

*In re Automobile Antitrust Cases I & II*
(2005) 135 Cal.App.4th 100 ............................................................................. 26

*International Shoe Co. v. Washington*
(1945) 326 U.S. 310 ......................................................................................... 25

*Janus v. Freeman*
(N.D. Tex. 2023) 651 F.Supp.3d 928 ............................................................... 24

*Mavrix Photo, Inc. v. Brand Technologies, Inc.*
(9th Cir. 2011) 647 F.3d 1218 .......................................................... 8, 9, 14, 16

*McClung v. Employment Development Dept.*
(2004) 34 Cal.4th 467 ..................................................................................... 22

*Moore v. Cecil*
(11th Cir. 2024) 109 F.4th 1352 ................................................................. 13, 16

*NAACP v. Claiborne Hardware Co.*
(1982) 458 U.S. 886 ......................................................................................... 24

*Pavlovich v. Superior Court*
(2002) 29 Cal.4th 262 ................................................................................*passim*

*Pena v. Lindley*
(9th Cir. 2018) 898 F.3d 969 ........................................................................... 13

*People v. Valencia*
(2017) 3 Cal.5th 347 ......................................................................................... 22

*Safieddine v. MBC FZ LLC*
(2024) 103 Cal.App.5th 1086 ....................................................................... 9, 26

- 4 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

*Shisler v. Sanfer Sports Cars, Inc.*
(2006) 146 Cal.App.4th 1254 ........................................................................................ 17

*Shrader v. Biddinger*
(10th Cir. 2011) 633 F.3d 1235 ............................................................................... 13, 16

*Smith v. California*
(1959) 361 U.S. 147 ....................................................................................................... 24

*Snowney v. Harrah's Entertainment, Inc.*
(2005) 35 Cal.4th 1054 ......................................................................................... 8, 16, 19

*Spence v. Washington*
(1974) 418 U.S. 405 ....................................................................................................... 23

*Stokinger v. Armslist, LLC*
(1st Cir. 2026) 166 F.4th 229 ................................................................... 8, 13, 14, 16

*Texas v. Johnson*
(1989) 491 U.S. 397 ....................................................................................................... 23

*Twitter, Inc. v. Taamneh*
(2023) 598 U.S. 471 ......................................................................................................... 7

*United States v. O'Brien*
(1968) 391 U.S. 367 ....................................................................................................... 23

*ViaView, Inc. v. Retzlaff*
(2016) 1 Cal.App.5th 198 ............................................................................................. 13

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*
(1976) 425 U.S. 748 ....................................................................................................... 23

*Vons Companies, Inc. v. Seabest Foods, Inc.*
(1996) 14 Cal.4th 434 ..................................................................................................... 9

*Walden v. Fiore*
(2014) 571 U.S. 277 ................................................................................................. passim

*Williams v. Yamaha Motor Co. Ltd.*
(9th Cir. 2017) 851 F.3d 1015 ...................................................................................... 12

*World-Wide Volkswagen Corp. v. Woodson*
(1980) 444 U.S. 286 ....................................................................................................... 25

*Young v. New Haven Advocate*
(4th Cir. 2002) 315 F.3d 256 ............................................................................. 13, 15, 16

*Zehia v. Superior Court*
(2020) 45 Cal.App.5th 543 ............................................................................................ 25

- 5 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL & WILMER

**Statutes**

Civ. Code § 3 .............................................................................................................. 22

Civ. Code § 3273.61 ............................................................................................. *passim*

Civ. Code § 3273.61(a)(1) ............................................................................. 21, 22, 26

Civ. Code § 3273.61(f) ................................................................................................ 23

Civ. Code § 3273.625 ................................................................................. 15, 17, 21, 24

Civ. Code § 3273.625(a) ............................................................................................. 24

N.J. Stat. Ann. § 2C:39-3(j) ....................................................................................... 14

N.Y. Penal Law § 265.02(8) ....................................................................................... 14

Pen. Code § 31910(b)(5) ............................................................................................. 13

Wash. Rev. Code § 9.41.305 ....................................................................................... 14

**Regulations**

Cal. Code Regs., tit. 13, § 1961.4(c) .......................................................................... 13

**Other Authorities**

*Distribute*, MERRIAM-WEBSTER DICT. (2026) ............................................................ 22

*Large-Capacity Magazines* (last accessed May 20, 2026),
    https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-
    ammunition/large-capacity-magazines/ .......................................................... 14, 15

Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1263 (2025-2026 Reg. Sess.) ........................ 22

SNELL
& WILMER

- 6 -

4923-6456-2346

## I.   **INTRODUCTION**[1]

The State concedes, as it must, that it seeks jurisdiction over non-California residents whose only connection to California is operating a website outside of this state, that links to a third-party website (Odysee.com)[2] containing digital design files posted by unknown third parties that can be downloaded anywhere in the world. Moreover, the State presents no evidence of anyone other than State agents downloading these files from the third-party website. The State cites no authority to support a finding of jurisdiction under these extraordinary circumstances, because none exists.

Due process requires that "the defendant himself" create forum contacts; "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore* (2014) 571 U.S. 277, 284–85. The State asks this Court to adopt a rule no court has accepted: California may exercise jurisdiction whenever a state agent accesses generally available Internet content, downloads files from a third-party platform, and then aggregates alleged California references or unrelated commercial contacts across distinct Defendants and a nonparty. Defendants do not concede—as the Opposition asserts—that they "distribute into California computer code for 3D printing firearms and dangerous firearm accessories." (Opp. at 7:24–25.) The record establishes, at most, globally accessible website content and State-engineered downloads from a third-party website—not Defendant-directed distribution into California.

***First***, passive accessibility is not purposeful direction. Here, "passive" (as opposed to "interactive") means user-initiated access to worldwide content with no state-by-state filters, no geotargeted advertising, no tailored California catalog, and no mechanism to channel content or transactions to California users. The California Supreme Court rejected jurisdiction over a generally

---

[1] This Reply is submitted on behalf of all specially appearing Defendants who moved to quash: Gatalog Foundation Inc. and Matthew Larosiere (the "Gatalog Defendants"); CTRLPew LLC and Alexander Holladay (the "CTRLPew Defendants"); and John Elik (collectively, "Defendants").

[2] Given Odysee's centrality to the State's allegations—the files are allegedly downloaded from there—its absence as a Defendant is notable. The likely explanation is that any such claim would be foreclosed by Section 230 immunity and binding precedent on aiding-and-abetting liability, both analogous to the State's theory here. *See Gonzalez v. Google LLC*, 2 F.4th 871, 893–95 (9th Cir. 2021) (Section 230 immunizes platform's hosting and recommendation of third-party content); *Gonzalez v. Google LLC*, 598 U.S. 617, 621–22 (2023) (per curiam) (vacating and remanding in light of *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which held that a platform's mere provision of services does not constitute the knowing, substantial assistance required for aiding-and-abetting).

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL & WILMER

accessible website despite alleged California effects. *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 273–75. The First Circuit in *Stokinger v. Armslist, LLC* (1st Cir. 2026) 166 F.4th 229 likewise held that state-specific labels, geographic filtering, and firearms-listing tools did not establish purposeful availment by themselves; jurisdiction depended on thousands of forum-specific listings. *Id.* at 236–41. And cases finding jurisdiction—such as *Snowney*, *Mavrix*, and *Briskin*—involved targeted California solicitation, audience exploitation, or substantial California commercial transactions. The State has none of that.

**Second**, the State's remaining "contacts" do not fill the gap. Merchandise stickers, boilerplate terms, CDN infrastructure, a user-created California chat topic, and a State-initiated MAF parts shipment are unrelated to the statutory code-distribution claims and insufficient under any jurisdictional theory. The State also treats Defendants as one "Gatalog" enterprise, but each Defendant's contacts must be assessed individually. Even in cases of alleged alter ego or conspiracy, which the State does not assert, contacts of one party cannot be imputed to another. *Burdick v. Superior Court* (2015) 233 Cal.App.4th 8, 24–25. Nor may the State import alleged, speculative, non-claim-related California commerce by MAF Corp.—a nonparty entity—to establish jurisdiction over these distinct Defendants.

**Third**, the State's theory depends on the foreseeable-effects reasoning *Walden* rejected. California's regulatory interest and a government agent's ability to click "download" cannot create jurisdiction over out-of-state Defendants who did not direct suit-related conduct at California. If that were enough, every out-of-state website operator would be subject to California jurisdiction whenever the State regulated online content and accessed it from California. No court has accepted that sweeping rule. This Court should not be the first.

At bottom, the State's theory has no limiting principle. If general Internet accessibility plus a state investigator's download sufficed, every out-of-state website operator would be subject to California suit once the State regulated online content and sent an agent to access it. No court has adopted such a broad rule. *See Pavlovich*, 29 Cal.4th at 273–75. Instead, the Constitution requires more: each defendant must create a substantial forum connection through intentional, forum-directed conduct. The State has not shown that any Defendant did so here. No amount of

- 8 -

jurisdictional discovery will cure the fundamental defect in the State's theory.

## II.      THE STATE FAILS TO SHOW PURPOSEFUL DIRECTION

Despite Defendants' lack of contacts with California, the State argues that Defendants purposefully directed activities at California, citing the "effects" test under *Calder v. Jones* (1984) 465 U.S. 783. (Opp. at 22:18–28:14.) But the State's own conduct in downloading the files at issue cannot supply minimum contacts for jurisdiction. *Walden*, 571 U.S. at 284–85. As such, the State fails to meet its burden to demonstrate, by a preponderance of evidence,[3] facts justifying jurisdiction. *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449.

TheGatalog.com and CTRLPew are not California distribution channels. (*See, e.g.*, Holladay Decl. ¶¶ 6–7, 9–10, 26–30, 33–36.) The third-party Odysee profiles are not directed at California in any way. (*See, e.g.*, Holladay Decl. ¶¶ 15, 17–18, 33, 35; March 27, 2026 Chan Decl. Exs. A–X; Opp. at 12:24 n.5). Nor is that platform's accessibility attributable to Defendants (*See* Holladay Decl. ¶¶ 17–20, 33–35; Larosiere Decl. ¶¶ 14–15, 20–24; Elik Decl. ¶¶ 3–4, 10–13, 15–19). *Cf. Safieddine v. MBC FZ LLC* (2024) 103 Cal.App.5th 1086, 1103–04, 1109 (third-party provider's routing of communications to California could not be attributed to the defendant to establish personal jurisdiction). Defendants' connection to the Odysee profiles is attenuated at best, and as to Gatalog Foundation, nonexistent. (*Ibid.*)

Under *Pavlovich*, interactivity turns on the level and commercial nature of forum-directed exchange; a passive site that makes information available is not enough. *Pavlovich*, 29 Cal.4th at 273–74. The features the State cites—CTRLPew search and download links, Odysee download availability, and Rocket Chat access (Opp. at 14:1–17:3, 25:4–21)—are user-initiated access points, not knowing and repeated California transactions or California-directed commercial exchanges. *Cf. Mavrix Photo, Inc. v. Brand Technologies, Inc.* (9th Cir. 2011) 647 F.3d 1218, 1227–32, ; *Bensusan Restaurant Corp. v. King* (2d Cir. 1997) 126 F.3d 25, 27, 29. They contain no geographic filtering, no state-specific listings, no geotargeted advertisements, and no mechanism to channel content or transactions to California users. (Holladay Decl. ¶¶ 17–18, 29, 35.)

---

[3] As detailed in Defendants' concurrently filed evidentiary objections, most of the State's evidence is inadmissible.

- 9 -

**A.    The State Improperly Groups the Defendant's California "Contacts"**

The Supreme Court has been categorical: "[e]ach defendant's contacts with the forum State must be assessed individually." *Calder*, 465 U.S. at 790; *Bristol-Myers Squibb Co. v. Superior Court* (2017) 582 U.S. 255, 268. The Opposition violates that command throughout, treating Defendants as a collective unit and conflating three distinct platforms: (a) TheGatalog.com, an informational portal hosting no digital design files; (b) the CTRLPew website, an informational and commentary site; and (c) Odysee profiles on Odysee.com that no Defendant owns, operates, or controls. (Holladay Decl. ¶¶ 4, 6, 17–18, 34; Larosiere Decl. ¶¶ 14, 20–21; Elik Decl. ¶¶ 15–18; *see* Opp. at 7:3–10, 12:1–15, 22:18–23:5.) When properly disaggregated, the State's evidence is insufficient to show jurisdiction.

*Gatalog Foundation and Larosiere.* Gatalog Foundation has never been operational, never conducted business, never owned a website, and never managed any Odysee profile. (Larosiere Decl. ¶¶ 4, 6, 20–24.) The State's response is that Gatalog Foundation must in fact operate TheGatalog.com because the website exists and the Foundation shares the name. (Opp. at 13:3–15.) That non sequitur cannot fill an evidentiary void. Likewise, Larosiere is a Florida resident who has never traveled to California for any purpose connected to this lawsuit. (Larosiere Decl. ¶¶ 7, 9.) The State identifies no California-directed conduct by Larosiere.

*CTRLPew and Holladay.* CTRLPew is a Florida LLC and Holladay is a Florida resident. (Holladay Decl. ¶¶ 11, 25–26.) Neither has California offices, employees, bank accounts, geotargeted campaigns, sales of digital files to California residents, or claim-related California transactions. (*Id.* ¶¶ 12–16, 25–33.) Holladay did not upload files to Odysee from California or instruct anyone to do so for a California audience; he does not control any "Gatalog" Odysee profile. (*Id.* ¶¶ 15, 17–18.) The State's CTRLPew-website evidence does not bridge the gap, for the reasons stated in Sections I.C and I.D, *infra*. (*See also id.* ¶¶ 27–29, 30–33.)

*Elik.* John Elik is an Illinois resident. (Elik Decl. ¶ 5.) He has never been domiciled in California, nor has he traveled here for any suit-related purpose. (*Id.* ¶¶ 5–8.) He did not author the "CAG19" file or its description. (*Id.* ¶ 12.) And he has not posted any files to Odysee since June 2025 (*id.* ¶ 19), which is before amended section 3273.61 took effect and the State filed this action.

- 10 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

**B.      The State's Unilateral Investigative Activities Do Not Create Jurisdiction Over Defendants**

The State relies on its agents' declarations recounting visits to Defendants' sites and downloads from Odysee to argue jurisdiction is proper.[4] (Opp. at 11:9–21:2.) Indeed, State investigators initiated every download, screenshot, and firearm-parts purchase from California discussed in the Opposition. The State treats its own in-state investigative acts as Defendant-created California contacts. But "the plaintiff cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 284–85 (cleaned up).

The State suggests that its agents' downloads merely illustrate what California residents *could* do, and uses that premise to recast global accessibility as "distribution" into California. (*See* Opp. at 7:24–25, 25:4–26:5.) Possibility is not proof. The State has not identified a single California resident—other than its own agents—who downloaded any file from Odysee, interacted with the Gatalog Rocket Chat, or purchased any parts from MAF Corp. (which is not a party). The declarations supporting the State's preliminary injunction motion describe ghost guns recovered in California, but none ties any recovered firearm to any Defendant. This evidentiary void is fatal.

The State also points to a Release Package Requirements wiki page it says Holladay authored or edited, casting Defendants as Odysee gatekeepers. (Opp. at 14:1–15:18, 23:6–13.) But quality-control involvement in a global open-source project is not California-targeted distribution. Requirements that release packages be complete or tested say nothing about audience location and do not convert general availability into express aiming. This does not show a defendant-forum relationship.

The State's jurisdictional theory ultimately rests on a foreseeable-effects rationale the Supreme Court rejected. The State cites Ninth Circuit authority that purposeful direction is satisfied where intentional acts have "foreseeable effects" in the forum. (Opp. at 28:9–14.) However, the Supreme Court rejected that test for minimum contacts. *Axiom Foods, Inc. v. Acerchem Int'l, Inc.* (9th Cir. 2017) 874 F.3d 1064, 1069–70 (citing *Walden*, 571 U.S. at 289). The required contact

---

[4] Each of the Declarations filed in support of the State's Opposition are the subject of Defendants' concurrently filed evidentiary objections.

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

must be the defendant's "suit-related" conduct connecting him to the forum State itself, not to a person, infrastructure provider, or alleged harm located there. *See Williams v. Yamaha Motor Co. Ltd.* (9th Cir. 2017) 851 F.3d 1015, 1022–25; *Walden*, 571 U.S. at 285–86. *Walden* asks "whether the defendant's conduct connects him to the forum in a meaningful way," not where injury is felt. 571 U.S. at 290. *Pavlovich* likewise held that foreseeability of injury "is not a sufficient benchmark" for jurisdiction and that a globally accessible website did not create contacts wherever users could access it. 29 Cal.4th at 272 (cleaned up); *id.* at 273–78.

The State's attempt to distinguish *Walden* fails. It says State agents are not the only link because content **might** be accessed by Californians, California infrastructure **may** route traffic, and California broadly suffers harm, which also has not been connected to any Defendant. (*See* Opp. at 26:20–28:14.) Those are at best foreseeable (hypothetical) California effects, not Defendant-created contacts.

### C.    The CAG19 File Label Cannot Convert Third-Party Platform Content into Express Aiming

The State's only evidence of express aiming is a single file on third party website, Odysee.com, titled "CAG19" and described there as a "California Compliant Glock 19-based Carbine kit." (Opp. at 25:6–13.) The State says the Odysee profiles target California, "including" by that file, but identifies no other California-directed Odysee feature. (Opp. at 16:1–4.) According to the State, the file label invites an inference that California users are foreseeable and jurisdiction is proper. That argument fails for at least three reasons.

***First***, Defendants did not create the file or its description. (Holladay Decl. ¶ 19; Elik Decl. ¶ 12; Larosiere Decl. ¶¶ 20–24.) The label resides on Odysee.com, a platform Defendants do not own, operate, or administer. (Holladay Decl. ¶¶ 17–18; Larosiere Decl. ¶¶ 12–15, 20–24; Elik Decl. ¶¶ 15–18.)[5] The State offers no evidence that Defendants authored the "California Compliant" description or selected the design for California-specific marketing. Instead, the State speculates that the individual Defendants must approve code files posted to Odysee. (Opp. at 25:9–13.) But

---

[5] The CTRLPew page contains only a hyperlink to Odysee. (Opp. at 17:12–14.)

- 12 -

4923-6456-2346

speculation is not evidence. *See ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 216–18. At most, the State identifies a third-party platform label and predicts a California effect. *Walden* requires more. The express-aiming inquiry focuses on the defendant's purpose and intent. *See, e.g., Young v. New Haven Advocate* (4th Cir. 2002) 315 F.3d 256, 263–64; *Moore v. Cecil* (11th Cir. 2024) 109 F.4th 1352, 1363–65. A passive hyperlink to third-party content is not express aiming unless the linker expressly intended to direct that content to the forum. *See ibid.*; *Shrader v. Biddinger* (10th Cir. 2011) 633 F.3d 1235, 1240–42, 1244–46. The State offers no such evidence.

**Second**, even if the State could prove the label is attributable to a Defendant, describing a product as "California Compliant" is not "targeting" California. A nutrition label touting FDA compliance does not "target" Washington, D.C. A vehicle bearing CARB-compliance labeling does not "target" California merely because California's emissions standards are the national benchmark.[6] A "CA" label or "California Compliant" descriptor identifies the design's features;[7] it does not solicit California customers, much less direct conduct at the forum. *Cf. Pavlovich*, 29 Cal.4th at 276–78; *Walden*, 571 U.S. at 289; *Axiom Foods*, 874 F.3d at 1070. Ultimately, the State has not identified a single California transaction or directed communication tied to the CAG19 file.

**Third**, the State ignores *Stokinger v. Armslist, LLC*—the most analogous firearms-website authority. There, a firearms-listing site had state-by-state labels, a geographic-filtering tool, and instructions telling sellers to list firearms where physically located. The First Circuit found those features and advertising revenue insufficient absent substantial forum-based listings or transactions. *Stokinger*, 166 F.4th at 236–41. Jurisdiction required **forum-specific evidence**—thousands of New Hampshire listings—not a single label or general accessibility. *Id.* at 239–43; *see also Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.* (7th Cir. 2014) 751 F.3d 796, 803.

---

[6] Under the Clean Air Act, California enjoys unique authority to set stricter vehicle emissions standards than the federal government. *See Engine Mfrs. Ass'n v. United States EPA* (D.C. Cir. 1996) 88 F.3d 1075, 1079–80. Because other states may adopt California's standards, manufacturers typically design vehicles to meet CARB requirements nationwide, and vehicles often carry CARB-compliance labeling. *See id.*; *Am. Auto. Mfrs. Ass'n v. Mass. Dep't of Envtl. Prot.* (1st Cir. 1998) 163 F.3d 74, 77–79; 13 Cal. Code Regs. § 1961.4(c). This labeling reflects manufacturers' efforts to streamline production—not any intent to "target" California.

[7] For example, under California's Unsafe Handgun Act, "semiautomatic pistols must be equipped with both a chamber load indicator (CLI) and a magazine detachment mechanism (MDM) . . . ." *Pena v. Lindley* (9th Cir. 2018) 898 F.3d 969, 974; Penal Code § 31910(b)(5).

- 13 -

This case is weaker still. The websites and Odysee profiles here have no geographic filtering, no state-specific listings, and no mechanism to channel transactions to California users. (Holladay Decl. ¶¶ 17–18, 29, 35.) A label on a single file cannot do jurisdictional work that a purpose-built forum architecture could not do in *Stokinger*, or that an interactive website with email lists could not do in *Advanced Tactical*.

The State's reliance on *Briskin v. Shopify, Inc.* (9th Cir. 2025) 135 F.4th 739 is misplaced. *Briskin* excused differential targeting because Shopify had substantial California contacts: millions of transactions, consumer-data capture, and merchant contracts. *Id.* at 746–49, 756–59. Here, Defendants process zero traceable California transactions, ingest no California consumer data, and maintain no California commercial relationships. (*See* Holladay Decl. ¶¶ 7, 10, 14–17, 20–21, 26–30, 33–36, 38; Larosiere Decl. ¶¶ 4, 10–15, 18–24; Elik Decl. ¶¶ 3–4, 7–13, 19.) *Cf. Briskin*, 135 F.4th at 757–58 (discussing *Mavrix*, 647 F.3d at 1230–31, where defendant was subject to jurisdiction because it knew "about its customer base there and 'exploit[ed] that base for commercial gain'"). Where a defendant has no purposeful California contacts, as opposed to substantial but non-differential contacts, the absence of differential targeting is fatal, not irrelevant. Mere foreseeability of California access cannot replace the substantial contacts that made *Briskin* possible. *Cf. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.* (2021) 592 U.S. 351, 361–68.

**D.    <u>The CTRLPew Merchandise, Boilerplate Terms, and "California Room" Do Not Establish Express Aiming</u>**

The State argues that CTRLPew expressly aimed conduct at California by selling merchandise including a warning sticker "Not for Making Guns," a "10 rounds only" sticker, and including a "California Users and Residents" reference in its terms of service. (Opp. at 17:4–18:18, 25:6–26:5.) These items cannot bear the jurisdictional weight the State places on them.

The stickers do not name California. Multiple states impose ten-round magazine limits and restrictions on 3D-printed firearm components. *See, e.g.*, N.J. Stat. Ann. § 2C:39-3(j); N.Y. Penal Law § 265.02(8); Wash. Rev. Code § 9.41.305.[8] The "10 rounds only" sticker is no more "aimed"

---

[8] According to the Giffords Law Center to Prevent Gun Violence, 12 states and Washington D.C. have enacted laws imposing magazine capacity limits of 10 rounds. *See Large-Capacity Magazines*,

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL
& WILMER

at California than at New Jersey, New York, or Washington. Moreover, the stickers do not relate to the State's claims: the State does not contend selling stickers violates Civil Code section 3273.61 or section 3273.625. Conduct unrelated to the claims cannot supply "contacts" for specific jurisdiction. *Bristol-Myers*, 582 U.S. at 262; *cf Ford Motor Co.*, 592 U.S. at 369–70 (Ford had a "truckload" of contacts with the forum states, the plaintiffs were residents of the forums, used the allegedly defective products in the forums, and suffered product-related injuries there).

The terms-of-service language is template boilerplate from termsfeed.com. (Holladay Decl. ¶ 32.) Federal and California courts have repeatedly refused to treat such boilerplate as purposeful direction. *See Young*, 315 F.3d at 262–64; *Burdick*, 233 Cal.App.4th at 24–25. If a generic California-resident notice sufficed to create jurisdiction, every website using a template policy would be hauled into California courts.

The State says the CTRLPew site "draws users in with California-specific content," but identifies only the CAG19 file addressed above. (Opp. at 17:20–21.) Reaching it requires user-initiated search and navigation to Odysee. There is no California solicitation. *Bensusan* rejected jurisdiction over materially comparable web conduct—event information and a hyperlink—where the site did not transact with or target forum residents. 126 F.3d at 27, 29. Otherwise, Defendants' websites contain no California-specific product line or targeted advertising. (Holladay Decl. ¶¶ 14–19, 26–33; *see* May 5 Chan Decl., Exs. A, C, E.) The State's totality argument underscores the deficit. (Opp. at 27:3–10.) It characterizes website operations as express aiming, but shows only an ***absence*** of geographic discrimination. (Opp. at 15:20–17:3.) Because Defendants allegedly did not block California, the State assumes they aimed at California. *Pavlovich* rejected that result. 29 Cal.4th at 275–79.

The "Search The Gatalog" tool and "File Drops" page reinforce the point. The State describes the CTRLPew homepage as inviting users to "Browse All The Gatalog Releases" and "Search The Gatalog," but its captures show only a general "File Drops" archive: 179 entries spread across many categories, through which a user must navigate to reach any individual file. (*See* Opp.

GIFFORDS.ORG (last accessed May 20, 2026), https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/.

- 15 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL & WILMER

at 17:9–19; March 27 Chan Decl. Exs. A, C (at p.1);[9] May 5 Chan Decl. ¶¶ 3, 5, 7 & Exs. A, C, E.) CAG19 thus appears as one ordinary archive entry among many files unrelated to California, not as content singled out for California users. (*See, e.g.*, May 5 Chan Decl. ¶¶ 5, 7 & Exs. C, E.) This agnostic indexing surfaces files generally rather than any file specifically, and a neutral search-and-archive structure does not manifest an intent to target California readers or promote third-party Odysee content to California. *See Young*, 315 F.3d at 263–64; *Moore*, 109 F.4th at 1363–64.

The unrelated contacts the State marshals—e.g., merchandise stickers and terms-of-service boilerplate—are doubly insufficient. Incidental contacts cannot substitute for purposeful, claim-related California direction. Nor does the State support its assertion that CTRLPew "monetizes" the downloadable files themselves; stickers, donations, and affiliate links require an inferential leap the State never ties to the code-distribution claims. That attenuated theory is unlike *Snowney v. Harrah's Entertainment, Inc.* (2005) 35 Cal.4th 1054, 1063–70, where claims arose from California-directed advertising and reservation transactions, or *Mavrix*, where the site advertised to and profited from a California audience, 647 F.3d at 1230–31. It also fails under *Bristol-Myers*, *Young*, *Pavlovich*, *Shrader*, *Burdick*, and *ALS Scan, Inc. v. Digital Service Consultants, Inc.* (4th Cir. 2002) 293 F.3d 707, which require forum-directed, claim-related conduct, and falls far short of *Briskin* (millions of California transactions) or *Stokinger* (thousands of forum transactions).

The State adds that the Gatalog Rocket Chat hosts a channel labeled #gen.california, as well as other channels. (Opp. at 12:16–15:19, 25:14–21; Baron Decl. ¶ 5, Exs. B–C; *see also* Baron Decl. ¶¶ 7–10, Exs. D–K.)[10] A chat-platform topic label is no more targeting of California than a subreddit titled "r/California" reflects targeting by Reddit. Even if Rocket Chat is interactive in the colloquial sense, the State shows no forum-directed commercial exchange or Defendant interaction with California residents of the kind *Pavlovich* requires. 29 Cal.4th at 274–75. The California-channel screenshots show, at most, stale third-party discussion, not Defendant-authored solicitation. (Baron Decl. ¶ 5, Exs. B–C.) The alleged Defendant-linked excerpts are ***not substantive*** and appear only on non-California channels, dating from 2021 or 2024. (*Id.* ¶¶ 7–10,

---

[9] *See* Defs' Evid. Objs.
[10] *See* Defs' Evid. Objs.

- 16 -

4923-6456-2346

SNELL & WILMER

Exs. D–K.) Nothing shows any individual Defendant posting in #gen.california. (*Id.* Ex. B.) Nothing shows any Defendant soliciting California downloads or encouraging California transactions **anywhere** on the websites. (*Id.* Exs. B–K.) Baron identifies no California user, no Defendant-authored California content, and no California-directed solicitation. (*Ibid.*)

**E.    The MAF Corp. Parts-Kit Shipment to a State Agent Is Not Defendants' California Contact**

The State argues that Holladay and Larosiere targeted California by promoting MAF Corp. firearm parts, asserting MAF is controlled by them, and citing an undercover purchase shipped to Fresno. (Opp. at 17:5–18:18, 25:22–26:9.) That theory fails at the threshold: MAF Corp. is a separate legal entity, is not a defendant, and allegedly sold physical merchandise unrelated to the digital-code distribution claims under Civil Code sections 3273.61 and 3273.625. Its commerce cannot be imputed to Holladay, Larosiere, CTRLPew, Gatalog Foundation, or Elik to manufacture personal jurisdiction, because each Defendant's forum contacts must be assessed individually. Another party's purposes or acts—even those of an alleged affiliate or co-participant—cannot establish jurisdiction over a different defendant. *Burdick*, 233 Cal.App.4th at 24–25. In addition, the only alleged California shipment was manufactured by the State's investigator. (*See* Galpin Decl.) *Walden* forbids treating that unilateral conduct as Defendants' contact. 571 U.S. at 284–85.

The State's broader shipping theory does not change the analysis. An out-of-state vendor's passive acceptance of a California order is not purposeful direction absent evidence the vendor expressly reached into California for the business. *Shisler v. Sanfer Sports Cars, Inc.* (2006) 146 Cal.App.4th 1254, 1259–62. Nor can the State repackage MAF-related revenue as a *Briskin*-style commercial relationship. Any alleged benefit is attenuated from the statutory code-distribution claims, not tied to California-directed solicitation, and nowhere near the millions of forum transactions, consumer-data collection, or California merchant relationships that supported jurisdiction there. *Briskin*, 135 F.4th at 746–60. At most, the MAF evidence shows passive order acceptance by a non-party for merchandise unrelated to the statutes at issue—not a Defendant-created contact tied to alleged distribution of digital code and not a contact that can be borrowed from MAF to hale these Defendants into California.

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

**F.      Use of California Third-Party Vendors and Content Delivery Network ("CDN") Servers Is Not Purposeful Availment**

Most of the Kantor Declaration observes that Defendants' websites use widely available technology services from companies headquartered in California (Cloudflare, GitLab, Automattic/WooCommerce, CDN77). (Kantor Decl. ¶¶ 4–18.) From these facts, the State asks the Court to draw three inferences: (1) that Defendants deliberately chose California infrastructure; (2) that Defendants consented to California jurisdiction by accepting vendor terms; and (3) that California-located CDN servers are themselves Defendants' California contacts. (Opp. at 18:19–21:2.) None of these inferences is sound.

*First*, using Cloudflare, GitLab, Automattic, or CDN77 no more constitutes purposeful availment of California than using Microsoft Office constitutes purposeful availment of Washington. These are global platforms; their California incorporation is incidental. Courts routinely reject such arguments. *See AMA Multimedia, LLC v. Wanat* (9th Cir. 2020) 970 F.3d 1201, 1210–12 (use of U.S.-based CDN insufficient), *overruled on other grounds by Briskin*, 135 F.4th 739; *Brophy v. Almanzar* (C.D. Cal. 2018) 359 F.Supp.3d 917, 925 (use of California-headquartered internet services insufficient). Under the State's theory, any website using California-based services like Cloudflare would be subject to California jurisdiction. No authority supports this position.

*Second*, the State's suggestion that Defendants likely consented to California jurisdiction through vendors' terms of use is speculation. (Opp. at 19:17–19.) Kantor did not review any contract between any Defendant and these vendors. (Kantor Decl. ¶¶ 4–11.) In any event, whether a forum-selection clause has been agreed to is irrelevant to whether Defendants purposefully availed themselves of California in relation to the claims here. *AMA Multimedia*, 970 F.3d at 1212.

*Third*, a third-party CDN's data-center location is not a Defendant-created California contact. Cloudflare's Los Angeles point of presence serves any Cloudflare-routed traffic from a Los Angeles user, regardless of who runs the destination website. (Kantor Decl. ¶¶ 7–8, Exs. F, G.) Cloudflare's California servers reveal nothing about Defendants' purposeful direction. *AMA Multimedia*, 970 F.3d at 1210–12; *Brophy*, 359 F.Supp.3d at 925. *Carbone v. Kaal* (6th Cir. 2025)

- 18 -

SNELL
& WILMER

140 F.4th 805, is directly on point: hosting content on forum-state servers does not establish purposeful availment where the defendant did not direct tortious activity toward the forum. *Id.* at 812–14. Using a California Internet vendor does not create a California contact.

The Cloudflare Radar university-DNS data fares no better. The State argues that Radar shows seven California university networks sent traffic to thegatalog.com. (Opp. at 20:22–21:2; Kantor Decl. ¶¶ 14–18, Exs. N–P.) But even crediting Kantor's interpretation,[11] DNS queries do not equal page views, much less downloads by California residents; they can originate from web crawlers, security scans, or bots. This is passive accessibility, which *Pavlovich* held insufficient. 29 Cal.4th at 273–78; *see Snowney*, 35 Cal.4th at 1063. The State infers targeting from the fact that California networks may reach global content, not from any Defendant-created California contact.

The Odysee evidence underscores the absence of California targeting or jurisdictionally meaningful interactivity. The profiles contain no geographic filtering, state-specific listings, California-directed solicitations, or file sales supporting an inference of California commercial benefit. (Holladay Decl. ¶¶ 17–18, 29, 35.) The State's own formulation—that files are "available for download by anyone in California, without limitation"—rests on nonblocking and passive accessibility, not affirmative forum-directed conduct. (Opp. at 16:1.) A free download button on a third-party platform is not the kind of knowing, repeated contractual transmission to forum residents that courts have treated as jurisdictionally significant. *See, e.g.*, *Pavlovich*, 29 Cal.4th at 274; *ALS Scan*, 293 F.3d at 714. The single "CAG19" label—the only arguable California reference across ten Odysee profiles containing over 130 designs—does not convert a globally accessible third-party platform into a California-targeted operation. If open access plus a predicted California audience sufficed, *Walden* would have left the foreseeable-effects test intact. It did not.

**G.    The State's Other-Litigation Evidence Does Not Establish Jurisdiction and Is Inadmissible**

The State relies on the Roberts Declaration's collection of materials from other litigation to suggest common control over TheGatalog.com, Odysee profiles, and the Gatalog Rocket Chat.

---

[11] The data is inadmissible hearsay. *See* Defs' Evid. Objs.

- 19 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

(Opp. at 11:9–15:19; Roberts Decl. ¶¶ 2–15.) Defendants' evidentiary objections address the admissibility problems. More importantly, even credited, those materials do not establish California-directed conduct. The materials show, at most, alleged affiliations, aliases, and administrative roles—not California-specific features, solicitation, transactions, uploads, or Defendant-authored California content. It remains that none of the websites referenced in the State's evidence is directed at California in any way. The lone (ostensible) California reference— the CAG19 label—has no Defendant connection. As explained above, Defendants did not create that file or its description on Odysee, and a single Odysee label cannot convert separate and otherwise global websites into California-directed operations.

Nor do the cited materials contradict Defendants' declarations. Holladay described TheGatalog.com as an index linking to accounts owned by others, which aligns with his testimony that neither he nor CTRLPew owns or controls the Odysee profiles. (Roberts Decl. Ex. C, ¶ 5; Holladay Decl. ¶¶ 17–18.) Larosiere's DMCA counternotice concerned intellectual-property representation, not operational control. (Roberts Decl., Ex. E; Larosiere Decl. ¶¶ 4, 6, 20–24.) Elik's qualified interrogatory responses about administrative roles do not show he authored the "CAG19" file or directed any California contact. (Elik Decl. ¶¶ 10, 12; *cf.* Opp. at 14:25–15:18.)

The State's best circumstantial point—that all nine Gatalog Odysee accounts allegedly used "ivanthetroll@protonmail.com"—also fails. At most, it suggests shared historical credentials for profiles on a third-party platform; it does not prove who currently operates the accounts, who controls what is posted now, or whether any Defendant directed any account activity at California. Elik had credentials in 2019 for a Deterrence Dispensed profile on Spee.ch; Spee.ch became LBRY; and LBRY became Odysee, with the profile and content transferring automatically. (Elik Decl. ¶¶ 15–17.) Migrated credentials do not establish present operational control, much less California targeting. Elik has not posted files or content to the Gatalog Odysee profiles since about June 2025—months before this action was filed and before subdivision (f) took effect. (Elik Decl. ¶ 19.)

The State's fundamental error remains conflating affiliation with California targeting. Even if the Roberts materials showed some general affiliation with "the Gatalog," the State still fails to identify a single California-directed act by any Defendant or even "Gatalog" generally. Under

- 20 -

SNELL
&WILMER

*Walden*, that is the only jurisdictional fact that matters. 571 U.S. at 284–85.

**III.    THE STATE'S CLAIMS DO NOT ARISE OUT OF OR RELATE TO ANY DEFENDANT-CREATED CALIFORNIA CONTACT**

Even assuming purposeful direction (which is absent), the State's claims still fail the relatedness prong because there is no Defendant-created statutory violation tied to California. *See Bristol-Myers*, 582 U.S. at 262. Defendants plainly dispute that any Defendant distributed digital firearm code into California. (*See, e.g.*, Gatalog Defs.' Mot. at 9:25–12:7, 15:21–20:18; Elik Mot. at 9:17–11:20, 17:11–21:14; CTRLPew Defs.' Mot. at 9:17–11:19, 15:10–21:4.) Civil Code section 3273.61 requires distribution "to any other person in this state" who is not exempt, and the State identifies no such non-exempt California recipient. Likewise, section 3273.625 requires identifiable in-state manufacture. The State's only concrete downloads and build are its own investigation.

That omission defeats relatedness. Hyperlinks and the State's own downloads do not create a claim that arises out of a "distribution" by Defendants to a non-exempt California person. Nor can the foreseeable effect of later, hypothetical California access supply the required affiliation between the forum and this case. *Walden*, 571 U.S. at 283 n.6; *Bristol-Myers*, 582 U.S. at 262.

**A.    Civil Code Section 3273.61 Cannot Expand California's Reach**

Civil Code section 3273.61 cannot substitute for California's long-arm statute or circumvent the limitations of the Due Process Clause. *See Daimler AG v. Bauman* (2014) 571 U.S. 117, 125. The statute provides, in relevant part:

> (a) A civil action may be brought against *a person* who knowingly does either of the following:
>
> (1) *Distributes or causes to be distributed*, by any means including the internet, any digital firearm manufacturing code *to any other person in this state* who is not a federally licensed firearms manufacturer, . . . or any law enforcement agency or forensic laboratory.

Civ. Code § 3273.61(a)(1) (emphasis added).

The statute regulates only distribution "to any other person in this state," not all online conduct that might be accessed from California. Civ. Code § 3273.61(a)(1). The Legislature recognized the constitutional boundary. For example, the Senate Judiciary Committee analysis

- 21 -
DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL & WILMER

acknowledged that AB 1263 "may implicate the extraterritoriality doctrine . . . ." Sen. Com. on Judiciary, Rep. on Assem. Bill No. 1263 (2025–2026 Reg. Sess.) at p. 21. That acknowledgment reinforces the plain textual limits.

Two textual features of the law foreclose the State's theory. **First**, the statute requires a directed distribution by a California distributor to a specific, non-exempt California recipient. **Second**, the present-tense verbs "distributes or causes to be distributed" require an affirmative distribution act, not mere continued availability of older files on a third-party platform from before the statute's effective date.

***The Geographic Limit.*** The statute does not prohibit making files "available to the public" or posting material accessible from California; it prohibits distribution "to any other person in this state" who is not exempt. Civ. Code § 3273.61(a)(1). The word "other" presupposes a first "person" to whom the "other person" is compared, indicating a transaction between two California persons. If the Legislature meant to reach any distributor anywhere, it would have written "to any person in this state," not "to any ***other*** person in this state." *See People v. Valencia* (2017) 3 Cal.5th 347, 357 (courts must give statutory words their "usual and ordinary meaning"). The transitive grammar also requires a specific California recipient. Reading the statute to cover passive global postings would erase the geographic limit and invite Due Process and Dormant Commerce Clause concerns. *See Pavlovich*, 29 Cal.4th at 275; *Bristol-Myers*, 582 U.S. at 262–66.

***The Temporal Limit.*** The present-tense formulation—"distributes or causes to be distributed"—also requires an affirmative act of distribution.[12] This language describes a transitive act where an actor hands something over. Static availability, legacy uploads, or passive hyperlinks are not new distributions to a non-exempt California person. Nor does section 3273.61 contain retroactivity language. Civ. Code § 3 ("No part of [the Civil Code] is retroactive, unless expressly so declared."); *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 475–77. The files at issue were posted as early as 2019 and 2021—years before the statute took effect in 2024— and remain static on Odysee. The State has not alleged any post-enactment, Defendant-directed

---

[12] To "distribute" is "to divide among several or many" or "to give out or deliver especially to members of a group." *Distribute*, MERRIAM-WEBSTER DICT. (2026).

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

distribution to a non-exempt California recipient.

**B.**      **The Rebuttable Presumption Under Section 3273.61(f) Cannot Supply Jurisdiction the Due Process Clause Forbids**

Subdivision (f), added by AB 1263 effective January 1, 2026, creates a rebuttable presumption of "knowing" distribution when a person owns or participates in managing an online platform that makes digital firearm manufacturing code available to individuals in California and, under the totality of the circumstances, encourages uploading, dissemination, or use of that code. Civ. Code § 3273.61(f).

The State does not quote subdivision (f), but relies on the same predicates throughout: alleged website and chat-room management, file availability to anyone in California, and purported encouragement through tutorials, beta-review processes, and slogans such as "Print Every Weapon" and "Become Ungovernable." (Opp. at 7–8, 11–17, 22–30.) The State then treats those merits predicates as jurisdictional contacts. That move fails. A rebuttable merits presumption cannot supply the Defendant-created California contact due process requires, revive the foreseeable-effects theory *Walden* rejected, or convert passive global availability and generalized encouragement into purposeful direction. *Walden*, 571 U.S. at 284–85; *Axiom Foods*, 874 F.3d at 1070. Because subdivision (f) is triggered by expressive activity,[13] the State cannot presume intent to state a claim and then use that same presumption as the California-directed contact.

The digital code at issue is protected speech, not commercial speech. It is undisputed that the code is made available without charge. (Holladay Decl. ¶ 7; Elik Decl. ¶¶ 15–18; Larosiere Decl. ¶¶ 20–24.) Commercial speech is "speech which does no more than propose a commercial transaction." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.* (1976) 425 U.S. 748, 762. The digital code proposes no transaction; it communicates information. *See*

---

[13] The line between "speech" and "conduct" is notoriously difficult to draw. The First Amendment protects conduct "sufficiently imbued with elements of communication." *Spence v. Washington* (1974) 418 U.S. 405, 409. Whether government regulation is permissible depends on whether the restriction is "related to the suppression of free expression." *United States v. O'Brien* (1968) 391 U.S. 367, 377. The doctrine yields unstable results: burning a draft card is regulable, *id.* at 376, while burning a flag is protected, *Texas v. Johnson* (1989) 491 U.S. 397, 406. A regulation targeting both distribution and encouragement straddles that line.

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

*Janus v. Freeman* (N.D. Tex. 2023) 651 F.Supp.3d 928, 942–45. References to unconnected merchandise sales do not transform code into commercial speech, and those products fall outside both predicate statutes. *See Cornelison v. Chaney* (1976) 16 Cal.3d 143, 148–49.

Subdivision (f)'s "encouragement" element must be understood against that First Amendment backdrop. The State's implied theory treats website management, tutorials, links, and commentary as enough to infer the intent or knowledge required for liability. But even "encouragement" of lawlessness is not unprotected incitement absent intent and imminence. *Brandenburg v. Ohio* (1969) 395 U.S. 444, 447; *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 927–28. If "encouragement" were read without that intent requirement, subdivision (f) would impose a content-based presumption based on protected speech. *See Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 255; *Smith v. California* (1959) 361 U.S. 147, 152–54.

The same defect defeats jurisdiction. Due process requires each Defendant's purposeful forum conduct, not a statutory assumption that expression accessible in California was aimed there. *Walden*, 571 U.S. at 284–85. At most, subdivision (f) presumes "knowing" distribution from website management, availability, and encouragement; it cannot also presume California targeting from those same facts. A statute cannot create jurisdictional contacts by fiat.

### C.   Section 3273.625 Reaches Only In-State, Identifiable Manufacture

Section 3273.625 has the same flaw. It requires "knowingly, willfully, or recklessly" causing, aiding, abetting, promoting, or facilitating "the unlawful manufacture of firearms" by "another person." Civ. Code § 3273.625(a). The statute thus requires a concrete principal and actual unlawful manufacture, not the abstract possibility that an unidentified Californian might later misuse globally available information. The State identifies no unlicensed California person whose unlawful manufacture was caused or aided by any Defendant. Its law-enforcement build does not show that Defendants caused "another person" to manufacture unlawfully in California. For relatedness, the required forum contact must be Defendants' connection to in-state unlawful manufacture, not the State's unilateral test build or speculation about downstream users.

- 24 -

DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL
&WILMER

## IV.   EXERCISING JURISDICTION WOULD VIOLATE FAIR PLAY AND SUBSTANTIAL JUSTICE

Even if the State's threshold showing were adequate, exercising jurisdiction over these Florida and Illinois Defendants would offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington* (1945) 326 U.S. 310, 316. The Due Process Clause "act[s] as an instrument of interstate federalism." *Bristol-Myers*, 582 U.S. at 263. Permitting any state to assert jurisdiction over any out-of-state speaker whose globally accessible content allegedly violates state law would obliterate the federalism principles that due process protects.

The State argues that California's special-regulation interest in ghost-gun proliferation tips the reasonableness balance. (Opp. at 30:21–33:27.) But *Pavlovich* held that even where a state has such an interest, the defendant's conduct must still be expressly aimed at California. 29 Cal.4th at 272–73 & n.3. The special-regulation doctrine is a factor in reasonableness analysis, not a substitute for express aiming. *Compare Burdick*, 233 Cal.App.4th at 25 (no express aiming based on public social media post with no California focus), *with Hogue v. Hogue* (2017) 16 Cal.App.5th 833, 838–39 (express aiming where defendant sent threatening video to specific California recipient), *and Zehia v. Superior Court* (2020) 45 Cal.App.5th 543, 556 (similar).

If California could bootstrap jurisdiction merely by passing a statute and labeling its subject matter "special," every state could do the same. The result would be the reciprocal encroachment the Court warned against in *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 293–94. California's policy interests, however weighty, cannot overcome the structural limits on judicial power the Due Process Clause imposes. *Bristol-Myers*, 582 U.S. at 263.

## V.   THE COURT SHOULD DENY JURISDICTIONAL DISCOVERY

The State closes by requesting jurisdictional discovery into Defendants' decision-making authority and control over Odysee profiles, knowledge of content posted by California developers, website views and downloads in California, sales into California, donations from California, corporate records, and use of California-based internet infrastructure. (Opp. at 33:4–34:18.) This is telling: the State cannot identify a single Defendant-created California contact and proposes a fishing expedition to find one.

- 25 -

4923-6456-2346

California law does not permit jurisdictional discovery on this record. A plaintiff must "demonstrate that discovery is likely to lead to the production of evidence of facts establishing jurisdiction," and a request fails where discovery cannot cure the jurisdictional defect. *In re Automobile Antitrust Cases I & II* (2005) 135 Cal.App.4th 100, 127. Odysee's forum-accessible platform activity is not Defendants' contact. *Safieddine*, 103 Cal.App.5th at 1103–04, 1109.

Discovery into website analytics, Odysee management, or download statistics would show only global accessibility and downloadable files. Mere passive accessibility is insufficient. *Pavlovich*, 29 Cal.4th at 273–78. Defendants do not manage or control the Odysee profiles, and the profiles are not aimed at California. (*See* Sections II–III, *supra*.) Discovery into California-based vendor relationships would show, at most, irrelevant use of California-based vendors. *See AMA Multimedia*, 970 F.3d at 1210–12; *Safieddine*, 103 Cal.App.5th at 1103–04, 1109. Defendants do not sell the digital code at issue (Larosiere Decl. ¶¶ 11, 17–20; Holladay Decl. ¶¶ 7, 10, 23, 30, 34); corporate records would reveal, at best, unrelated CTRLPew revenue.

No discoverable fact can transform general Internet availability into purposeful direction or transform a State agent's investigative downloads into Defendants' California contacts. No discoverable fact can rewrite the geographic limits of section 3273.61(a)(1). The State seeks a prosecutorial fishing expedition. The Court should deny the request. *ALS Scan*, 293 F.3d at 716.

## VI.   **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' Motions to Quash Service of Summons for Lack of Personal Jurisdiction.

Dated: May 20, 2026                                   SNELL & WILMER L.L.P.

By: _Cameron Schlagel_
Colin R. Higgins
Cameron J. Schlagel
Susan G. Biscardi
*Attorneys for Specially Appearing Defendants*

- 26 -
DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 600 Anton Boulevard, Costa Mesa, California 92626-7689.

On May 20, 2026, I served, in the manner indicated below, the foregoing document described as the **SPECIALLY APPEARING DEFENDANTS' OMNIBUS REPLY IN SUPPORT OF MOTIONS TO QUASH SERVICE OF SUMMONS FOR LACK OF PERSONAL JURSIDICTION** on the interested parties addressed as follows:

⊔　　BY REGULAR MAIL: I caused such envelopes to be deposited in the United States mail with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the United States Postal Service each day and that practice was followed in the ordinary course of business for the service herein attested to (C.C.P. § 1013(a)).

⊔　　BY FACSIMILE: (C.C.P. § 1013(e)(f)).

⊔　　BY FEDERAL EXPRESS: I caused such envelopes to be delivered by air courier, with next day service, to the offices of the addressees. (C.C.P. § 1013(c)(d)).

⊔　　BY PERSONAL SERVICE: I caused such envelopes to be delivered by hand to the offices of the addressees. (C.C.P. § 1011(a)(b)).

☒　　BY ELECTRONIC MAIL: I served a true and correct copy by electronic transmission through this Court's File & Serve Xpress system. Participants who are registered with File & Serve Xpress will be served electronically.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on May 20, 2026, at Costa Mesa, California.

_____
Jocelyne Poveda
Jocelyne Poveda

- 27 -
DEFENDANTS' REPLY ISO MOTIONS TO QUASH

4923-6456-2346

SNELL
& WILMER